UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------x

MARCATO LP, AND MARCATO INTERNATIONAL MASTER FUND, LTD.

Plaintiffs,

v.

SIGNET JEWELERS LIMITED, MICHAEL BARNES, RONALD RISTAU, MARK LIGHT, VIRGINIA DROSOS, and MICHELE SANTANA,

Defendants.

--------------------------------------------------------------------x

No.

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND THE COMMON LAW**

JURY TRIAL DEMANDED

Plaintiffs Marcato LP and Marcato International Master Fund, Ltd. (on its own behalf and as transferee) (together, the "Marcato Funds" or "Plaintiffs")[1] are investment funds that purchased the common stock of Defendant Signet Jewelers Limited ("Signet" or the "Company").  Plaintiffs, through their undersigned attorneys, by way of this Complaint and Jury Demand, sue Signet and certain of its former executives, Michael Barnes (Signet's former Chief Executive Officer ("CEO")), Ronald Ristau (Signet's former Chief Financial Officer ("CFO")), Mark Light (also Signet's former CEO), and current executives, Virginia Drosos (Signet's CEO), and Michele Santana (Signet's CFO) (collectively, the "Executive Defendants" and with Signet, "Defendants").  Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief as to allegations concerning matters other than itself and its own acts is based upon the investigation conducted by and through counsel, which included, among other things, the review and analysis of:  (i) the Fifth Amended Class Action Complaint for Violations of the Federal Securities Laws filed in *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.) (the "Class Action Complaint"); (ii) the Decision and Order

---

[1] The Marcato Funds are managed by a common manager, Marcato Capital Management LP ("Marcato"), located in San Francisco, California.

Denying Defendants' Motion to Dismiss the Fifth Amended Class Action Complaint in *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.) (the "Motion to Dismiss Opinion"); (iii) the Decision and Order Denying Defendants' Motion for Judgment on the Pleadings in *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.); (iv) other filings in *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.) (the matter being referred to generally as the "Class Action"); (v) transcripts, press releases, news articles, and other public statements issued by or concerning Signet and the Executive Defendants; (vi) research reports issued by financial analysts concerning the Company; (vii) reports and other documents filed publicly by Signet with the U.S. Securities and Exchange Commission ("SEC"); (viii) Signet's corporate website; and (ix) other publicly available information. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiffs bring this action under the federal securities laws and under the common law to recover the investment losses they suffered as a result of false and misleading statements that Signet and its executives made to induce Plaintiffs to purchase the common stock of Signet. Defendants' misrepresentations to Plaintiffs caused Plaintiffs to suffer significant investment losses when the truth was gradually, but only partially, revealed and the price of Signet's common stock fell as a result.

2.      Before and during the Relevant Period[2] to this action, Signet was engaged in two distinct lines of fraudulent conduct.

3.      First, Defendants qualitatively misrepresented the health and careful management of Signet's credit portfolio. Signet also misrepresented the quantitative aspect of its credit portfolio, using the recency method for aging accounts to materially understate Signet's loan reserves, and thereby overstate earnings. Critically, even as the market began to learn of

---

[2] The "Relevant Period" referred to herein is August 28, 2014, to March 16, 2017, with the Relevant Period of Plaintiffs' purchases starting from June 9, 2016.

problems with Signet's credit portfolio, Signet doubled-down, reassuring the market that its credit portfolio was sound and reassuring investors – like Marcato – that Signet's prior statements had been accurate.  Those reassurances were false.  Second, Defendants concealed Signet's pervasive culture of sexual harassment – and the business impact that revelation of that culture would have – from investors.  Specifically, Signet concealed its culture of sexual harassment and the nature of a class action lawsuit it faced regarding that culture.  When this was revealed to the market in 2017, Signet's stock price tumbled as investors began to appreciate the impact such horrific facts would have on a retail jewelry company.  Plaintiffs exited their Signet position soon thereafter.

## Signet's Credit Portfolio Fraud

4.      Signet touted its credit portfolio as "strong;" "very strong;" "very healthy;" "robust;" "very stringently controlled;" "very stringently managed;" "conservatively managed;" "highly disciplined;" with "qualified customers;" and with "effective" and "consistent" underwriting that "minimized risk."   This was false or misleading.   Signet also painted a misleading picture for investors in discussing its loan reserves.  Signet knew (or should have known) that Signet's reserves did not account for losses that it was likely to incur and that its reserve figures provided a misleading picture of its credit portfolio and underwriting practices.

5.      Signet is the world's largest specialty jewelry retailer with retail brands that include Jared, Kay Jewelers, and Zales.  Through an in-house consumer credit program, Signet extended credit to its customers for their jewelry purchases.  As detailed herein, Defendants held Signet out to the investing public as a "prudent" lender that made high-quality loans according to "stringent" credit criteria.  Unbeknownst to Plaintiffs, Signet was actually a reckless subprime lender that had systematically built a massive portfolio of high-risk consumer loans.  As the truth about Signet's credit portfolio began to be revealed to the market, the price of Signet's stock fell.

6.      Signet's consumer credit operation was of vital importance to the Company and its investors.

7.      During the Relevant Period, Signet's loan portfolio grew to approximately $1.7 billion and was the second largest asset on the Company's balance sheet.  Defendants stated that the loan portfolio was critical to Signet's business because it increased sales, built customer loyalty, and incentivized repeat purchases.  On numerous occasions during the Relevant Period, Defendants emphasized that Signet's lending operation was a "competitive advantage" that boosted Signet's financial performance and distinguished the Company from its peers.

8.      Given the significance of Signet's lending operation, Defendants repeatedly assured investors that they paid close attention to the Company's underwriting and the credit quality of the portfolio.  Signet would often discuss its in-house consumer credit program on investor calls.  For instance, Defendant Michael Barnes, Signet's former CEO, stated that the credit portfolio was "a big important part of our business and one that we don't take lightly. We watch it very closely and we use it to really help drive the core of our business."  Defendant Ronald Ristau, Signet's former CFO, further stated that "we ... fully understand the credit risk and profitability of our decisions."

9.      Prior to and during the Relevant Period, Defendants significantly expanded the loan portfolio, thereby fueling substantial sales growth for Signet.  Defendants repeatedly assured investors that this sales growth was being undertaken in a safe and responsible way. Based on their close familiarity with the lending operation, Defendants represented that the Company's underwriting was strict, and the credit quality of its loan portfolio was very strong.

10.      Bolstering these representations, in Signet's financial statements, Defendants consistently reported small loan loss reserves for the portfolio, which signaled to investors that the portfolio was, in fact, healthy and stable.  As alleged herein, these low reserve levels were enabled by Defendants' use of "recency" accounting – a controversial and disfavored form of counting delinquent loans under which a loan may be considered current even if the borrower does not make the contractually required payments.  Signet used the recency method to obscure the quality of, and mask the true losses embedded in, its credit portfolio.

11.     Due to Defendants' expansion of the credit portfolio and Signet's resulting sales growth, Defendants consistently reported favorable financial results. Indeed, Signet met or exceeded analysts' earnings estimates – often by just a hair – for much of the Relevant Period. Defendants lauded the Company as "a prudent, measured and profitable growth story."

12.     Based on Defendants' statements and the Company's ostensibly stellar financial results, analysts repeatedly issued buy recommendations for Signet stock, reporting that "credit [is] a competitive advantage for Signet," and that the portfolio was "stable and healthy" and "high-quality."

13.     However, during the fall of 2015, after Signet surprisingly reported disappointing financial results, certain analysts and investors began questioning whether Signet had been generating significant amounts of risky loans in an effort to drive its sales to an unsustainable degree.  They also criticized Signet's use of the recency method, and questioned whether it was obscuring the true credit quality of the loan book.

14.     In response to these concerns, Defendants "doubled down" on their prior assurances.  Defendants vehemently denied that the concerns were legitimate, with the Company's Vice President of Investor Relations dismissing them as "bullying" from a few investors and assuring the market that Signet was "one of the great retail businesses of our time."

15.     Likewise, the Company's then-CEO, Defendant Mark Light, and current CFO, Defendant Michele Santana, mounted a staunch public defense of Signet's lending operation. They repeatedly assured investors that the Company's credit quality remained strong, that its underwriting remained conservative, and that the "extremely profitable" loan book remained a "competitive advantage."   In a nutshell, Defendant Light stated that the "concerns about our credit portfolio" were "unwarranted, quite frankly."

16.     This was all false (or at least grossly misleading).   Contrary to Defendants' statements, Signet's loan portfolio was rife with toxic credits that posed a material risk to the Company.   Unbeknownst to investors, approximately 45% of Signet's loan portfolio consisted of subprime loans.

17.     In May of 2016, Defendants announced that the Board had authorized "a strategic evaluation of the Company's credit portfolio," and had hired a third party, Goldman Sachs, to run the review.  Defendants acknowledged that they were considering a sale of the portfolio and a complete outsourcing of the credit operation.

18.     Critically, Defendants did not reveal the truth of their credit portfolio quality issues, and instead continued to reassure the market.  At the same time that the Company announced the strategic review, Defendants also continued to defend the credit quality and performance of the credit portfolio, making a number of statements designed to assuage any investor concern created by the announcement.  For example, on the May 26 earnings call, Defendant Light stated that "our credit metrics in our credit portfolio are strong" and "are improving sequentially. ... So, our credit metrics are strong."  He added that, a "point I want you to take away is that we remain a growth story; a prudent, measured and profitable growth story."

19.     During this period, Signet repeatedly reassured investors as to its credit portfolio – telling them the Company would "keep you up to speed," that changes in Signet's net bad debt provision were *not* from credit deterioration, and, ultimately, that Signet was still performing solid underwriting, with a strong credit portfolio.  These reassurances and explanations were false.

20.     Because Signet was continuing to obfuscate and hide its poor credit quality, Signet also did not tell the market that the poor quality of its credit portfolio would necessitate a tightening of underwriting standards, resulting in decreased sales and thereby materializing the risk of the poor quality credit portfolio.

21.     The Marcato Funds purchased tens of millions of dollars of Signet stock starting on June 6, 2016.  Events subsequent to those purchases confirmed that Signet had been engaging in a credit quality charade for years.

22.     On August 25, 2016, the risk of the poor quality credit portfolio materialized as Signet announced disappointing results for the second fiscal quarter 2017 (tied to credit quality issues, including underwriting standards).  Specifically, Signet announced that its same store

sales had decreased 2.3%, and its total sales had declined 2.6%.  It also reported adjusted earnings of $1.14 per share, far below consensus estimates.  Signet further lowered its fiscal 2017 same-store growth guidance from 2-3.5% growth, to negative 2.5-1.0%.  The Company also announced worsening credit metrics.  It reported that net bad debt expense rose 12% from the prior year, total loan loss reserves increased 12% from the prior quarter, and non-performing loans as a percentage of gross receivables increased more than 22%.  In response to the Company's August 25 announcements, Signet's stock price plummeted on heavy volume.  On August 25, 2016, the Company's stock price fell from the prior day's close of $95.50, to a closing price of $83.44 – a decline of nearly 13% – on volume of nearly 11 million shares.

23.    The Marcato Funds lost millions of dollars on this date alone attributable to the revelation of Signet's fraudulent conduct.

24.    Post-Relevant Period events confirming the falsity of Signet's prior representations include:  Signet's eventual revelations that its sales had been dramatically impacted by its credit tightening (despite it supposedly having "conservative" standards all along); that its credit portfolio was worth nowhere near what Signet was carrying it for; that the Consumer Financial Protection Bureau ("CFPB") was investigating the Company; and that the New York Attorney General was investigating the Company.

**Fraud Regarding Signet's Culture of Sexual Harassment**

25.    While Signet was falsely reassuring investors about its credit portfolio, it was also harboring a far uglier secret.  Signet misrepresented and omitted both an ongoing litigation involving thousands of female Signet employees, hiding pervasive allegations of sexual harassment, and the Company's *actual* culture of sexual harassment, which materialized in a February 2017 article that caused significant damage to investors.  The risk was material and it was obvious:  as a retail jewelry company, Signet's customers would be particularly disturbed by the horrific allegations in the existing litigation and might well "walk on by" Signet stores if they knew of the Company's unchecked and pervasive culture of sexual harassment.

26.     In 2008, Signet was sued by a class of female employees alleging gender discrimination in pay and promotion decisions.  Pursuant to the arbitration agreements Signet required its employees to sign, the matter was referred to arbitration and kept confidential. Signet repeatedly minimized the matter in its disclosures, assuring investors that the matter concerned Signet's "store-level" practices at a "few" stores, asserting that these limited practices were allegedly "discriminatory as to compensation and promotional activities," and stating that the Company had investigated the allegations and found them to be unsubstantiated.  At the same time, Signet further assured investors that it adhered to the highest level of ethics in conducting its business.  Signet repeatedly stated that it made employment decisions "solely" on merit, and was "committed to a workplace that is free from sexual . . . or other unlawful harassment . . . . Abusive, harassing or other offensive conduct is unacceptable . . . ."

27.     Prior to the beginning of the Relevant Period, and contrary to its statements, Signet had been provided at least 250 sworn declarations from at least 200 employees detailing widespread and pervasive instances of sexual harassment by senior Signet employees.  Contrary to Defendants' statements that the arbitration concerned only limited, unsubstantiated "store-level practices . . . as to compensation and promotional activities," the evidence in front of Signet showed a consistent and pervasive culture of severe sexual harassment.  Further, the evidence showed that the harassment was conducted by the Company's senior executives, including Defendant Light.  Scores of declarations detailed, among other things, routine instances of sexual harassment of female subordinates by male superiors – including high-level executives – at Signet's annual Managers' Meetings, as well as regular instances of female employees being pressured into sexual activity with their male superiors in order to obtain promotions and other economic advances, or even to just keep their jobs and livelihoods.  As one former Signet employee stated in her declaration, "[s]exual harassment regularly occurred in Sterling [a Signet brand].  The Company's top level executives fostered this behavior and this culture of sexual discrimination at the Company because they actively participated in it."

28.     As Defendants knew, but concealed, the existence of this culture of sexual harassment posed a severe, and acute, risk to Signet's business and reputation.  This was because Signet's key product – diamond bridal jewelry – was targeted to female consumers.  The reputational damage that would occur for any company upon revelation of a culture of sexual harassment would be significant; but for Signet, it would be particularly severe because of its product lines and consumer segment focus.  Moreover, as Defendants repeatedly told investors, "trust" was essential to its sales model, because its product was an "emotional" one that was sold in face-to-face settings.  According to Signet, trust was the single most important factor impacting a consumer's decision to buy jewelry at Signet's stores. If the facts demonstrating the existence of pervasive sexual harassment at Signet became public, it would alienate the recipients of Signet's flagship products, seriously compromise the trust on which its sales model depended, and significantly damage the Company's business, reputation, and stock price.

29.     Thus, while publicly minimizing the allegations and facts in the arbitration, and touting its own ethical business conduct, Defendants strove to keep this explosive evidence hidden from public view.  Since at least 2015, the media had sought to access the declarations, which were kept confidential under arbitration rules.  Defendants resisted disclosure for years – successfully.

30.     As the Court in the Class Action summarized in its June 20, 2019 Order:

[Signet] falsely touted the company's merits-based corporate culture, its commitment to preventing sexual harassment and disciplining offenders, its providing employees with a means to safely and anonymously report misconduct without fear of reprisal, and that Signet's senior officers and directors specifically adhered to Signet's code of conduct in recognition that the company sought to conduct its business with honesty and integrity.

Those representations were made in Signet's code of conduct, a document that was incorporated by reference in Signet's SEC filings and posted on the company's website during the Class Period, including after *Jock*[, the sexual harassment suit,] was filed [in 2008].

As alleged . . .  those representations were false, because Signet, among other things: made certain employment decisions, not on merit, but on the basis of whether female subordinate employees acceded to the sexual demands of male supervisors; retaliated

against women who utilized the company's purported anonymous reporting mechanism; and tolerated, rather than disciplined, misconduct.

[Citations omitted throughout]

31.     As the Court overseeing the Class Action further summarized in its June 20th Order:  "Signet's code of conduct and ethics – again, reincorporated by reference in Signet's SEC filings and posted on Signet's website *after Jock* was filed – touted certain values and practices that constitute the *exact opposite* of what the company allegedly valued and practiced."

32.     And as the Court overseeing the Class Action summarized in its June 11th Order: "a reasonable investor – who otherwise would be concerned about how grave allegations concerning rampant sexual misconduct might affect her investment in Signet – took Defendants at their word."  Signet's "word" was not truthful.

33.     It was not until February 27, 2017, when the declarations regarding sexual harassment were finally made public – albeit still with "company-approved" redactions – that investors learned the truth about sexual harassment at Signet.  That evening, after the close of market, *The Washington Post* published a blockbuster article entitled "Hundreds allege sex harassment, discrimination at Kay and Jared jewelry company."  The article detailed Signet's pervasive culture of sexual harassment, reaching all the way up to the highest levels of the Company, and quoted and summarized many of the declarations evidencing that fact.

34.     Investors were shocked, and they fled the Company in droves.  On February 28, 2017, Signet's stock priced opened sharply down, and by midday had declined 8%.  Desperate to arrest this nosedive, Signet took the extraordinary action of halting trading so that it could prepare a public statement.  In this statement, Signet reiterated its prior mischaracterization of the arbitration as involving "a very small number of individuals," whose assertions had been "thoroughly investigated" and were "not substantiated."

35.     The market disagreed.  When trading resumed, Signet's stock price continued its collapse.  By the close of market on February 28, 2017, Signet's stock price had lost 13% of its value on extraordinary trading volume of more than 11 million shares.  As the media continued

to cover the revelation, leaking additional information into the market, the risks Signet had concealed materialized and Signet's stock fell again on March 7th, 10th, 13th, and 14th.

36.    On July 17, 2017, Signet announced that Defendant Light would step down after more than 30 years with Signet.  Signet and Light offered scant explanation for his departure, with Light citing a "need to address some health issues" and stating that "the Board and I agreed that it is a good time for a transition."  The media noted that, given the Company's troubles, Light's departure was "also an opportunity to bring fresh eyes to a business that clearly needs new direction."

37.    On December 6, 2017, a broad bipartisan group of members of Congress introduced legislation to prevent companies from forcing employees to arbitrate sexual harassment claims.  Representative Cheri Bustos, the chief sponsor of the bill, stated that the impetus for this legislation was Signet's use of forced arbitration to conceal pervasive sexual harassment by its senior executives.  As she stated, the declarations detailed herein "painted a troubling picture of a corporate culture that fostered systemic sexual harassment," and Signet had used the sealed arbitration process in an effort to ensure that those facts "would never see the light of day."  The Company's misconduct, she stated, had therefore spurred Congress "to address institutionalized sexual harassment."

38.    In April 2019, a *New York Times Magazine* exposé laid bare further information about Signet's culture of sexual harassment and exploitation, including alleged instances of rape and quid-pro-quo sexual harassment events that Signet swept under the rug via its internal "Resolve" system.  The exposé provided an extensive amount of information that Signet knew about these events and its culture, and concealed them from investors – including investors like Marcato.

39.    During the Relevant Period, the Marcato Funds purchased tens of millions of dollars of Signet stock.  As the truth of Signet's credit portfolio and culture of sexual harassment was revealed, Plaintiffs suffered tens of millions of dollars of damages resulting from Signet's misrepresentations.

## JURISDICTION AND VENUE

40.     The claims asserted herein arise under and pursuant to Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78r and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under state common law.

41.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

42.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.  Certain acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District.

43.     Signet regularly made presentations in this District that included the dissemination of false and misleading information.  On information and belief, Signet made presentations in this District on at least the following dates:  June 24, 2015; March 29, 2016; and June 1, 2016.  Further, on information and belief, in each presentation Defendants either made false or misleading statements, or failed to disclose the falsity of prior statements or misleading nature of prior statements, despite discussion of the Company and its credit portfolio.

44.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange and market.

## THE PARTIES

45.     The Marcato Funds are managed by a common manager, Marcato, located in San Francisco, California.

46.     Plaintiff Marcato LP is a limited partnership organized under the laws of Delaware and managed by Marcato.  Marcato LP purchased Signet common stock on or about the dates set out in Exhibit A.

47.     Marcato International Master Fund, Ltd. ("Marcato International") is a Cayman Islands ordinary non-resident company, managed by Marcato.   Marcato International Master Fund, Ltd. purchased Signet common stock on or about the dates set out in Exhibit B.   Marcato International is also the transferee and assignee of certain securities, originally purchased by other funds managed by Marcato.   Marcato International brings claims for those securities (the dates of purchase which are stated on Exhibit B) as well.

48.     Defendant Signet Jewelers Limited is a Bermuda corporation with headquarters located in Akron, Ohio and with its Corporate and Distribution facility located in Irving, Texas. Signet is purportedly the world's largest retailer of diamond jewelry.   The Company wholly owns Sterling Jewelers, Inc. ("Sterling") – through which it operates retail stores under the brand names Kay Jewelers ("Kay") and Jared The Galleria of Jewelry ("Jared"), among others, as well as its in-house credit operation.   The Company also wholly owns Zale Corporation, through which it operates retail stores under brand names including "Zales The Diamond Store" ("Zales") and "Piercing Pagoda."

49.     Defendant Michael Barnes ("Barnes") served as CEO and as a Director of Signet from January 2011 until October 31, 2014.

50.     Defendant Mark Light ("Light") was CEO and a Director of Signet during the Relevant Period.   Light became CEO and a Director of Signet on November 1, 2014.   Prior to becoming CEO of Signet, Light served as President and Chief Operating Officer of Signet and CEO of its Sterling Jewelers division, and held senior leadership positions with Signet and the Sterling division for over 25 years.   According to the Company's website, Light "has broad and deep knowledge of Signet's business and the jewelry industry" and "has extensive knowledge of Signet's operations."   Light resigned on July 31, 2017 and was replaced by Virginia Drosos ("Drosos") on August 1, 2017.

51.     Defendant Ronald Ristau ("Ristau") served as CFO of Signet from April 2010 until July 31, 2014.   On information and belief, Ristau resides in the State of New York and resided in the State of New York during the Relevant Period.

52.     Defendant Michele Santana ("Santana") became CFO of Signet on August 1, 2014, and continues to hold that position.

53.     Defendant Drosos became CEO of Signet on August 1, 2017, and continues to hold that position.

54.     Barnes, Light, Ristau, Santana, and Drosos are collectively referred to herein as the "Executive Defendants."  The Executive Defendants, because of their high-ranking positions and direct involvement in the everyday business of Signet and its subsidiaries, directly participated in the management of Signet's operations, including its public reporting functions, had the ability to, and did control, Signet's conduct, and were privy to confidential information concerning Signet and its business, operations and financial statements, as alleged herein.

55.     Signet and the Executive Defendants together are sometimes collectively referred to herein as the "Defendants."

## SUMMARY OF THE CREDIT PORTFOLIO FRAUD

### Signet's Consumer Lending Portfolio Was Critical To The Company's Value, And Was A Key Focus Of The Market And Defendants

56.     Prior to and during the Relevant Period, a key part of Signet's business was its consumer lending operation.  While Signet's competitors generally offered credit-financed sales through third party underwriters, Signet operated an in-house credit business run through its Sterling division.  By 2015, Signet's total credit-financed sales (that is, sales financed through the use of in-house credit) had grown to 61.5% of total sales, or $2.45 billion.  The Company's outstanding receivables balance had risen to $1.85 billion, or more than double its 2008 levels and triple its 2004 levels.  The lending portfolio's receivables grew to be Signet's second-largest asset by 2015.  More than one-third of Signet's operating income came from its in-house consumer finance program.

57.     In numerous investor conference calls and investor presentations before and throughout the Relevant Period, Defendants repeatedly stressed that the lending operation and

loan portfolio were extremely important to the Company's business and financial performance, in major part because the lending operation increased sales and thus was a key driver of revenue for the company.

58.     For example, during an October 8, 2013 New York Analyst Day, then-CEO Barnes touted Signet's in-house customer finance operation, emphasizing "how valuable that is to our Company because it's powerful and it really drives our business and we have a very large percentage of sales that use our in-house customer financing. So that's a huge competitive advantage for us."   Similarly, during a September 4, 2014 Goldman Sachs Global Retailing Conference, Defendant Santana described the Company's credit operation as "a key enabler of our sales," and "as one of the competitive advantages we have."   Indeed, Defendants opened their discussion of the Company's credit portfolio on nearly every earnings call during the Relevant Period with a statement that the lending operation was a "competitive advantage."   In total, Defendants described Signet's in-house credit operation as a "competitive advantage" no fewer than 20 times over the course of the Relevant Period.

59.     The lending operation was especially important to driving sales in the bridal category, which comprised 60% of the Sterling division's credit sales and was its most important segment.  According to the Company, credit penetration in the bridal category could reach 70%.

60.     Based on Defendants' statements, analysts repeatedly issued reports stating that the lending operation was a key differentiating feature that boosted the value of Signet's shares.  For instance, on January 29, 2014, Miller Tabak & Co., LLC reported regarding Signet's credit portfolio:

> A competitive advantage, it's proven, self-funding and integral to the primary business goal, i.e., the sale of fashion and diamond jewelry[.] The high-quality credit portfolio is specifically designed to help customers make jewelry purchases (primarily bridal) and keep them coming back for add-on purchases.

The same report likewise concluded that it was unlikely that Signet would ever consider a sale of its credit operation considering the edge it gave the Company over its competitors.  Buckingham

Research Group similarly reported on December 19, 2014 that Signet's "proprietary credit card is probably one of its most important competitive strengths as it helps drive sales."

61.     Given the importance of the lending operation to Signet's financial performance and value, along with its sheer size, it was a significant focus of the market's attention during the Relevant Period – as evidenced by numerous investor questions during earnings calls relating to the Company's credit business.  Signet was well aware of this fact.  As Ristau stated during Signet's New York Analyst Day on October 8, 2013, "Well, I couldn't do a presentation without talking about credit."  As explained further below, Defendants addressed this subject in detail in dozens of investor calls and presentations during the Relevant Period, and analysts issued hundreds of reports concerning Signet's lending operation.

62.     In light of the market's focus on the credit operation, Defendants repeatedly stated that they paid close attention to the lending operation and the health of the portfolio, and had personal knowledge of these subjects.  For example, during the September 10, 2013 Goldman Sachs Global Retailing Conference, hosted at the Plaza Hotel in New York, New York, Defendant Barnes stated that the credit portfolio was "a big important part of our business and one that we don't take lightly. We watch it very closely and we use it to really help drive the core of our business."  During the October 8, 2013 New York Analyst Day (hosted in New York, New York), Defendant Ristau further stated that the Company "welcome[s] the increasing use of our credit programs, as we have very definitive approval criteria and fully understand the credit risk and profitability of our decisions. We take great care in our decisions[.]"

63.     Defendants bolstered these representations in their SEC filings.  Defendants stated in Signet's Form 10-Ks that "on an ongoing basis, management monitors the credit exposure based on past due status and collection experience."  Signet's Form 10-K filed in February 2014 provided that subsequent to a customer's initial finance purchase, "Signet monitors the credit quality of its customer finance receivable portfolio based on payment activity that drives the aging of receivables. This credit quality indicator is assessed on a real-

time basis by Signet."  Likewise, in its Form 10-K for fiscal 2016, Signet stated that, "We closely monitor the credit portfolio to identify delinquent accounts early[.]"

> **As The Credit Portfolio Increases In Size To Drive Sales,**
> **Defendants Repeatedly Assure Investors That Their**
> **Underwriting Is Conservative And Credit Quality Is Strong**

64.     Prior to and during the Relevant Period, Defendants expanded Signet's in-house credit program to drive sales.  The Company's credit penetration rate and the size of the loan portfolio grew to record heights during the Relevant Period.   For example, from the beginning of the Relevant Period to the end of 2016, the credit penetration rate rose from 60.4% to a high of 66.8%. Similarly, the Company's accounts receivable grew from $1.15 billion in the beginning of the Relevant Period to $1.86 billion by the first quarter of fiscal 2018.

65.     Defendants' expansion of the Company's credit portfolio in turn caused the Company to experience enormous sales growth.  For example, at the very beginning of the Relevant Period, Signet reported second quarter fiscal 2014 total sales of $880.2 million.  By the second quarter fiscal 2015, the Company reported total sales of $1.2 billion, followed by total sales of $1.4 billion in the second quarter fiscal 2016.

66.     As the Company's sales grew, Defendants repeatedly told investors that their underwriting remained conservative and that the credit quality of the portfolio remained healthy and strong.  For example, during an August 29, 2013 earnings call, Defendant Light stated that Signet's

> overall credit portfolio statistics continue to remain very strong and I want to make sure that you understand that point. [] Consumers are behaving strongly. They are making more than the minimum down payments very strongly. They are using credit appropriately. Our credit approval rates remain relatively consistent to prior year, so there is no big change in anything that we are doing there.

67.     Similarly, on September 10, 2013 during the Goldman Sachs Global Retailing Conference, Defendant Ristau stated that there had been no "change in the quality of the portfolio or consumer behavioral changes.  That has all been very, very strong and the portfolio continues

to be very healthy." Ristau further stated that Defendants "don't push the credit, we don't change the way that we measure in terms of "do you get credit, do you not get credit." We will never cross that line. But because of the fact that it is so well-managed we're still gaining a lot of traction, bringing in a lot of new customers."

68.     During the same conference, Defendant Ristau assured investors that Defendants were intimately familiar with the credit operation, and the Company's underwriting was "stringent" and "conservative," stating:

> Okay, well, the credit business, as I am sure you are all aware, we believe is a competitive advantage of our business. We do run our own credit operation. We are very, very strong operators of that particular segment of our business, we have been at it for 40 or 50 years, we are best in class operators of running a private label credit operation.
>
> So it is very stringently controlled, it is a very important part of our business particularly as it helps to facilitate the sale of the bridal product. . . . So it is a very important part of our business, it is very well managed, it is very conservatively managed. From a credit granting perspective about 50% of the people who apply for credit are granted credit. So it is very stringently managed from a credit criteria perspective.

69.     Whenever the Company's provision for bad debt ticked upwards, Defendants assured investors that the increase was not due to credit deterioration. Specifically, Defendants stated that the increasing bad debt provision was driven by the fact that the portfolio was increasing in size, thus requiring an increasing provision automatically. Defendants further stated that this provision was "more than offset" by the increased levels of interest income generated by the larger portfolio – resulting in a net benefit to Signet – and that credit continued to be "profitable" and "integral to enabling sales in the business[.]"

70.     For example, on October 8, 2013, Defendant Ristau noted that the "net impact" of these items – *i.e.*, bad debt expense and interest income – "was an increase of $19.3 million in operating income. . . . So our message here is credit is profitable . . . ." Defendants made substantially similar disclosures throughout the Relevant Period.

71.     Analysts issued reports adopting this understanding and continued to report that they had no concerns regarding Signet's credit portfolio.   For instance, following Signet's August 29, 2013 earnings call, Deutsche Bank reported that "although bad debt as a percentage of sales rose YoY, management said they have seen no deterioration in customers' ability to re-pay, and indeed profits from credit rose YoY."   On August 30, 2013, Stephens reported that it viewed Signet's "credit portfolio as healthy despite an uptick in bad debt expense," which was "attributed to higher receivables and is being offset by higher interest income on those receivables."   In September 2013, Stephens reported that Signet's bad debt increase was "due to a higher credit penetration as more consumers are buying on credit. This was mostly offset by higher interest income earned on a higher receivables balance. Its underwriting terms have not changed."

72.     In April 2014, the Company made certain unspecified changes to its credit decision engine.   These changes further increased the Company's credit penetration rates; that is, they resulted in Signet granting more credit.

73.     Soon thereafter, on July 1, 2014, Signet issued a press release notifying the public that Defendant Ristau would resign from his position as CFO effective July 31, 2014, and that Defendant Santana would replace him following his departure.   During an August 28, 2014 earnings call, Defendant Santana assured investors that the changes to the Company's credit decision engine would not adversely affect the credit quality of the portfolio.   Defendant Santana stated that these changes "preserve[] credit requirements, but more accurately score applicants, which yields more qualified customers."   According to Santana, the changes were meant to "increase credit penetration without adversely affecting the net impact of bad debt."   In November 2014, Defendant Light replaced Defendant Barnes as CEO.

74.     At the same time Defendants were making these statements, they also reported in their SEC filings that the credit portfolio did not pose a material concentration of credit risk.   For example, each of Signet's Form 10-Qs stated that "[m]anagement does not believe Signet is

exposed to any significant concentrations of credit risk that arise from cash and cash equivalent investments, derivatives or accounts receivable."

75.    Meanwhile, Defendants kept the Company's publicly reported loss reserves at very low levels.  This communicated to the market that only a very small percentage of the debt was likely to default, and therefore that the portfolio was strong.  Further, because bad debt was charged against income dollar for dollar, keeping reserves low allowed Signet to report higher income.

76.    Notably, Signet used a rare and disfavored form of accounting – "recency" accounting – that effectively suppressed the number of accounts considered delinquent.  This method of "aging," or determining the delinquency of accounts receivable, is not standard.  The most common method of aging the delinquency of accounts receivable is the "contractual" method, whereby an account is current only if the account holder is paid in full under the contractual terms of the loan.  In contrast, Signet's accounting methodology counted an account as "current" even when a customer had missed a payment – or several of them – so long as the customer recently had made a single "qualifying payment" of a minimum amount which could be less than the amount due.  The Federal Reserve has explained in its Bank Holding Company Supervision Manual that "banks and their consumer finance subsidiaries are required to use the contractual method," and that, while "uninsured, non-bank consumer finance subsidiaries" of bank holding companies are permitted under GAAP to employ recency accounting, "[i]n general, the contractual method provides a more accurate reflection of loan performance and, therefore, is the preferred methodology, especially from the standpoint of financial-statement transparency and public disclosure."

77.    Specifically, Signet permitted customers to make partial payments – as little as 75% of the monthly contractual agreed upon amount – for the account to be considered current under Signet's recency method, even though such account would not be current under the contractual method.  Thus, for example, if a customer had failed to make any payment for 90 days, the account would nevertheless "reset" and be considered current if the customer

subsequently made one minimum partial monthly payment; the customer did not need to pay the past due amount to be considered current under Signet's accounting methodology. This aging method enabled Defendants to avoid disclosing to the market the amount of money owed to Signet that was actually past due because it deferred the identification of accounts as delinquent.

78.     During the Relevant Period, Defendants also used the Company's reserve levels as a signal to investors that the credit portfolio was healthy. For example, Santana stated during a March 26, 2015 earnings call that "the portfolio continues to perform very strongly for us and that's evidenced by the allowance as a percentage of our ending accounts receivable finishing nearly flat to last year." Similarly, during a May 28, 2015 first quarter earnings call, Defendant Santana stated that, "[o]ur portfolio continues to perform well as evidenced by the [positive] net impact of bad debt and other operating income as well as the allowance as a percentage of accounts receivable being fairly consistent."

79.     Significantly, by keeping the allowance low, the Company was also able to consistently meet earnings estimates (by avoiding charges against its income that would have been required if the reserves were raised).

80.     Analysts often lauded the Company's performance and issued "buy" recommendations for its stock. For example, on August 27, 2015, Buckingham Research Group issued a BUY rating for the Company, noting that its recent earnings beat consensus estimates "on a better than expected same store sales increase[.]" Similarly, on September 1, 2015, UBS issued a report stating that Signet is "still shining bright," and highlighting that the Company's EPS "was well ahead of management guidance." On October 21, 2015, Wells Fargo named Signet its "top pick in our universe" and placed it on the Priority Stock List.

81.     As a result of Defendants' false and misleading statements during the Relevant Period, Signet's stock price became artificially inflated.

**Contrary To Defendants' Statements, Signet Had Engaged In
High-Risk Lending Practices To Drive Loan Volume, Thus
Filling Its Credit Portfolio With Huge Amounts Of Toxic Loans**

82.     Unbeknownst to investors, in order to expand the Company's lending operation, Signet had engaged in reckless underwriting through which it routinely extended credit to high-risk borrowers – the precise opposite of the "conservative" practices Defendants touted.  As a result of its reckless underwriting, the Company's loan portfolio contained a material amount of high-risk loans that were likely to default in significant numbers, contrary to Defendants' statements that the credit quality of the portfolio was "strong."  Numerous former Signet employees confirmed that Signet engaged in high-risk lending practices to increase sales.

83.     The Class Action Complaint ("CAC") cites Former Employee 1 as a person who worked at Signet from January 1999 until February 2014.  According to the CAC:

> Former Employee 1 began in the collections department and rose through the Company. Former Employee 1 began working in the credit risk department in 2009 as a Project Manager/Business Analyst before becoming the Director of the Credit Information Technology and Strategy Department in 2011. Former Employee 1 was involved with designing the Company's credit scoring system called "score card" in approximately 2005 or 2006. Later, as the Director of the Credit Information Technology and Strategy Department, Former Employee 1 was responsible for all technological aspects of the Company's credit business, including system management, infrastructure, and data analytics. Former Employee 1 reported to Mario Weiss, who was Signet's Senior Vice President of Credit Operations from 1990 to 2016.

84.     According to the CAC,  when told that the Company said its credit portfolio was conservatively managed and subject to stringent underwriting, Former Employee 1 said,

> I whole heartedly disagree. It's a running joke in Akron that it's very easy to get credit at Kay Jewelers or Jared. If you ask any college student or young adult where they got their first credit card, 90% will tell you one of those places. There were situations where applicants' jobs weren't verified. Stores would just lend to anyone, even with very bad credit. We would review applications in the collections department after the accounts had gone delinquent and they were a joke. There were people with six charge- offed credit cards and two bankruptcies getting a $2500 credit line. One

> applicant listed his telephone number as 12345678910. The application went through with no problems. We only found it when we were trying to add his account to the predictive dialer and it wouldn't work.

Former Employee 1 further explained, "That's a complete lie. The extension of credit is not stringent at all. There's no strict rules there."

85.     According to the CAC, Former Employee 1 reported that the Company's credit portfolio did not collapse suddenly.   Rather, according to Former Employee 1, the high levels of bad debt in the portfolio and resulting problems were well known within the Company dating back to at least 2008: "There were signals going all the way back to 2008 that the credit department had some major issues with the bad debt process, with how it used recency methods and causing major cash flow issues." Former Employee 1 reported that the biggest issue with the portfolio was the growing gap between total sales and real cash flow.

86.     According to the CAC, Former Employee 1's responsibilities included conducting daily or weekly gap analyses of the differences between sales numbers and real cash flow within the Company.  As Former Employee 1 explained, this "gap" arose from granting credit to borrowers with low or no credit history, who could afford only very low monthly minimum payments.  For example, Former Employee 1 explained, by taking someone fresh out of college with no credit, giving him a $2,000 limit, and making the monthly payment only $25 per month, the Company would be able to show a great number from a sales perspective. However, from a true cash flow perspective, this was problematic. The money that the Company reported as revenue wasn't really there. Internally, the credit department was performing constant analyses, and this gap between sales totals and real cash was the number one analysis they did.

87.     According to the CAC, Former Employee 1 also stated that Signet's recency method of accounting allowed the gap between outstanding account balances and real cash flow to grow.  The Company had many customers who were between thirty and ninety days delinquent. They would make smaller monthly payments, and the Company would charge them interest.

From a recency perspective, and the Company's perspective, the customers were still current even though they were paying only $25 per month.  However, these small monthly payments were eaten up by interest, so the customers' actual account balance kept increasing. Further, because customers were current, they were able to purchase more merchandise on their credit line. Thus, even if the customer is still paying $25 or $30 per month, the gap between the account balance and the amount actually being collected continues to grow.

88.     According to the CAC, Former Employee 1 strongly disagreed with the notion that the bad debt increase Signet experienced was an "all of a sudden thing."  Former Employee 1 reported that employees in the credit risk department began issuing internal warnings as far back as 2007 or 2008 that the bad debt issue was a problem and the portfolio was in trouble, but nothing was really done.

89.     According to the CAC, Former Employee 1 reported that this issue and other negative trends in the credit portfolio were communicated to senior Signet executives, including Defendant Light.  Former Employee 1's department would identify negative and positive trends in the credit data.  In addition to the cash flow problem, one of the key negative trends was the rate of customer contacts for collection compared with the number of attempts to contact them. The lower that rate became, the greater the cash flow decrease associated with collections.  These types of reports would then be written up and sent to Former Employee 1's peers and other executives in the credit department, and ultimately shared with Defendant Light and Bob Trabucco, the CFO of Sterling Jewelers.  Former Employee 1 reported that there would be regular bad debt meetings with the executives, including Light and Trabucco, to discuss strategies to overcome expanding bad debt, low contact rates, and similar issues.

90.     According to the CAC, Former Employee 1 said that the question in meetings was always, "[d]o we change our lending practices and alienate a large portion of customers that would not qualify for more stringent credit terms?"  The overarching opinion was that, if the Company tightened its underwriting, Sterling would lose a significant number of customers from a buying power perspective.

91.     According to the CAC, Former Employee 1 reported that it was an internal joke that the Company was going to have a discussion about changing the lending program every October, which was the month prior to the high increase in sales during the holiday season. Former Employee 1 reported that, "[i]t was like we thought about changing the lending program but here comes the holidays so those high sales numbers will cover the smell of the bad debt." According to Former Employee 1, everyone at the Company knew that eventually the Company was going to have to change its lending practices because it was going to fall apart, which indeed eventually happened to Sterling. Former Employee 1 reported, "[t]here was always that piano hanging above everyone's heads, but the performance of the sales during the holidays hid the smell for the most part. That's why you'd see that sales versus cash flow gap continuing to grow. Maybe from the outside it looked like all of a sudden, but if you look at the internal trends you could see the issue going back as far as 2007 or 2008."

92.     According to the CAC, at the bad debt meetings, loan loss reserves were discussed. Former Employee 1 said that these discussions included Defendant Light, as well as Trabucco, and Weiss – both of whom reported to Light – and other representatives from the executive team in the credit department

93.     According to the CAC, Former Employee 1 said there were discussions that the reserves were low, but that nothing was done because "the reserving had to be under a certain amount." Specifically, according to Former Employee 1, at these meetings, the executives decided not to raise reserves to a more appropriate level because reserves were "comped" to the prior year's level precisely to avoid a significant increase. As Former Employee 1 explained, the discussion at these meetings centered on the fact that "the reserves are low but there's not much we can do about it because we're comping to the numbers last year." Former Employee 1 stated that the concern with raising the reserves too much was that it would hurt the Company's "bottom line."

94.     According to the CAC, Former Employee 1 would also listen in to investor calls. As Former Employee 1 recalled, the number one topic that always came up was the bad debt.

Defendant Light, or whoever was speaking for the Company, would typically represent that "the bad debt was manageable, the credit portfolio was okay, and there were no plans on changing Signet's recency method because that's what gave the Company its competitive advantage." But Former Employee 1 knew from the trend analyses that the recency method had to be modified, or at least scaled down so the cash flow was more equitable to the sales numbers. Yet that reconciliation never happened and only got worse.

95.   According to the CAC, Former Employee 1 characterized Light's remarks on the calls as "spin." For instance, as Former Employee 1 described, Light would represent that the credit portfolio is doing fine, and would explain to investors all these indicators the Company looks at showing the trends were moving in a positive direction. But Light was not mentioning all of the negative trends that Former Employee 1 and his team were looking at. Former Employee 1 said that internally, discussions about bad debt were very different than they were on the investor calls. That was one of the reasons Former Employee 1 finally decided to leave the Company. Former Employee 1 held significant positions at Signet for thirteen years and saw the direction the Company was going in, especially at the executive level.

96.   According to the CAC, numerous former employees reported that the Company forced its sales representatives to aggressively push credit on customers, even those who did not want it, by requiring them to meet minimum daily quotas for credit applications, and disciplining employees or firing them when they did not meet these quotas. Former employees also reported that the Company was extremely lax in granting credit to customers, even those who appeared to be high- risk, such as those with bankruptcy or late fee histories.

97.   Public internet postings, including on indeed.com by persons stating they were former Signet employees (employees of Kay, Jared, Zales, and similar) confirm the accounts of former employees in the CAC. Former employees report a culture pushing credit, regardless of the credit quality of the consumer.

98.   According to the CAC, Former Employee 2 worked for the Company as a sales associate at Kay and Belden stores from approximately 2012 to 2014 in Massena, New York.

Former Employee 2 reported that the Company was extremely strict about its quota for getting credit applications. Former Employee 2 was required to obtain one credit application for every day Former Employee 2 worked. If you worked five days in a week, you had to get five credit applications. This was a very harsh requirement, especially in the mall Former Employee 2 worked at, which was small. Former Employee 2 reported that the Company would make staff stand out in the mall hallway and essentially beg people for credit applications "or else we'd get fired." The Company was "very, very, very dominant about getting credit applications," Former Employee 2 reported. "We needed credit, credit, credit, and that was our downfall in our [Belden] store, anyway," said Former Employee 2. Former Employee 2 reported that sales staff were judged by six standards, including the quota of one credit application per day, sales goals, upselling on warranties and service plans, among others. If a sales associate failed to meet their credit application quota for a month, they would get fired.

99.     According to the CAC, Former Employee 3 worked for the Company as a sales associate at the Jared store in Fort Lauderdale from January 2014 to April 2017. Former Employee 3 reported that Former Employee 3 was required to procure one half of a credit application per day. Because a lot of potential customers already have credit, "you were really going out of your way to get [new credit applications]." Former Employee 3 stated that getting credit applications was very important for promotions. "You heard 'credit is king' every day; that's what was written on the daily goals sheet. They pushed credit more than they pushed sales," said Former Employee 3. Former Employee 3 further stated that Jared's "credit was pretty easy to get. They gave credit to people I wouldn't have let take my car around the block. They gave credit to just about everybody." According to Former Employee 3, the only time the Company would not give credit was if the applicant had not paid the Company in the past. Former Employee 3 said, "It's the culture of getting credit, and as long as it's extended, you have to sell. You've got to do it."

100.     According to the CAC, Former Employee 4 was a district training captain at Ultra Diamonds, and moved over to Sterling when Ultra was acquired in 2012. Former

Employee 4 was a District Manager in Training at Sterling until leaving the Company in March 2015.  Former Employee 4 reported that every employee was held to standards of production, and one of them was the number of credit applications they generated. Based on whether an employee was full time or part time, a determination was made on what that requirement was. This was factored into promotions, demotions, and terminations.  The training pieces for this standard focused on going out and getting applications rather than looking for applicants with a true need for credit or who were attractive and safe borrowers.  Some store managers would have their employees walk around the mall and ask other mall employees to fill out applications just to meet their standard.   The standard was either one or two credit applications per day. Sometimes it would be one or two credit applications per four or six hour block.  Part time employees had to get half of whatever the full time production standard was.  Managers were considered selling managers, so they were held to these standards as well.  Former Employee 4 echoed that "there were a lot of people that would say they had bad credit, and we'd still get them a $300 starter line.  There was a big increase in the amount of those which are obviously riskier and more likely to default."

101.    According to the CAC, Former Employee 5 worked for the Company from June 2008 until May 2017.  At the end of Former Employee 5's tenure, Former Employee 5 was an assistant store manager in Fort Lauderdale Florida.  When asked about Signet's credit program, Former Employee 5 explained that "basically anybody gets approved" and you had to have "the worst credit score in history" to be denied.  Former Employee 5 said that it was "very, very easy" to get credit and that the application process took five minutes, with a decision being made within five minutes of the submission unless the individual had a security block.  Former Employee 5 provided her mother as an example of the ease with which someone with poor credit would be approved through Signet's system.  Former Employee 5's mother applied for credit from Signet to help Former Employee 5 meet her credit application quota.  "She was doing it to help me for a quota I needed to meet," Former Employee 5 said.  At the time, Former Employee 5's mother had filed for bankruptcy, was losing her home, had "tons of medical bills

and a car she couldn't pay for," and as a result Former Employee 5 assumed she had an extremely poor credit score. To Former Employee 5's surprise, Signet approved Former Employee 5's mother for approximately $8,000 in credit.

102.    According to the CAC, Former Employee 5 explained that Signet had a quota on the number of credit applications each sales associate was required to process. In the Jared division this was one half of a credit application per day, but in the Kay division it was one credit application per day. If you were unable to convince a customer to apply for credit, Signet would want you to bring in a fellow employee to try to convince the customer. The objective was to convince customers to open credit. This quota structure remained the same throughout Former Employee 5's tenure at the Company. Former Employee 5 stated that these quotas were set by corporate, and there were six standards, referred to internally as the "6 for 6 standard:" sales goals, selling additional pieces during a single transaction, selling lifetime warranties on the purchased jewelry, revenue generated by the in-store repair department, credit applications, and selling credit insurance.

103.    According to the CAC, Former Employee 6 worked as a collector in the level 3 collections department, which collected on accounts that were 90 days past due, from 2011 until September 2014. Former Employee 6 would start the collections process by looking at the original credit applications. Former Employee 6 reported that a lot of the applications were "garbage." Former Employee 6 noted, "[a] lot of the times the original credit application was incomplete, either not filled out or missing the applicant's signature. I remember looking at one and in source of income it said 'stealing watches.' It was just ridiculous. I'd look at these applications and just shake my head." Former Employee 6 said that Former Employee 6's department would always laugh at the credit authorizers because it was "ridiculous how some of the people they were collecting on got approved for loans in the first place."

104.    The above statements by former employees are corroborated by the fact that the Company's borrowers did, in fact, increasingly consist of bankruptcy filers during the Relevant Period. As stated below, in the first quarter of calendar year 2015, 1,903 bankruptcy filers named

Signet as a creditor.   In the months following the end of that quarter, that number jumped: 2,663 bankruptcy filers named Signet as a creditor in the fourth quarter of calendar year 2015, an increase of 29.9% over the first quarter, and 3,274 filers in the first quarter of calendar year 2016 named Signet as a creditor, an increase of 72% year-over-year.

105.   Defendants had knowledge of these facts.   Bankruptcy courts notify all creditors named in a bankruptcy filing.   Further, the Company stated in its SEC filings that it tracked bankruptcy petitions throughout the Relevant Period.   For example, in Signet's fiscal 2016 Form 10- K, the Company's underwriting disclosures provided that:

> [A] 100% allowance [for uncollectible amounts] is made for any amount aged more than 90 days on a recency basis and any amount associated with an account the owner of which has filed for bankruptcy . . . . The allowance calculation is reviewed by management to assess whether, based on economic events, additional analysis is required to appropriately estimate losses inherent in the portfolio.

**Defendants Issue False Assurances To Quell Market Concern
In the Face of Negative Information**

106.   As the severe credit risk created by Signet's reckless lending practices began to materialize in late 2015, Defendants promptly (and falsely) reassured investors that Signet's underwriting was conservative, the portfolio was not risky, and that Signet's lending practices were appropriate – stating that the credit portfolio remained stable and healthy.   These reassurances were false.

107.   On November 24, 2015, Signet issued disappointing earnings for the third quarter of 2015, which were below consensus expectations.   Specifically, earnings per share were $0.33, $0.05 below the street's $0.38 estimate.   Defendants stated that higher net bad debt expense, which rose to $53 million compared to $41.7 million the year prior, had led to contracting margins and therefore to the earnings miss.

108.   To (falsely) reassure investors, Defendants made a number of false statements in response to analysts' questions on the ensuing conference call to discuss these results.   For

example, Defendant Santana explained that the increased net bad debt expense was not caused by deterioration, but rather by a shift in "credit mix," namely, an increase in credit being granted to Kay customers (who had a lower credit profile) relative to Jared customers.  Further, Defendants claimed that because the third quarter was historically a very small one for the Company's earnings, the effect of this shift in credit mix was magnified more than it would normally have been.  Ultimately, Defendants assured investors that the Company's underwriting remained disciplined and credit quality was strong.  As Santana stated:

> The credit mix shift had a notable and partially offsetting impact on operating income because our operating earnings in Q3 are less than 5% of our overall annual operating earnings, so a small shift in credit has a more noticeable impact. Our credit approval standards remain disciplined and unchanged. [] The higher participation rate was primarily driven by a greater increase of Kay customers compared to our Jared customers. [] Signet has not changed its credit standards and our credit portfolio continues to perform well and profitably.

109.    Analysts issued reports in which they credited Defendants' reassurances. Barclays reported that the higher bad debt expense "was due to mix shift to Kay vs. Jared, which has different credit metrics, but the overall state of the credit business remains in good shape."  Cowen & Company likewise reported that Signet "remains highly disciplined in its approval process and its credit portfolio continues to be profitable and stable."

110.    Critically, between the end of November 2015 and May 2016, Defendants continued to issue a series of false reassurances in which they stated that the Company's underwriting remained conservative and its credit quality was strong.

111.    Indeed, on the January 7, 2016 holiday sales call, Defendants dismissed market concern as unwarranted and reassured investors that all was well with the credit operation.  For example, Defendant Light stated that:

> [I]t's very important that everybody understands this. We have been running a credit portfolio for well over 30 years – well over 30 years. And we've been through good times and bad times with the recessions, and we've been able to manage our accounts

> receivable appropriately and arguably better than most during all
> times over the last 30-plus years. So – this credit, as Michele said,
> there's modest shifts going on, but there's nothing that's
> unprecedented for us. So we have every confidence in the way
> we manage our credit portfolio and the profitability of our credit
> portfolio. I just want to reinforce that because there seems to be
> some concerns about our credit portfolio, and – we just think it's
> unwarranted , quite frankly.

112.   Similarly, Santana added, "Again, just to go back, our credit portfolio remains

extremely profitable. . . . So I really hope with the comments that we mentioned today, that it does

help to put this credit discussion – to minimize it to where it should be." Santana added that,

"[i]n-house credit has long been an important element of Signet's success," and emphasized

again that, "[o]ur credit program offers a competitive advantage for the Company."

113.   Analysts reacted positively to Defendants' assurances, and Defendants provided

even more assurances to the market.

114.   Most importantly and in response to growing investor pressure for transparency

into credit metrics, Defendants promised investors that there would be new disclosures

regarding the Company's credit decision-making protocol, accounting method, and credit

metrics in its forthcoming March 2016 SEC filing.

115.   In addition, on February 29, 2016, Signet made a number of announcements

designed to discredit its critics and boost its stock price.  *First*, Signet took the extremely

unusual step of pre-announcing its earnings for the fiscal fourth quarter 2016, which exceeded its

guidance.  Notably, Signet's Vice President of Investor Relations James Grant sent this pre-

announcement to several investors along with a note dismissing the market's concerns as

"bullying" from a few investors, and lauding Signet as "one of the great retail businesses of the

present time:"

> Normally [we] would not pre-announce our earnings-beat unless it
> materially deviated from our guidance. But this is a very unique
> time for all of us. Please, do not consider this a new precedent or
> read into this in any way except for what it is: A news release to
> publicly show our great results which creates an open period to
> repurchase our stock; and to counter the bullying we've endured

<u>over the last three months regarding our business – one of the
great retail businesses of the present time</u>.

116.     *Second*, the Company announced that its Board had authorized a share repurchase
of $750 million.  *Third*, the Company announced an 18% increase in its dividend.

117.     In March of 2016, Defendants made a number of additional statements designed to
reassure the market that the credit portfolio was strong and the Company's reserves were
accurately stated.  For instance, during a March 24, 2016 conference call to discuss fourth
quarter 2015 earnings, Defendant Santana emphasized again that "[w]e have provided and
operated in-house credit for 30 years, and it gives us a number of competitive advantages," that
the "credit program is designed for rapid repayment that minimizes risk," and that the
Company's "underwriting standards are proven and have been consistent."  Santana further
stated that "the visibility that we have into our credit portfolio performance which includes
daily collections, weekly roll rates to 30, 60 and 90 days and other meaningful indicators leads
us to remain highly confident in the strength of our credit portfolio performance."  The
Company discussed its improved credit metrics that had been pre-released, with Santana stating
that the Company's "year-end valuation allowance and nonperforming metrics improved as
management had expected, compared to the third quarter.  This improvement was driven not
only by the normal seasonality we customarily see, but also due to excellent credit execution
and credit marketing initiatives designed to favorably influence credit receivable mix."

118.     In defending the Company's use of recency accounting, Santana stated that this
approach accurately reflected the Company's true financial condition, and that switching to
contractual accounting would make no difference:  "In other words, the net charge-off to the
balance sheet, and the net bad debt expense in the P&L would be the same under both recency and
contractual aging.  There is no difference between the two when it comes to our financial
statements."  The Company also pointed to additional disclosures in its Form 10-K, including
disclosures expanding on the manner in which Signet used the recency method, and a disclosure

showing that the weighted average FICO score of the credit portfolio was 662, higher than the 640 score that is generally considered to be subprime.

119.    The market reacted favorably to these statements.  Cowen & Company reported that "management commented that excellent credit team execution & credit marketing initiatives designed to favorably influence credit receivable mix helped to drive the improvement [in the Sterling in-house credit portfolio]," and J.P. Morgan reported that improved fourth quarter credit metrics should "assuage[e] concerns that had been weighing on the stock following a 3Q increase in mix driven bad debt expense. . . . Importantly, this update should put the bear thesis to rest for now regarding concerns for worsening credit metrics given a moderating credit environment."  On March 28, 2016, an analyst from Buckingham Research Group stated that, "we are more confident that there is no 'smoking gun' to come from SIG's credit operations," while issuing a "BUY" rating for the Company's stock.

### Signet Announces Retention of a Third-Party Reviewer and Gives Further Assurances

120.    On May 26, 2016, Signet reported earnings for the first quarter of fiscal year 2017.[3]  While the Company's press release touted its "record first quarter earnings," the results were mixed.  Signet fell short of consensus estimates for revenue but exceeded consensus estimates for its earnings per share by 1 cent.  Continuing its efforts to boost its stock price, Signet announced that it had repurchased 1.1 million shares in the first quarter for $125 million.

121.    Significantly, Signet's press release stated that its management was "conducting a strategic evaluation of the Company's credit portfolio," which Light described in the press release as a "top priority."  Signet further announced that it had hired a third-party, Goldman Sachs, to conduct this evaluation, and that it would "consider a full range of options with respect to its credit operations" – including a sale or outsourcing of what Defendants had told investors

---

[3] Signet's fiscal year operates on a different clock than the standard calendar.  As explained in the Form 10-K for 2014:  "Signet's fiscal year ends on the Saturday nearest to January 31."  As a result, for Signet, "Fiscal 2015," refers to "the 52 week period ending January 31, 2015" – effectively, the 2014 calendar year.  Quarters are similarly shifted, with the "First Quarter 2016" starting as of February 1, *2015* and ending 13 weeks later.

for years was a critical source of strength and a key competitive advantage for Signet. Notwithstanding the importance of this development.  The press release vaguely stated that the "primary objective of this process will be to ensure Signet has an optimized business structure that enhances our ability to execute against our strategic objectives."

122.    On the conference call held on May 26, 2016 to discuss the Company's results, after Defendant Light reiterated generally that the Company was "considering a full range of options" as to its credit portfolio, analysts pressed Light for more detail on what the Company's actual "priorities" were for the review. Just as Signet did in its press release, Light obfuscated, stating that the Company was "going to look at it holistically," was "looking to see what opportunity is out there," was "talking to different type of constituents," and "we'll keep you up to speed."

123.    At the same time that the Company announced the strategic review, Defendants also continued to defend the credit quality and performance of the credit portfolio, making a number of statements designed to assuage any investor concern created by the announcement. These statements were designed to keep investors in the dark, to keep Signet's stock price inflated, to delay or avoid the negative stock price impact of the truth – and the statements were false.

124.    On the May 26 earnings call, Defendant Light stated that "our credit metrics in our credit portfolio are strong" and "are improving sequentially. . . . So, our credit metrics are strong."  He added that, a "point I want you to take away is that we remain a growth story; a prudent, measured and profitable growth story."

125.    Similarly, Defendant Santana explained that the higher net bad debt provision "was driven by our higher receivables balance," and thus, was a function of increased sales, not credit deterioration.   When asked again about "the reality of using the recency accounting methodology," she again represented that it accurately stated the Company's reserves, stating, "at the end of the day, regardless of recency or contractual, whatever method you are on, the

financial results are going to yield the same answer.  The provision will be the same, our bad debt expense will be the same."

126.    Defendants' attempts at mitigation involved false or misleading statements that perpetuated the fraud and the continued inflation of Signet stock.  The Marcato Funds purchased Signet stock in actual reliance on these statements, and relying on the market price of Signet stock (which price was marinated in an inflated state by these statements).

## THE RISKS PARTIALLY MATERIALIZED AND THE MARKET REACTS

127.    The full truth about Signet's toxic loan portfolio was not revealed until well after the end of the Relevant Period, and was disclosed to investors on a piecemeal basis, with information leaking into the market through a series of partial corrective disclosures.  During the Relevant Period, a partial corrective disclosure of Signet's fraud occurred on August 25, 2016.  Post-Relevant Period, further partial disclosures occurred, starting in 2017, which further confirmed the falsity of Signet's representations regarding its credit program and portfolio.  In addition, the information released on August 25, 2016, represented a materialization of the risk of Signet's hiding its poor credit portfolio quality.  As the portfolio degraded, and bad debt increased, Signet was forced to tighten underwriting standards, which had the effect of suppressing sales.  Further, on information and belief, Signet had hired a public relations firm with respect to this issue and was actively seeking to manage market reactions to the disclosure of fraud.

128.    According to the CAC, Former Employee 7 described the Company's efforts to tighten its credit portfolio.  From August 2011 until February 2017, Former Employee 7 was a Credit Authorizer based out of Signet headquarters in Akron, Ohio.  Former Employee 7 processed credit applications.  Former Employee 7 stated that in approximately mid-2016, credit guidelines became stricter and the Company made changes to the way it scored customer accounts.  Thereafter, if a customer had a score at or below a certain level, it was "pretty much a definite termination of their account even if on the credit bureau [the customer] had only one bad

marking on their last credit review."  At one point, Former Employee 7 was closing at least five accounts a day based on the new changes the Company implemented.

129.   As a result of its tightened underwriting, Signet's sales growth, which to that point had been fueled by its high-risk lending, began to contract.  In need of cash, Signet nearly doubled its credit facility.

130.   On August 25, 2016, Signet announced disappointing results for the second fiscal quarter 2017.  Specifically, Signet announced that its same store sales had decreased 2.3%, and its total sales had declined 2.6%.  It also reported adjusted earnings of $1.14 per share, far below consensus estimates.  Signet also lowered its fiscal 2017 same-store growth guidance from 2-3.5% growth, to negative 2.5-1.0%.  The Company also announced worsening credit metrics.  It reported that net bad debt expense rose 12% from the prior year, total loan loss reserves increased 12% from the prior quarter, and non-performing loans as a percentage of gross receivables increased more than 22%.  The increase in bad debt expenses was driven by higher receivable balances and an increase in non-performing loans.

131.   In response to the Company's August 25 announcements, Signet's stock price plummeted on heavy volume.  On August 25, 2016, the Company's stock price fell from the prior day's close of $95.50, to a closing price of $83.44 – a decline of nearly 13% – on volume of nearly 11 million shares.

132.   On a conference call to discuss these results, Defendants offered a raft of excuses and continued misrepresentations for Signet's poor performance.   For instance, Defendant Light stated that the sales slow-down was due to the declining energy industry, which impacted sales in places such as Texas and "Louisiana, Oklahoma, and Alberta, Canada" – locations that have a small minority of the Company's stores.  He also cited macro trends impacting the industry, and when asked to expand on that subject, he cited "Brexit [which] we believe affected the mindset of people in middle America and across the country," and the "presidential election which is unique this year and I think has some very unique characteristics that can be affecting the mindset of middle America consumers."  Light also noted, for the first

time, that "[w]e believe Jared has a number of fundamental issues that have not been quick and easy fixes."

133.     In tandem with announcing these poor results, Defendants made a pair of additional announcements designed to blunt investors' reaction to the news and mitigate the negative impact on the Company's stock price.  *First*, Defendants announced that private equity investor Leonard Green & Partners ("LGP") had committed to a $625 million purchase of convertible preferred stock in the Company, the value of which was pegged to the Company's stock price, but which also paid a 5% dividend.   On the August 25 call, Defendant Light positioned this investment as a reason for the "public markets" not to punish Signet's stock price for the Company's performance, stating that "[t]he transaction is a significant vote of confidence in the Signet operating model and our long-term prospects for growth," that supposedly "should serve as a validating signal to the public markets."   Light assured investors that the Company had "opened our books and shared significant amounts of information as a part of the process" (but did not specify what information was provided, or what it showed).

134.     Defendants again emphasized their continuing buyback tactic.  On the August 25 call, Defendant Light stated that the Company had bought back 4% of its shares.  Notably, Defendant Santana stated that the Company financed this repurchasing by using $200 million of its recently-enlarged credit facility – a statement that contradicted the Company's prior statement that it needed the larger facility simply because it was a "bigger company" following the Zales acquisition.  Defendant Light added that the Company would also use all the money from the LGP investment to purchase its own shares.

135.     Signet's August 25, 2016 disclosures partially corrected Defendants' prior materially misleading statements and omissions concerning the credit quality of Signet's loan portfolio, the conservative nature of its underwriting, and the profitability of its credit business. Notwithstanding that partially corrective information, Defendants' prior false statements and omissions continued to operate as a fraud on the market because the August 25, 2016 disclosures failed to disclose that:    (a)  Signet had engaged in reckless underwriting and had been

systematically issuing loans to subprime borrowers to drive loan volume; and (b) Signet overstated its financial results by failing to properly reserve for delinquent loans in violation of GAAP.

136.    The August 25, 2016 disclosures also partially materialized the concealed risks of Signet's poor quality credit portfolio.  As the Company reacted to the increasing bad debts, it tightened its underwriting standards – a consequence forseeable to the Company since the Company knew (or should have known) the poor quality of its credit portfolio.  The tightened underwriting standards suppressed sales and materialized the risk of the poor quality loan portfolio.

137.    The August 25, 2016 disclosures by Defendants did not reveal the full truth.

138.    On August 26, 2016, representatives of Signet spoke to representatives of Marcato and provided false assurances as to Signet's credit quality.  On that call, Signet also failed to reveal its culture of sexual harassment, the later revelation of which would cause Marcato further damages.

## FURTHER EVENTS CONFIRM SIGNET'S CREDIT QUALITY FRAUD

### The SEC Questions The Company, And Signet Stonewalls

139.    In 2016, the SEC began questioning the Company's disclosures concerning its use of recency accounting.  On October 4, 2016, the SEC sent Signet a letter asking for detail on the Company's accounting practices.  The SEC asked the Company why it did not disclose the dollar amount of accounts that were contractually delinquent, but which Signet nevertheless categorized as performing under its recency method:

> [T]ell us your consideration of disclosing the aging of accounts receivable on a contractual basis as compared to the aging of accounts receivable based on your recency-aging methodology as of each balance sheet date; i.e., the dollar amount of accounts that is contractually delinquent but still considered current or performing, based on your recency-aging methodology.

140.   In response to the SEC's questions, the Company stonewalled.  In an October 18, 2016 letter to the SEC, Signet again offered a spate of generalities, asserting that the recency method allowed it "to provide outstanding customer service and build long-term relationships with its guests, while maximizing the use of our working capital."  Signet also asserted that the recency method "provides a more accurate reflection of its customers' performance relative to the ultimate collectability of the customer account," and that providing information about what the Company's delinquencies would look like under the contractual method "is not relevant or meaningful from a disclosure perspective."

141.   On March 9, 2017, the Company reported results for the fourth quarter of 2016. On the same day, the Company held a conference call to discuss these results.  In a remarkable change, and unlike previous analyst calls, this call was moderated by Signet's head of investor relations, James Grant, and its non-executive Chairman of the Board of Directors, Todd Stizer.

142.   Stizer continued the defense of the Company's use of recency accounting – this time offering the excuse that Signet employed the method in order to enable its customers to maintain higher credit scores.  Notably, in another about-face for the Company, Stizer also stated that Signet would switch to the contractual method if the Company kept the credit business. Stizer said specifically:

> [I]n regard to our credit business, we absolutely reject any notion that Signet manipulates either its numbers or its customers. The great American retail business was built on consumer credit provided by retailers. While we respect that this system is in transition, we are providing a valuable service for our customers, enabling them to celebrate life and express love. . . . It is regrettable that the use of the recency aging method, a credit business management tool which we've applied in our credit business consistently and successfully for over 30 years, has been distorted by certain members of the financial community to advance their own narrative about our business. In reality, the recency method actually enables customers to better maintain their credit rating. And we are, after all, interested in serving our customers. That being said, should we decide to retain and optimize the in-house credit business, we will change to contractual aging.

**Post-Relevant Period, Defendants Reveal That The Portfolio Contains Massive Amounts of Subprime Loans**

143.    On May 25, 2017, the Company announced unexpectedly bad financial results as well as the sale of a portion of the credit portfolio, which gave investors new insight into Signet's lending operation. Significantly, the Company revealed that – even though it had been considering selling its portfolio for one year – it had been able to sell only the "prime" portion of its credit portfolio to Alliance Data Services. This portion of the portfolio totaled $1 billion or approximately 55% of the total book. The remaining 45% of the loan book consisted of $700 million to $800 million in subprime loans. The Company had been unable to find a buyer for these toxic credits.

144.    The Company further announced that it was outsourcing the servicing of the subprime portfolio to two different credit servicers, Genesis and Progressive Leasing. Progressive would service the most risky portion of the subprime customers by offering them a so-called "lease to own" option. In other words, these customers were of such poor credit quality that they were only qualified to lease their jewelry rather than buy it on credit.

145.    Progressive, a virtual rent-to-own company that appeals to a credit-challenged customer base, was acquired by Aaron's, Inc. ("Aaron's"), a brick-and-mortar rent-to-own company self- described as serving "both the unbanked and under-banked customer," 83% of which fall into the $15,000 - $50,000 per household income range. According to an Aaron's press release discussing the Progressive acquisition, Progressive "offers point-of-sale lease and purchase programs to customers who do not qualify for traditional, FICO-based financing."

146.    During the May 25, 2017 investor call, Defendant Santana acknowledged that these most risky of customers comprised approximately 7% of the company's sales for the past several years, which amounted to about $125 million of the credit portfolio.

147.    On that conference call, analysts asked when the Company would be able to find a buyer for the $700 to $800 million worth of subprime loans in the portfolio. Defendants Light

and Santana were unable to give any timeline, other than to concede that it would not be in 2017. In other words, there was no buyer in sight.

148. These post-Relevant Period admissions confirmed that Defendants' prior representations about credit quality were false or misleading. Contrary to Defendants' numerous prior public statements asserting that the credit book was strong and did not pose a material risk, on the conference call, and in accompanying materials, they now stated that the purpose of the transaction was to "substantially derisk[] our balance sheet" and "eliminate material credit risk from the balance sheet." Signet also confirmed that – after more than a year of defending its recency method as appropriate and transparent – it would finally switch to the contractual method for its subprime loans in October 2017.

149. On March 14, 2018, Defendants made an announcement effectively admitting that the subprime portion of Signet's credit portfolio was severely overvalued, and its reserves understated. The too-low reserves and the overvaluation of the credit portfolio existed during the Relevant Period. This post-Relevant Period admission confirmed that Defendants' prior quantitative representations about credit quality were false or misleading.

**Post-Relevant Period, Multiple Government Regulators Investigate Signet for Abusive And Deceptive Lending Practices**

150. On December 1, 2017, Signet disclosed that two government regulators were investigating Signet's lending practices for widespread violations of laws prohibiting abusive and deceptive lending practices.

151. The Company also disclosed that, on September 6, 2017, Signet was notified that the CFPB's Office of Enforcement was "considering taking legal action against Signet" for violations of sections 1031 and 1036 of the Consumer Financial Protection Act of 2010 and the Truth in Lending Act, laws which are meant to regulate deceptive and abusive practices and protect consumers against inaccurate and unfair credit card practices. The violations at issue, according to Signet, related to its "in-store: credit practices, promotions, and payment protection products."

The CFPB website includes nearly 600 complaints against Signet for, among other things, fake accounts set up through deceit and identity theft, and abusive collection practices – the polar opposite of the "conservative" and "stringent" lending practices that Defendants' touted. According to the Company's December 1, 2017 Form 10-Q, the CFPB had given Signet the opportunity to submit a letter "present[ing] its position to the CFPB before an enforcement action is recommended or commenced."

152.    Signet's lending practices also triggered an investigation by the New York Attorney General into "similar issues under its jurisdiction," the existence of which Signet also disclosed in its December 1, 2017 Form 10-Q for the first time.

153.    In January 2019, Signet settled with the CFBP and New York Attorney General, paying $11 million because of its deceptive and abusive lending practices.  In its press release announcing the settlement, the CFPB detailed numerous violations of law by Signet with respect to its lending practices:

> The Bureau's and the State's parallel investigations found that Sterling violated the Consumer Financial Protection Act of 2010 by opening store credit-card accounts without customer consent; enrolling customers in payment-protection insurance without their consent; and misrepresenting to consumers the financing terms associated with the credit-card accounts. The Bureau also found that Sterling violated the Truth in Lending Act by signing customers up for credit-card accounts without having received an oral or written request or application from them. The State of New York found that Sterling violated several provisions of state law.

154.    The CFPB (and NY State Attorney General) complaints concerned actions by Signet, before, during, and after the Relevant Period.

### SUMMARY OF SIGNET'S SEXUAL HARASSMENT FRAUD

155.    Signet misled investors about a culture of rampant and pervasive sexual harassment at Signet as well as the nature and impact of certain litigations that had been initiated against Signet relating to its culture of sexual harassment.

156.    While the existence of such a culture would be of importance to any investor, it was particularly important to investors in Signet stock.  This is because the Company's principal

product, bridal and other jewelry, was primarily marketed to a female audience and purchased for women. Further, as the Company repeatedly told investors, Signet's business was built on a foundation of trust, and that trust was cultivated by its employees. For precisely this reason, the Company stated in its June 24, 2015 investor presentation that its employees were its "most important competitive strength." The existence of pervasive sexual harassment at Signet seriously threatened to alienate the recipients of its products, and severely harm the trust that its business was built upon. It also threatened to severely harm the Company's relationship with the employees who were charged with creating that trust and building Signet's reputation.

### Signet Repeatedly Mischaracterized the Actions and Made Misleading Statements Concerning the Conduct of Its Business

157. On March 18, 2008, a class action lawsuit, captioned *Jock et al v. Sterling Jewelers, Inc.*, Case No. 1:08-cv-02875-(JSR), was filed in the United States District Court for the Southern District of New York (the "*Jock* Litigation").

158. The *Jock* Litigation was filed on behalf of a class of current and former female employees of Sterling. It alleged that female Sterling employees were subjected to age and gender discrimination, as well as sexually harassing comments and communications, while working there. On the basis of these allegations, the class brought claims against Sterling for violations of (i) Title VII of the Civil Rights Act, (ii) the Equal Pay Act, and (iii), on behalf of two of the named plaintiffs, for violations of the Age Discrimination in Employment Act.

159. Sterling's employment agreements required that employees agree to arbitrate disputes arising out of their employment. On June 18, 2008, Judge Jed Rakoff referred the *Jock* Litigation to private arbitration, which was conducted by the American Arbitration Association Employment and Class Action Tribunal under case number 11-160-00655-08 (the "*Jock* Arbitration," and, collectively with the *Jock* Litigation, the "*Jock* Actions"), and stayed the *Jock* Litigation. Retired Judge Kathleen Roberts served as the arbitrator in the *Jock* Arbitration (the "Arbitrator"). The *Jock* Arbitration was initially kept confidential.

160.    On September 23, 2008, the United States Equal Employment Opportunities Commission also filed a lawsuit against Sterling, bringing claims under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991 (the "EEOC Litigation," and, collectively with the *Jock* Actions, the "Actions").

161.    On June 21, 2013, claimants in the *Jock* Arbitration filed a memorandum in support of their motion for class certification (the "Class Certification Brief"). The Class Certification Brief attached declarations (the "Declarations") from hundreds of Sterling employees (the "Declarants") concerning their experiences at Sterling.

162.    Neither the Class Certification Brief nor the attached Declarations were initially made public. Although claimants in the *Jock* Arbitration sought to make the materials public, Signet resisted. Finally, in late 2013, counsel for plaintiffs in the *Jock* Actions, Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"), posted a version of the Class Certification Brief with Company-approved redactions (the "Redacted Class Certification Brief") on its website. The Declarations were not posted publicly at that time.

163.    The Redacted Class Certification Brief contained only limited information from the Declarations that was immediately relevant to class certification issues. While the brief asserted that Defendant Light had engaged in certain instances of sexual harassment, the evidence supporting those assertions was largely obscured. The Company-approved redactions in the Redacted Class Certification Brief obscured, among other things, the names of many individuals and the nearly eight pages of the Class Certification Brief's Statement of Facts that specifically discussed the roles and activities of Sterling executives in Sterling's alleged discriminatory activity and provided "evidence of abusive treatment and sexualization of women employees."

164.    On February 2, 2015, the Arbitrator issued a ruling permitting the *Jock* Arbitration claimants to proceed with disparate impact claims on a class-wise basis (the "Class Award"). As with the Redacted Class Certification Brief, the Class Award contained only limited information concerning the underlying merits of the litigation, focusing instead on issues

pertinent to its class certification determination.  The Arbitrator permitted Cohen Milstein to post the Class Award on its website.  Like the Redacted Class Certification Brief, the Class Award contained only limited information relevant to class certification issues.

165.   For its part, Signet repeatedly mischaracterized the Actions when it made (required) disclosures to investors in its filings with the SEC.  Signet first disclosed the *Jock* Litigation in a Form 6-K it filed with the SEC on March 20, 2008.  In its disclosure, Signet stated that the *Jock* Litigation (i) was based on allegations of discrimination in "store-level" employment practices concerning "compensation and promotional opportunities" made by a limited number of employees at a "few" stores, and (ii) that the Company had investigated the allegations and found them to be unsubstantiated:

> The lawsuit alleges Sterling Jewelers' US store-level employment practices are discriminatory as to compensation and promotional opportunities. The lawsuit is based on the allegations of 15 former and current employees working in a few stores. They allege that the subsidiary paid women less than men who performed similar work, and with favoring men over women for promotions. When these allegations first surfaced, they were investigated. That investigation failed to substantiate the allegations.

166.   In subsequent disclosures throughout 2008 and into 2009, Signet repeated its characterization of the *Jock* Litigation as alleging only that store-level employment activities were discriminatory with respect to pay and promotion.

167.   On March 25, 2009, Signet filed a Form 6-K with the SEC in which it revised its disclosure concerning the *Jock* Litigation to include language disclosing the EEOC Action. Signet added no substantive facts concerning the allegations underlying the lawsuits, stating only that:

> A class lawsuit for an unspecified amount has been filed against Sterling Jewelers Inc., a subsidiary of Signet Jewelers Limited, in the New York federal court by private plaintiffs. The US Equal Opportunities [sic] Commission has filed a separate lawsuit <u>alleging that US store-level employment practices are discriminatory as to compensation and promotional activities.</u>

168.     Signet substantially repeated this disclosure in its various SEC filings throughout 2009.  By letter dated December 23, 2009, the SEC raised questions about the adequacy of Signet's disclosures.  Among other things, the SEC asked Signet to supplement its disclosures concerning the Actions by "disclos[ing] the date the proceedings commenced, and briefly describ[ing] the factual basis alleged to underlie the class action proceeding."

169.     In a letter filed with the SEC on January 22, 2010 (the "January 2010 Letter"), Signet proposed including the following language in future filings, which did not substantially expand on its prior disclosures:

> In March 2008, a class action lawsuit for an unspecified amount was filed against Sterling Jewelers Inc[.], a subsidiary of Signet, in the U.S. District Court for the Southern District of New York federal court by private plaintiffs alleging that US store-level employment practices are discriminatory as to compensation and promotional activities. On September 23, 2008, the US Equal Employment Opportunities [sic] Commission ("EEOC") filed a lawsuit against Sterling in the U.S. District Court for the Western District of New York. The EEOC's lawsuit alleges that Sterling engaged in a pattern or practice of gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present. The EEOC asserts claims for unspecified monetary relief and non-monetary relief against the Company on behalf of a class of female employees subjected to these alleged practices. The Group denies the allegations from both parties and intends to defend them vigorously.

170.     Signet adopted the substantive characterization of the allegations in the Actions that it proposed in the January 2010 Letter in the litigation disclosure and litigation-related "Risk Factors" sections of its SEC filings from 2010 through the end of the Relevant Period.

171.     In its Form 10-Q filed with the SEC on August 29, 2013, Signet first disclosed that, in the *Jock* Arbitration, "[o]n June 21, 2013, pursuant to the briefing schedule ordered by the Arbitrator, the Claimants filed their motion for class certification, disclosed their experts, and produced their expert reports."   Sterling did not disclose the existence or contents of the Declarations at this time.

172.    Sterling first acknowledged the existence of the Declarations in its Form 10-Q filed with the SEC on November 26, 2013, when it disclosed that "[i]n mid-October 2013, Sterling filed its opposition to Claimants' class certification motion, its disclosure of its experts and their reports, as well as three motions to exclude the reports of Claimants' experts and a motion to strike [the Declarations] and attorney summaries."  Sterling said nothing further about the Declarations in that filing, and made no further statements concerning the Declarations until after February 28, 2017.

173.    Signet's attempts to minimize the Actions were largely successful:  analysts paid little attention to the Actions.  News coverage of the Actions was similarly limited.  Only a handful of articles discussed the Actions in the period prior to February 26, 2017, and, unsurprisingly, none of those addressed the extensive facts asserted in the Declarations.

174.    At the same time that Signet minimized the Actions in its public disclosures, it also assured the market that it adhered to rigorous standards of ethics.  Prior to and during the Relevant Period, Signet repeatedly made available to investors its "Code of Conduct" and "Code of Ethics" (collectively, the "Codes").  In its Form 20-F, filed with the SEC on April 1, 2009, Signet explained that the Codes applied to senior officers, and adherence to them was of "vital importance:"

> In adopting both the Code of Ethics and the Code of Conduct, the Company has recognized the vital importance to the Company of conducting its business subject to high ethical standards and in full compliance with all applicable laws and, even where not required by law, with integrity and honesty.

175.    The Code of Conduct explained that (i) Signet was committed to a workplace free from sexual harassment, (ii) the Company based its employment and promotion decisions, among other things, "solely" on ability and potential in relation to job needs, (iii) the Company would protect persons who reported ethical concerns and had confidential and anonymous processes for reporting concerns, and (iv) sexual harassers would be disciplined. As the Code of Conduct explained (italics in original):

Maintaining a Safe, Healthy and Affirmative Workplace

The Company is an equal opportunity employer and bases our recruitment, employment, development and promotion decisions solely on a person's ability and potential in relation to the needs of the job, and complies with local, state and federal employment laws.

The Company is committed to a workplace that is free from sexual, racial, or other unlawful harassment, and from threats or acts of violence or physical intimidation. Abusive, harassing or other offensive conduct is unacceptable, whether verbal, physical or visual.

176.    The Code of Conduct further explained:

Those who violate the standards in this Code will be subject to disciplinary action.

* * *

It is the Company's policy to encourage the communication of bona fide concerns relating to the lawful and ethical conduct of business, and audit and accounting procedures or related matters. It is also the policy of the Company to protect those who communicate bona fide concerns from any retaliation for such reporting. Confidential and anonymous mechanisms for reporting concerns are available and are described in this Code.

177.    The Code of Ethics provided for additional duties for Signet's CEO, CFO, and other senior officers of Signet and its subsidiaries (collectively, the "Covered Officers").  As the Code of Ethics explained:

In all of their dealings on behalf of, or with, the Company, each Covered Officer must

Engage in and promote honest and ethical conduct . . . ;

Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts . . . .

178.    The statements above from the Codes were substantially re-adopted each year by the Board and published on Signet's website before and during the Relevant Period.  Signet also

incorporated these documents by reference into SEC filings before and during the Relevant Period.

179.    Signet also repeatedly emphasized to the market that, given the nature of its business – selling jewelry, often engagement rings, in face-to-face settings – its business was built on a foundation of reputation and customer trust.  Signet further stated that this reputation and trust were cultivated by its employees, who interacted directly with Signet's customers. Given the critical function of its employees, Signet specifically stated in its SEC filings that the Company had an "excellent" relationship with them.

### In Reality, And Contrary To Signet's Representations, Signet Had a Culture of Rampant and Pervasive Sexual Harassment Reaching Up To The Highest Levels Of The Company

180.    Signet's disclosures and omissions successfully concealed an ugly truth:  that Signet's culture was rife with sexual harassment of female employees, all the way up to the highest levels of the Company – including Signet's CEO, Light.

181.    As set forth more fully below, the truth would not be revealed until February 2017, when versions of the Declarations, albeit still bearing Company-approved redactions obscuring the names of executives and managers who committed sexual harassment (the "Redacted Declarations"), were made public.

182.    The Redacted Declarations provided copious facts demonstrating that, unbeknownst to investors, (i) sexual harassment was indeed rampant at Signet, (ii) it pervaded several aspects of female employees' work lives, and (iii) executives at the highest levels of the Company committed acts of sexual harassment against their subordinates.  Signet by and large did not contest the veracity of the horrific facts contained in the Declarations during Class Certification in the *Jock* Arbitration.  As the Arbitrator explained in the Class Award:

> The conduct described in the [D]eclarations . . . includes references to women in sexual and vulgar ways, groping and grabbing women, soliciting sexual relations with women (sometimes as a quid pro quo for employment benefits), and creating an environment at often-mandatory Company events in which women

are expected to undress publicly, accede to sexual overtures and refrain from complaining about the treatment to which they have been subjected. . . . For the most part Sterling has not sought to refute this evidence; rather Sterling argues that it is inadmissible, irrelevant and insufficient to establish a corporate culture that demeans women.

183. Later reporting, including an April 2019 exposé by the *New York Times Magazine*, would confirm that the behavior described above was pervasive at Signet.

**Sterling Management – Including Executives at the Highest Levels of the Company – Were Known Throughout the Company for Harassing Female Subordinates**

184. Several Declarants explained that Sterling had a pervasive – and well-known – culture of sexual harassment, flowing from the very top levels of the Company.  For example, Anthony Christy, who worked at Sterling for several years during the period from 1997 through 2008, explained about the Company's leadership:

In general, I would describe the top executives of the Company as being a "boys' club." There was basically a clique at the top of the Company that consisted of the primary male executives. . . . These executives had a reputation at the Company for engaging in intimate sexual relations with subordinate female managers at Sterling.

185. Sherri Chegini, who worked for Sterling in the early 1990s, and then again from approximately 2000 until 2006, had a similar characterization.  She recalled that Sterling managers, including District Managers and higher-level executives, were part of what they called "the 'boy's club,'" which consisted of "male managers who played golf together, went to strip clubs, and made sexual conquests of female associates."

186. Sadie Cisneros-McMillian, who worked for Sterling from 2003 until 2006, stated that "it was widely known and accepted as part of the Company culture that male management and upper management engaged in sexual harassment of and sleeping around with female employees under them."

187.    Several high-level executives were notorious throughout the Company for being "womanizers" and for routinely sleeping with and sexually harassing female subordinates. As Heather Henry, who worked for Sterling from 1998 until 2005, explained:

> Sexual harassment regularly occurred in Sterling. The Company's top level executives fostered this behavior and this culture of sexual discrimination at the Company because they actively participated in it. For instance, [a certain top-level executive] had a well-known reputation at the Company for being a womanizer who took sexual advantage of lower level-female managers or employees at the Company.

188.    Donna Orosz, who worked at Sterling from 1984 until at least 2009, recalled, of a senior Sterling executive, that "[i]t was known among the managerial ranks that [he] was a womanizer, who used the power and prestige of his high-ranking executive position at Sterling to get subordinate female managers to have sexual affairs with him."

189.    Katherine Christy, who worked for the Company from 1993 until 2006, likewise said, of a "very high ranking executive of the Company," that he "had a reputation at the Company for pursuing and engaging in romantic affairs with subordinate female managers at Sterling. . . . Other Sterling managers told me that [he] had a "list of pretty girls" that he was especially interested in at the Company. . . ."  Christy further explained that "[i]t was also common knowledge at the Company that there were other high-ranking male executives who . . . were also engaged in sexual affairs with female subordinates in the Company . . . ."

190.    Melissa Corey, who worked for Sterling for approximately seven years starting in 2002, mentioned two specific executives who had reputations for being "womanizers."  At least one of them was "a high level executive" who had a reputation for "sleeping with female employees."

191.    Mandy Lee Alva, who worked at Sterling in 1996 and then from 1999 until 2007, recalled never wanting to meet a certain "top executive" because he had a reputation "for being a womanizer who slept with subordinate female managers at the Company."  She also stated that

she was told by one or more of her Store Managers that the executive "would 'do' anything that walked and that female managers needed to be careful about what clothes they wore when they were around him, so as not to provide him with any provocation" to approach them sexually.

192.    Tina Waring, who worked for Sterling from approximately 1999 or 2000 until 2005, stated that she was told by a store manager that a certain executive, who "was a high level executive at Sterling," was a "playboy" who "slept around with female Sterling employees."

193.    Julia Highfill, who worked for Sterling from 2002 until 2011, stated:

> During my employment at Sterling, I was aware that sexual harassment of female employees by superior male managers and executives was widespread and prevalent. I was exposed to many examples of this during the nearly nine years I worked for Sterling. The sexual harassment I was aware of occurred throughout the various supervisory ranks of the Company and included some of the Company's highest ranking male executives.

194.    Joseph Kabbas, who worked at Sterling, likewise stated:

> I knew [a certain executive] during my employment at Sterling. He was a high-ranking executive who became Sterling's [Redacted] in approximately 2003. I met [him] many times including at Sterling's Headquarters in [Redacted] Ohio . . . . [He] was an attractive man with a charismatic personality. He also had a very well-known reputation at Sterling for being a womanizer with subordinate female employees at Sterling. This reputation came to me from other Store Managers and supervisors above the Store Manager level who would regularly discuss [his] womanizing activity.

195.    Later reporting, including an April 2019 exposé by the *New York Times Magazine* would confirm that the behavior described above went to very highest executives at Signet, with the author of the *New York Times Magazine* piece writing that they believed Defendant Light was often named in the redacted portions of the Declarations.

### Sterling Executives Routinely Sexually Harassed Subordinates at Sterling's Annual Managers' Meetings and Other Special Events

196.    The Declarants also identified scores of instances where Sterling executives –
including high-level executives – sexually harassed female subordinates at Sterling's annual
Managers' Meetings and at other special events.

197.    Anthony Christy attended several Managers' Meetings, and explained:

> These meetings provided much opportunity for Sterling's male
> executives and managers to have sexual encounters with
> subordinate female managers in attendance. Male executives used
> the power and prestige of being Sterling executives to find and
> coerce lower-level female employees at Sterling to have sexual
> relations with them. Based on my personal observations of
> executive behaviors and from discussions with other Sterling
> Managers, it was apparent that this inappropriate and warped
> activity was well-known throughout the Company, and it
> encouraged lower-level male managers to engage in similar
> behavior.

198.    Timeen Adair, another former Sterling employee who attended several Managers'
Meetings, also observed male executives and District Managers hitting on female subordinates at
the events.  She explained that "[i]t seemed . . . that at these meetings the men were on the prowl
sexually, and the younger the better when it came to the females they pursued."

199.    Chris Jones, who worked at Sterling from 2001 to 2008, explained that:

> It was common knowledge at the Company that the Annual
> Managers' Meeting . . . was a "Sexcapade." That is the term I
> recall hearing to describe it. There were wide-spread rumors at the
> Company about all the illicit sexual activity at the [events], which
> is why they were referred to as "Sexcapades."

200.    Melissa Corey attended several Managers' Meetings. She stated that the
Managers' Meetings "had a reputation within the company for being a wild event in which male
managers, supervisors, and executives could seek out sexual encounters with subordinate female
Store Managers."  She further explained that, at Managers' Meetings, she

> [r]egularly observed [male executives and District Managers]
> hitting on female Store Managers, buying them drinks, dancing
> with them in a sexually suggestive manner, and otherwise sexually

preying on them. This was done out in the open, and appeared to
be encouraged, or at least condoned by the company.

201.    She also called the Managers' Meetings "a sex-fest," explaining that she was
warned to stay away from a hot tub at the resort at which a Managers' Meeting was being held
because "male executives and supervisors had sex with female Store Managers in the hot tub
after hours."  She further recalled seeing a high-level Sterling executive regularly staying late at
the bars with a group of attractive female Store Managers and buying alcoholic drinks and shots
for the group, and that she had heard stories about that executive, who had a reputation as a
"womanizer," being naked in the hot tub with female Store Managers.

202.    Alain Dawn Gough, who worked at Sterling from 1998 until 2005, also described
the Managers' Meetings as a "sex-fest."  She recalled witnessing members of upper management
getting drunk with employees, and noted that an executive, "who was at the top of upper
management, had a reputation of being a womanizer of Sterlings' [sic] female employees and
was regularly drunk with a woman by his side." She also recalled hearing "that members of
upper management would invite some of the female Store Managers to join them in their pool
area where they would watch the female Store Managers get even more drunk."

203.    More "colorful" terms were commonly used for the Managers' Meetings as well.
Marsha Davis, who worked for Sterling from 1994 to 2002, stated that at least one Store
Manager who had attended a Managers' Meetings referred to it as a "f*ck fest."  She also stated
that she learned about the reputation of Managers' Meetings from Store Managers who had
attended them, explaining that "[t]he reputation of the [Managers'] Meeting was one of sexual
permissiveness between the male and female managers and executives who attended it."

204.    Stacey Goldberg, who worked at Sterling from 1997 until 2007, also used the
same term: she stated that the Managers' Meetings "had a well-deserved reputation of being
'F*ck Fests,' which was a common term at Sterling used to describe them. . . . Sexually
promiscuous activity between male executives and managers and subordinate female managers
was commonplace."

205.    Diane Acampora, who worked for Sterling from 2002 through 2009, attended several Managers' Meetings.  Among other things, Ms. Acampora explained in the Declarations that "[i]t was common knowledge at the Company that these meetings provided abundant opportunity for heavy drinking and extramarital sexual activity between male managers, supervisors, and executives and subordinate female managers."  She further explained that she saw a Sterling executive at the Managers' Meetings who "had a well-known reputation at Sterling for being a womanizer including his having sexual relations with subordinate female managers." She also explained that, while attending one of the Managers' Meetings, she was groped and fondled by a Sterling manager, and that a District Manager attempted to kiss her.  She further explained that it was common knowledge that sexual activity between male Sterling managers and their female subordinates occurred during cruises that Sterling held to recognize high-performing employees.

206.    Heather Ballou, who worked for Sterling from 2000 through 2009, also attended several Managers' Meetings.  At one, she was propositioned by a Sterling District Manager.  She also recounted observing a Sterling executive watching a group of 10 female managers "frolicking" in a pool in various stages of undress at one of the meetings, and, at another, the same executive flirted with her and touched her on the lower back in a way that made her feel uncomfortable and that he was "putting the moves" on her and another Store Manager.

207.    The Class Complaint alleges (on information and belief) that the Sterling executive whom Ballou described and whose name was redacted in Ballou's Declaration was Light, who would later become Signet's CEO.  The Redacted Class Certification Brief alleged that "Mr. Light was also observed by multiple witnesses at Company meetings being entertained by female managers, in various states of undress, in a swimming pool and joining them in the pool himself."

208.    Jeanene Glaude worked for Sterling from 1996 until 2002.  She recalled seeing a "very high-ranking executive at the company" at the Managers' Meetings, and stated:

> [At the Managers' Meetings] I regularly observed him being very touchy-feely with subordinate females, and flirting with them. For example, he usually had a crowd of attractive female managers around him, and it was not unusual for him to have his arm around one of them. . . . [He] had a reputation within the company as being a womanizer.

209.    Brad Bartl, who worked for Sterling from 1989 until 2006 and attended Managers' Meetings from 1991 to 2005, explained that "[i]t was . . . common knowledge that many of the male managers and executives in attendance [at the Managers' Meetings] were engaged in extramarital sexual activities with their subordinate female managers."

210.    Donna Bartl, who worked for Sterling from 1999 through 2003, attended the 2002 Mangers' Meeting and observed that "[t]here was a lot of drinking . . . and inappropriate fraternizing between male managers and their female subordinates."  She gave the example of observing a Sterling executive inappropriately touching a female subordinate on the buttocks while waiting for dinner with a group of Sterling employees.

211.    Cathy Mantia, who worked for Sterling from 2003 until 2006, attended the 2005 Managers' Meeting.  She recalled seeing a District Manager and other executives "dancing with female Managers in a close, sexual manner with their bodies touching those female Managers." She also explained that she "could not walk around [the event] without a male Manager propositioning [her] for sex."  She recounted an episode where an executive had tried to force her to dance with him, and held her with both arms around her when she refused to do so.  When several women intervened and managed to pry the executive's arms from around her so she could escape, he became angry.

212.    Katherine Christy, who worked at Sterling from 1991 until 2006, shared her harrowing experience at the 2003 Managers' Meeting:  she was dancing with a male District Manager at a party there when

> [he] said, "I need some air." He put his hand on my elbow and led me off the dance floor and outside. After we got outside, he suddenly grabbed my arm and dragged me off to the bushes nearby. I was stunned. He reached through the front of my dress

> and fondled my breasts and kissed me on the mouth. I pushed him
> off with both hands, and kneed him on his inner thigh. I ran away
> very upset and crying.

213.     Christy returned to the party, where she learned that the same District Manager had previously been "arrested at the Florida meeting for raping [a female Sterling employee]."

214.     Several of the other Declarations give similar accounts of Sterling's Managers' Meetings.  In total, more than 90 of the Declarations discussed the Managers' Meetings, and the vast majority of those described a similar atmosphere of sexual predation by Sterling managers and executives on female subordinates.

### Sterling Executives Regularly Harassed Female Subordinates in the Ordinary Course of Business

215.     The Declarations further make clear that sexual harassment of female employees by Sterling executives was not limited to the Managers' Meetings – it was a pervasive feature of the Sterling workplace.

216.     Timeen Adair explained that, on the occasions a certain Sterling executive visited the store where she worked, he "requested attractive female employees go out for drinks and dancing with him the night before he visited the store."  She further explained that the District Manager would call in advance of these visits with a list of women for the executive to party with.  She stated, "[i]t was apparent to me that [the executive] was arranging these evenings to find someone to hook up with sexually," and explained that, although the female employees did not want to go, they felt obligated to do so.  She also recounted hearing stories of women going up to the executive's room at the hotel and hearing about a time when a colleague had to get a female employee out of the executive's bathroom after the female employee locked herself in there when she became scared by the executive's behavior.

217.     Heather Ballou also experienced sexual harassment while working at Sterling. She explained that a District Manager "would come up and wrap his arms around me, and I would have to pull away.  [The District Manager] told me not to tell his fiancée, who also

worked for Sterling in the district." On another occasion, Ballou said, the same District Manager "grabbed my butt in a sexual way." Ballou also described a situation where a District Manager sexually assaulted Ballou's coworker. Although the District Manager apologized the next day, he "also said he could get away with just about anything, like it was a joke." Ballou and her coworker did not report the assault because they were afraid of retaliation. Ballou also stated that it was "common knowledge in the store that [the District Manager] had several sexual harassment complaints from female employees against him [but] he was not fired for sexual harassment until years later."

218.    Anna Battaglia-Laglante worked at Sterling from 2005 until 2006. While there, she observed and experienced "inappropriate behavior and sexual harassment by male upper management;" she stated, for example, that a District Manager would "look me and the other female Sales Associates with whom I worked up and down, stare at our breasts and rear ends, get very close in our personal space, and even reach into our shirts to stick tags back in." She never complained about his behavior because she and her coworkers "were . . . afraid of him. He was our District Manager, and we felt our jobs were in his hands."

219.    Sherri Chegini recalled that two different Store Managers she worked for were both having affairs with their District Managers.

220.    Anthony Christy likewise stated, "I was told by a young female front office employee at [a] Kay store that [the District Manager] had made sexual advances toward her. She was approximately 19 or 20 years old at the time . . . . [The District Manager] was viewed by his employees as a sexual predator."

221.    Katherine Christy also experienced sexual harassment from her District Manager. She explained that her District Manager "often made inappropriate sexual comments to me that made me uncomfortable. He made comments about my breasts and legs." She recalled one incident in which they were sitting on a couch and he said to her, "[o]h my god. Looking at your legs makes me hard. We have to get up and walk around."

**Sterling Executives Regularly Conditioned Employment Decisions Concerning Female Employees On Whether Or Not Those Employees Acceded To Sexual Demands**

222.     The Declarations demonstrate that female employees at Sterling were routinely pressured into sexual activity with their superiors in exchange for better economic opportunities at the Company, including preferred store assignments and promotions, as well as to protect themselves from adverse employment decisions.

223.     Amanda Barger, who worked for Sterling on and off from 2005 until 2010, explained that, when she expressed interest in a promotion to a District Manager, he invited her to a management meeting in Georgia.  While at the meeting, he sent her a sexually explicit text. When she reported the sexual harassment, Human Resources employees accused her of having a relationship with the District Manager but told her that "she would not have to be worried about [her] job" if she "cooperated."

224.     Mary Casillo, who worked at Sterling from 2003 until 2010, explained that "[s]exual harassment is prevalent at Sterling."  She recalled a situation where a female Assistant General Store Manager was passed over for promotion to General Manager in favor of a female sales person "who was rumored to have been performing sexual favors for the District Manager." After that sales person was promoted to Store Manager, another employee walked in on her and the District Manager "engaged in sexual behavior in the stockroom."

225.     Ellen Contaldi worked for Sterling from 1994 until 2008.  As she explained in her Declaration:

> Employees typically found out about promotion opportunities at Sterling through word-of-mouth. Advancement at Sterling was very dependent on who you were connected to at the Company. If you were connected to, meaning you had a relationship with, someone in upper management you were more likely to advance into management and receive perks. At Sterling it was common for female employees to exchange sexual favors for non-sexual favors with their male superiors, and when a female employee was promoted employees typically speculated "I wonder who she knew and who she blew," meaning that if a female employee obtained a

promotion it was highly probable that she had an intimate relationship with a male superior.

226.    Contaldi further explained:

> I knew from speaking with other female Store Managers that a way to ensure advancement at Sterling was to establish a sexual relationship with a male Executive. In approximately 2000, I began a sexual relationship with [an executive]. . . . When my relationship with [the executive] turned sexual, he transferred me almost immediately to a more desirable, high-volume store and I received a pay increase. Before my relationship with [him] I was placed in less desirable, low-volume Stores. He also started to groom me for advancement into management.

227.    Other employees' Declarations confirm that female employees were vulnerable to predation by male executives in exchange for career advancement and job security.  Alaine Dawn Gough explained that a certain District Manager "had many affairs with Store Managers. It was well known among the Store Managers that if [he] slept with a Store Manager, he looked out for her better interest."  Gough recounted a situation where a certain Sales Manager was caught "performing oral sex on" a District Manager, who later "turned a blind eye" to the Store Manager's declining sales; she was not written up or demoted, and nothing was entered into her file.  In fact, she was promoted.

228.    Jeanene Glaude likewise explained:

> [A very high-ranking executive] had a reputation within the company as being a womanizer. I heard this from other Store Managers and District Managers. It was believed within the company that sleeping with [Redacted] was a way for women to advance within the company. For example, [Redacted] was a young, attractive female employee who came to Sterling from Starbucks. She moved up in the company very quickly, and was promoted to Store Manager at the Kay store in California, at the [Redacted]. Sterling managers talked about how she gained quick advancement by being one of [the executive's] favorites, and by sleeping with him.

229.    Heather Ballou told of two situations where District Managers suggested that she could advance her career by acceding to sexual demands.  When she expressed interest in being promoted to the same District Manager who hugged and grabbed her as described above, he "tried to get me to go out and discuss it with him over dinner and drinks, in a manner that appeared inappropriate to me."  At the 2005 Managers' Meeting, Ballou, then a Store Manager in Florida, was propositioned by a District Manager.  She stated in her Declaration that the District Manager "told me that if I had sex with him, then he would make sure that I would be transferred back to the [redacted], Florida area whenever I wanted to make that move. From conversation with me, he knew that was something I was going to be interested in doing in the future."  Ballou acceded to the District Manager's demand, and, when she sought to transfer a few years later, the District Manager made the transfer happen.

230.    Cathy Mantia was also propositioned by a superior in connection with a potential promotion.  Mantia explained that, when she was interested in being promoted to Store Manager, a District Manager asked her "'what incentives' I was prepared to do for him in exchange for a promotion to Store Manager."  Mantia further explained, "I felt cornered, afraid, and angry that [the District Manager] was propositioning me for sex in exchange for a promotion to Store Manager."  She further stated that the District Manager propositioned her on at least four other occasions, and that she was initially afraid to report him.  Also, as discussed above, Mantia was subjected to sexual harassment at a Managers' Meeting, when a District Manager tried to force her to dance with him and became angry when she escaped with the help of friends.  She was fired soon after.  A few weeks later, she called the District Manager to discuss her termination and the sexual harassment incident.  The District Manager "confirmed that he was the person who dealt with termination issues," and became "hostile" and stonewalled Mantia when he learned about her reason for calling, saying that she "[would] not win a sexual harassment or wrongful termination case against Sterling."

231.    Female employees who refused to accede to their superiors' sexual demands risked being frozen out of opportunities for advancement at Sterling.  For example, Jessica

Delorey repeatedly refused the advances of the District Manager for whom she worked.  As she explained in her Declaration:

> At the time, I was a single mom and could not afford to lose my job. [The District Manager] knew this and preyed upon my vulnerability. However, I refused to succumb to his advances and requests for sexual favors and as a result, [he] refused to aid in my obtaining a raise or promotion to assistant management. I am not aware of females being promoted on merit by [the District Manager]. Based on my experience, the only way to be promoted as a female at Sterling under [him] was to perform sexual favors.

232.    Delorey further noted that female employees who had affairs with this particular District Manager received promotions shortly thereafter.

233.    Alain Dawn Gough recounted a similar example in which a female employee was pressured into sexual acts with a Sterling executive in order to keep her job.

> [M]ale District Managers were often predatory and sought out subordinate female employees to prey on. For example, in 1999, [a female store manager] told me that she contacted [a District Manager] because her store had an inventory problem and she was worried she would be fired. She told me that she agreed to have sexual relations with [the District Manager] in exchange for keeping her job. This Store Manager also described to me in detail their sexual encounter . . . . This Store Manager was not fired.

234.    Stacey Goldberg had a similar experience. She explained that a Sterling executive who would periodically visit her store "began to sexually proposition me" once they had become acquainted.  She explained that the executive "was very persistent in his pursuit of me," and that, after he continued to persist even though she rebuffed his advances, "I began to think my job security might be in jeopardy if I did not succumb to his pressure. I eventually felt I had no other option."  This also happened to Goldberg with her District Manager.  Although she felt it was inappropriate and against Sterling's official policies, "due to my concern about my job security and [the District Manager's] pressure, as my direct and immediate supervisor, I felt I had no option but to succumb to his demands."

235.    Heather Henry also experienced the pressure to engage in sexual acts to advance her career.  She explained that, when she sought a Store Manager position, a District Manager told her he could get her a job, and, "[b]ased on his reactions and what he said on the phone about helping me get [the job], it was clear to me that he would expect me to succumb to him sexually if I decided to accept this offer."   Henry decided not to accept the job, and was terminated shortly thereafter.

### Sterling Repeatedly Failed To Respond To Sexual Harassment Allegations and To Protect Female Employees Who Complained Of Sexual Harassment from Retaliation

236.    The Declarations also make clear that Sterling's responses to allegations of sexual harassment at the company were grossly inadequate, and that they failed to protect employees who reported harassment from retaliation by their harassers or the Company.

237.    Sterling utilized a hotline, called "TIPS," for employees to report matters including sexual harassment.  As many employees discovered, complaints raised via the TIPS hotline were routinely ignored or swept under the rug by the Company.  Even worse, although the TIPS system was held out to employees as being anonymous, it was not.  As many employees discovered, employees who reported sexual harassment were routinely outed to their harassers and subjected to retaliation for making complaints.

238.    For example, Jasmina Hadzialic explained in her Declaration that a male superior sent her "numerous text messages with pictures of his penis" and propositioned her with extremely crude language, saying "I want to bend you over the case and f*ck the sh*t out of you."  Although she reported this to her District Manager, nothing was done for three months, during which time the harassment continued.  When Sterling did finally act, it transferred Hadzialic.  She explained that she was not aware of her harasser being reprimanded; in fact, Sterling subsequently promoted him twice.

239.    As Julia Highfill explained in her Declaration:

Sterling did not have an effective or serious mechanism by which female employees could complain about their mistreatment. Many employees were afraid to call the supposed anonymous complaint TIPS line because it was not confidential or anonymous. In approximately 2003, I called the TIPS line to put in a complaint regarding [a District Manager]. [He] was scheduled to visit my store but he didn't show up until 30 minutes before closing. When [he] did show up it was clear that he was drunk; he was giddy and reeked of alcohol. After I called the TIPS line to complain about this incident, [the District Manager] called me back soon after I called and told me that I shouldn't have made a complaint against him. He confirmed that the TIPS office had notified him of my "confidential" complaint. He warned me if I called again, he would immediately find out about it. I was hesitant to call the TIPS line after that because I was afraid of retaliation. This was true throughout my employment with Sterling . . . .

240. Many employees who knew about the lack of anonymity of the TIPS hotline were scared out of using it at all. After Jessica Delorey was sexually harassed by a District Manager, a colleague told the District Manager that Delorey was going to call the TIPS hotline.

[The District Manager] then called the store and asked for me and demanded that I step outside and call him back on my cell phone and not on the store's phone. When I called him back, he was furious and threatened to fire me if I called TIPS. He stated, "If you complain, I will take you out." He also made clear to me that he would be informed if I called TIPS . . . . There was no one I could complain to at Sterling who had the power to stop the sexual harassment I was facing. I knew the TIPS tine would not be confidential because [the District Manager] clearly stated it was not and I learned through personal experience that it was not. I believe the fact that Sterling has no policy or procedure in place to allow employees to confidentially report sexual harassment without the fear of losing their jobs only allows for more sexual harassment to take place.

241. Amy Anderson, who worked for Sterling from 1984 until 1991 and again from 1998 until at least 2009, shared a story and explained that she did not believe that the TIPS hotline was truly anonymous:

Employees at Sterling are encouraged to use an anonymous "TIPS" system to report instances of sexual harassment. This system utilizes a toll-free number that supposedly reaches someone

in the H.R. department, who is then supposed to conduct an investigation. Although it is widely advertised that calls to the "TIPS" line are anonymous, this is not actually the case.

I am aware of a part-time Sales Associate who called in a complaint to the TIPS line about a Store Manager, in 1999 or 2000. Shortly after the complaint was lodged, my Store Assistant Manager . . . told me that she and the District Manager were aware of the name of the person who made the complaint . . . . I no longer have faith that if I need to make a complaint in the future, that it will be anonymous, as advertised. I probably would not be comfortable making a complaint, if the need ever arose, knowing that the subject of the complaint may discover my identity and be free to confront me or retaliate against me.

242.    Wendy Avila, who worked for Sterling from 2002 until 2008, shared a similar story:

During my employment, I observed that calls to Sterling's supposedly confidential complaint hotline, TIPS, were not in fact confidential. It was well known in the district that [the District Manager] found out the identity of those employees who utilized the TIPS line to make complaints. In 2005 or 2006, I learned from [a female employee] that [the District Manager] had told her that [the District Manager] had listened to the recording of an employee's call to the TIPS line. [The District Manager] said she was able to identify the employee's identify from her voice and accent.

Because [the District Manager] was able to learn the identity of employees who utilized the TIPS line, it impacted whether employees would use it to bring complaints to the company's attention. For example, in 2007 or 2008, [a female employee] came to me about an offensive remark that [the District Manager] had made comparing gas prices to rape. I counseled [the female employee] not to call the TIPS line because [the District Manager] would find out that she had made the complaint and possibly retaliate against her for that.

243.    Christine Ferreri, who worked for Sterling from 2002 until 2009, explained that, when she reported harassment by a male coworker, Sterling asked her District Manager "if I was a troublemaker. . . . Retaliation was widely feared at Sterling, and this comment confirmed those fears for me."

244.    Teri Flippin, who worked for Sterling from 2003 until at least 2013, likewise stated that she had been dissuaded from reporting inappropriate sexual activity between a Store Manager and an employee "because I ha[d] heard other Sales Associates say that complaints to TIPS are not confidential and are usually not addressed or resolved by Sterling."

245.    Lisa Jackson, who worked at Sterling from 2001 to 2003 and then from 2006 until at least 2012, shared her story of intimidation in her Declaration:  in the fall of 2010, she was interviewed by Human Resources regarding a complaint that had been made about a male superior who had previously warned her that, if she "complained about him to HR, he would find out about it and that it would not be good for" her.  As she explained:

> Sure enough, within a few minutes after I hung up the phone with [Human Resources], [the male superior] called me and in a threatening manner asked me how my call with [Human Resources] had gone. He told me that I should have called him to report the details of the call.

246.    Joy Lamb, who worked for Sterling from 2004 until 2011, shared her story of Signet's failure to take complaints of sexual harassment seriously:

> Sterling's attitude about female employees is also evident in the way that it handles complaints of sexual harassment. Inappropriate behavior by Store Manager [Redacted] was a frequent topic of conversation in the [Redacted] Jared. Stories about him getting too close in the supply room, making inappropriate comments or having lunches with young female subordinates were constantly heard in the store. I regularly saw young female employees actually crying about his inappropriate behavior. I know some people reported this behavior on the TIPS line, but am not aware of any action or investigation taking place as a result of that. In fact, after complaints were made about his sexual harassment, [the Store Manager] was actually promoted to a position in another state.

247.    Cathy Mantia also suffered indifference regarding her sexual harassment complaints.  As discussed above, Mantia explained that she was initially afraid to report her District Manager who offered her a promotion in exchange for sexual activity, but once she

transferred to a different district she attempted to file a harassment complaint on at least two occasions.  As Mantia stated:

> Each time I asked Human Resources if I could speak with someone regarding sexual harassment that I had experienced, Human Resources refused to listen to me. I was told by Human Resources that my sexual harassment issue could not be addressed at that time but someone would contact me at a later date. No one from Human Resources ever followed up with me to discuss filing a sexual harassment complaint.

248.    Adawie Mais Tarrab explained that, in her experience, "Sterling would transfer females who complained of sexual harassment rather than discipline or demote the harasser."

249.    Vanessa White, who worked at Sterling from 1999 until 2010, shared her experience with a Store Manager who routinely touched without permission and made inappropriate, sexual comments to female employees.  White explained that when complaints were launched via the TIPS hotline, Signet "would investigate by calling complainants in the store where they worked – often alongside the accused party."  This allowed the Store Manager to identify the women who made complaints, thus deterring others from doing so in the future. And, in any event, White was unaware of any action taken against the Store Manager despite numerous complaints; in fact, he was subsequently transferred to a higher-volume, more lucrative store.

250.    Joretta Whyde, who worked for the Company from 2003 until 2005 and again in 2007, also experienced Sterling's indifference to sexual harassment complaints.  Whyde's Store Manager repeatedly touched her without permission and made inappropriate comments.  As Whyde explained, when she complained about the sexual harassment to her District Manager, "he shrugged off my complaint by saying 'That's just [Store Manager].'"  Whyde noted that the Store Manager **had been previously fired by Sterling for sexual harassment**, and stated, "[t]he fact that the company had rehired a sexual harasser, and then a District Manager shrugged off complaints about his behavior, made me realize that it was futile to complain about sexual

harassment to this company." Later, when Whyde was working at a different store and was harassed by a Sterling Sales Associate, she complained to her Store Manager; her complaint was again brushed off, and shortly thereafter her hours started being reduced.

251. Lindsay Zalanka, who worked for Sterling during the time period from 2003 through 2005, was also the victim of sexual harassment and retaliation for reporting it. Zalanka was groped against her will by a coworker, and then pressured not to bring a complaint with the Company because her Store Manager "felt this would attract negative attention to our store." Zalanka explained:

> There was a lot of pressure on me not to say anything. . . . I also got the sense that Sterling management had encouraged [the Store Manager] to dissuade women from reporting incidents of sexual harassment. This gave me the sense that this kind of incident had been ignored by Sterling in the past.

252. Zalanka further explained that, when she eventually did complain, she was retaliated against. She worked temporarily on a sporadic, part-time basis during 2005, and when she sought full-time employment again she was told that "Sterling's corporate officers refused" to give her old position back. "When I asked why, [the Store Manager] refused to give me an answer. I had consistently high standards and a high sales record, so I believe that Sterling was only refusing to reinstate me in retaliation for having filed a complaint of sexual harassment."

**Sterling Repeatedly Attempted To Intimidate Employees into Silence in the Context of the Actions**

253. Several Declarants testified that they were intimidated into signing declarations for Sterling in the *Jock* Actions that were materially inaccurate. For example, Christine Ferreri, who worked for Sterling from 2002 until 2009, explained that, on April 5, 2006, she was interviewed by an attorney for Sterling in a vacant store front at the mall at which she worked. Ferreri further explained:

> I was very concerned about my job security when answering questions from Sterling's attorney and felt compelled to participate in the interview. . . . At the end of the interview, Sterling's attorney handed me a statement to sign. I did not feel like I had a choice other than to sign the statement because I was concerned about losing my job if I did not.

254.     Susan Crump, who worked for Sterling from 2005 until at least 2009 and who was a claimant in the *Jock* Arbitration from 2008 onwards, recounted her experience being interviewed in connection with the *Jock* Actions.  Crump explained that, on October 10, 2005, Sterling's Human Resources Manager, Mary Ellen Mennett, and Sterling's outside counsel, Jacqueline Kalk, arrived at the store at which Crump worked, unannounced, to conduct interviews.  Crump was interviewed last, at approximately 8:30 p.m., after a full day of work.  One of Crump's co-workers was fired during his interview.  Mennett told Crump at the start of her interview that she would be terminated if she did not cooperate. Crump explained:

> It was very intimidating and scary to have my job threatened like this. It was my only means of income – my livelihood, and I also had aspirations to be promoted to Assistant Manager and then Store Manager. I was not offered to have a lawyer of my own present, nor was I told that I did not have to speak with Sterling's HR manager or its outside attorney. I felt very scared, intimidated, and threatened.

> * * *

> [A]bsent from the declaration Mennett and Kalk gave me to sign was information I had provided them regarding sexual harassment and inappropriate behavior by male Sterling employees against female Sterling employees that I had witnessed on the job. . . . In addition, during the interview, I was asked if I agreed with the women who were bringing the case against Sterling that Sterling was discriminating against its female employees in pay and promotions based on their gender, and I said, "yes." However, Kalk and Mennett did not include this statement, or any of the information I provided regarding sexual harassment and inappropriate behavior, in the declaration they gave me to sign at the conclusion of my interview.

> * * *

> Because of what Mennen told me, I understood that if I did not cooperate in the interview and sign the declaration at the end of the "interview," that I would be terminated.
>
> I signed the statement and was not given a copy. I felt so pressured to keep my job that I did not even feel comfortable asking for a copy. This was one of the most emotionally and psychologically grueling hours of my life.

255.    Anna Melton, who worked for Sterling from 2002 until 2006, was also interviewed by an attorney for Sterling in connection with the *Jock* Actions, though Melton was misled into thinking that the interview was in connection with a proactive investigation into timekeeping practices conducted by Sterling after Zales had been sued for issues related to overtime compensation.  Melton's interview was conducted in March 2006.  She stated, "I was very intimidated by having to speak with an attorney for Sterling and was fearful that I would lose my job if I did not cooperate with the attorney."  Melton explained that the attorney did not ask questions about gender discrimination issues.  Melton signed the declaration the attorney drafted without reading it.  Years later, she was dismayed to find that it contained assertions concerning fairness in pay and promotion, including "I believe my pay rates have been set fairly and without regard to gender," and "[g]ender is not a factor in making promotion decisions, instead, all promotions are awarded to the most qualified applicant," which Melton did not believe at the time the interview was conducted.

256.    Adawie Mais Tarrab was also intimidated into signing a declaration containing untrue statements.  Tarrab explained that she "did not voluntarily provide [her initial statement]. I was told by [a Store Manager] that I was required to participate in the interview."  Tarrab explained that the way in which Sterling conducted the interviews made her believe that she had no choice by to agree to whatever Sterling's attorneys prepared for her to sign:

> I was intimidated, afraid to refuse to participate in the interview and feared retaliation if I refused to sign the statement or disagreed with its contents. I felt that I had been summoned to the interview specifically "to agree" and that the process was being conducted for the benefit of Sterling, to protect it from some legal trouble.

* * *

Because I am no longer employed by Sterling or dependent upon Sterling for my livelihood, I no longer feel afraid to acknowledge experiences I had during my employment, which demonstrated to me that Sterling did in fact make promotion decisions in favor of males based upon gender and that Sterling would transfer females who complained of sexual harassment rather than discipline or demote the harasser.

### The Truth Emerges

257.    After market close on Monday, February 27, 2017, *The Washington Post* published a blockbuster article entitled "Hundreds allege sex harassment, discrimination at Kay and Jared jewelry company" (the "Washington Post Article").   The Washington Post Article quoted several of the 250 Redacted Declarations from the *Jock* action, and summarized others.   It also included interviews with several of the Declarants.   The Washington Post Article focused directly on Signet's pervasive culture of sexual harassment, reaching all the way up to the highest levels of the Company:

> Hundreds of former employees of Sterling Jewelers, the multibillion-dollar conglomerate behind Jared the Galleria of Jewelry and Kay Jewelers, claim that its chief executive and other company leaders presided over a corporate culture that fostered rampant sexual harassment and discrimination, according to arbitration documents obtained by The Washington Post.
>
> Declarations from roughly 250 women and men who worked at Sterling, filed as part of a private class-action arbitration case, allege that female employees at the company throughout the late 1990s and 2000s were routinely groped, demeaned and urged to sexually cater to their bosses to stay employed. Sterling disputes the allegations.

258.    The article also explained that journalists and Cohen Milstein had sought to make the Declarations public over a year earlier, but that Signet had resisted, and had only recently agreed to the publication of the materials – and only after approving redactions that obscured harassers' identities:

> Most of the sworn statements were written years ago, but the employees' attorneys were only granted permission to release them publicly Sunday evening. One of the original women who brought the case, those lawyers said, died in 2014 as proceedings crawled on without resolution.
>
> * * *
>
> Since 2015, The Post has requested to review the employee statements submitted as part of arbitration, all of which were designated as confidential. Employees' attorneys have also sought to make them publicly available. Attorneys for the employees and the company recently reached an agreement that the documents could be made public on the condition that they not identify any of the individuals to whom conduct was attributed.
>
> More than 1,300 pages of sworn statements were released Sunday and feature company-approved redactions that obscure the names of managers and executives accused of harassment or abuse.

259.  The interviews in the Washington Post Article were particularly saddening. Heather Ballou explained in her interview that, when her District Manager promised to help her get a store transfer she wanted if she had sex with him, she did so because she believed she was "'backed into a corner' and had no other way to advance." The Washington Post Article further quoted Ballou: "Looking back, I can't believe some of the things I had to do,' Ballou told The Post, adding that in the moment she thought: 'You suck it up and do what you have to do for your family. You need this job.'"

260.  The Washington Post Article pulled together facts from multiple sources, and from interviews, which provided the market with a new and much more complete picture of sexual harassment at Sterling. For example, the Washington Post Article highlighted new facts substantiating earlier allegations against Defendant Light:

> One night, Ballou told The Post, she saw a top executive watching as female managers in varying stages of undress splashed in a hotel pool. "He had a drink in one hand and a cigar in the other, just taking it all in, like, 'I am the king and this is my harem,'" she told The Post. She was prevented by her attorneys from naming which executive was involved, because of the condition of the arbitration

documents' release. The 2013 class-action motion states Light took
part in a pool- related incident similar to the one Ballou described.

261.    The revelations in the Redacted Declarations and the Washington Post Article
stunned the market, and its reaction the following day was severe.  Signet stock closed at $72.88
per share on February 27, 2017.  It opened on February 28 at $68.90, and, by 11:22 a.m. that day,
it was down to $66.89, 8.3% off the previous day's close.

262.    At 11:22 a.m. on February 28, the Company halted trading pending a release of
news.  Half an hour later, at 11:52 a.m., Signet issued a press release denying the allegations in
the Washington Post Article, which it characterized as "misleading" and "distorted and
inaccurate."  Signet further argued, among other things, that the *Jock* Actions had never included
sexual harassment claims, that the claims "involve a very small number of individuals," that
Signet "takes any concerns seriously and had – and continues to have – multiple processes in
place to receive and investigate allegations of misconduct," and that the Company had
"thoroughly investigated the allegations and . . . concluded they [were] not substantiated by the
facts and certainly [did] not reflect [Signet's] culture."

263.    The market – newly educated by the Redacted Declarations and the Washington
Post Article – was not reassured.  When trading resumed, losses continued to mount.  By day's
end, Signet was trading at $63.59, down from the previous day's close of $72.88 by $9.29 per
share, or 13%, on extraordinary volume of 11,317,100 shares.

264.    The revelations in the Redacted Declarations and the Washington Post Article
swept through the media.  Signet's hometown newspaper, the *Akron Beacon Journal*, published
an article on March 1, 2017, detailing the allegations in the Redacted Declarations and the
Washington Post Article and linking readers to both sets of documents.

265.    Several other articles, also published on March 1, reported on the revelations.  For
example, an article entitled "5 Things We Learned About Sexual Harassment Discrimination
Claims Against Kay Jewelers, Jared," published by *Consumerist*, recounted details of several
revelations contained in the Redacted Declarations and the Washington Post Article, including

(i) events occurring at the Managers' Meetings, (ii) the conditioning of employment decisions on female employees' acquiescing to sexual demands of superiors, and (iii) retaliation against employees who reported harassment to the TIPS hotline.  Similarly, a March 1 article published in the *Detroit Free Press* explained that "[d]eclarations by nearly 250 women and men describe [Sterling] as a hotbed of sexual harassment where senior men groped, demeaned and demanded sex of young saleswomen in return for better jobs and job security . . . ."  A *New York Times* article published the same day explained that one of the Declarants "did not know much about the experiences of other women at [Signet]. As it turns out, [she] was one of hundreds of former Sterling employees who described a corporate culture polluted by sexual aggression, gender discrimination and abuses of power, according to newly released documents . . . ."  And a March 1, 2017 article in *USA Today* explained that "[t]he declarations, obtained by the Washington Post, depict Sterling Jewelers as fostering a workplace where senior men treated young saleswomen as their private harems, including groping, demeaning and demanding sex in return for better jobs and job security, the Post reported."

266.   S&P Capital IQ issued a report on March 2, 2017, in which it lowered its opinion on Signet from "Buy" to "Hold" and lowered its 12-month target for Signet shares by $20, from $105 to $85, citing the recent revelations:

> We think a Washington Post report bringing public a 2008 class action arbitration allegation of gender discrimination and harassment at SIG's Sterling Jewelers operations will weigh on the shares. SIG disputes the reports as portrayed in the media, but we think the exposure will hurt sales regardless.

267.   Analysts and media sources generally connected Signet's stock decline to the revelation of the concealed information about Signet's sexual harassment problem.  For example, a February 28, 2017 piece by *Bloomberg News* observed:  "Signet Jewelers Ltd. suffered its worst stock decline in eight years following claims of gender discrimination and sexual harassment at the jewelry chain, including allegations that involved Chief Executive Officer Mark Light."  An article by the *Financial Times* published in early March 2017 stated

Signet's stock drop of nearly 13% on February 28, 2017, was "its biggest one-day drop in 8 years – after the Washington Post reported that former employees of Sterling Jewelers filed a private class-action arbitration case alleging discrimination, among other claims."

268.    Signet scrambled to deal with the repercussions of the release of the Redacted Declarations and the Washington Post Article in late February 2017, and soon proposed dramatic reforms.  On March 9, 2017, Signet hosted its fourth-quarter 2017 earnings call.  Todd Stitzer, the Chairman of the Board, started the call by speaking at length concerning the recent revelations.  After rehashing several of Signet's previous denials of the validity of the *Jock* Actions, Stitzer announced that Signet was undertaking three new initiatives "to assure ourselves, our shareholders, and our team members that our policies and practices are functioning as intended, and to identify areas where we can further improve."  *First*, the Board would form a new committee, comprised of all of the Company's female directors, and focused on "respect in the workplace," and specifically on "programs and policies to support the advancement and development of [Signet's] female team members."  *Second*, the new committee would appoint an independent consultant to conduct a "thorough review" covering the Company's current and future policies and practices regarding, among other things, training, reporting, investigation, and non-retaliation in the context of sexual harassment.  Stitzer explained the purpose of the independent consultant:  "[W]e want to be sure that the framework we have in place for reporting and responding to [discrimination and harassment] is robust and effective."  *Finally*, the new committee would establish an ombudsperson office to provide confidential advice to employees, address their concerns regarding issues in the workplace, and to provide them with strategies and options to help resolve workplace concerns.

269.    Stitzer also explained that the Board had been briefed on the litigation for years and, when considering Defendant Light for promotions had reviewed available information concerning the harassment:

> As a Board, we have been briefed on this litigation since 2008. As noted earlier, many of the allegations publicized in connection with

the case go back decades. When evaluating whether to make Mark Chief Operating Officer in 2014, we obviously reviewed his business performance and evaluated, with advice from counsel, the allegations that were described in connection with the case, reviewed the available information, the timeframes involved, and the context in which it was offered. Based on our review and evaluation, we appointed Mark as COO. When the previous CEO departed the Company, we conducted a further confirmatory review, and Mark was appointed CEO.

270. On March 7th, 10th, 13th (the next trading day), and 14th, Signet's stock price declined.

271. On information and belief, Signet's stock declines on these dates were, at least in part, reactions to information leaking into the market regarding Signet's sexual harassment culture. In particular, in light of the Washington Post Article in late February, and given Signet's March 9, 2019 announcement of extensive measures in response (despite Signet's denials of a cultural problem), media sources and analysts took notice.

272. On March 7, 2017, there was additional coverage of the sexual harassment claims against Signet, including in media sources ValueWalk and theflyonthewall.com. The news continued to spread and add context to the information released by the Washington Post Article.

273. On March 10, 2017, analyst downgrades of Signet stock occurred; the average analyst price target for Signet stock fell 4%. Also on March 10, the *Chicago Tribune* published an article reviewing the claims against Signet and the Company's response, including that in its response Signet did not "respond to or rebut" the specific allegations in the Washington Post Article. On March 11, 2017, over the weekend, *Business Insider* published an article on Signet and the sexual harassment issues at the Company. News regarding the sexual harassment issues at Signet dominated the news about the Company during this period.

274. In April 2017, the Marcato Funds exited their Signet positions entirely, having suffered millions of dollars in losses as a result of Signet's fraudulent actions.

## POST-RELEVANT PERIOD ALLEGATIONS

275.    Approximately one month after the revelations above and the accompanying stock price declines, Signet issued a completely revamped Code of Conduct, the first such overhaul of the document since it was issued in 2009.  For the first time, the Code of Conduct began with a letter, which was signed by Defendant Light.   In that letter, Light explicitly connected compliance with ethical principles to earning and keeping customer trust and to the success of the business more generally (bold and all caps in original):

> Our Core Values require not only compliance with law but also ethical conduct. We have refreshed our existing codes across all locations and brands to reflect an enhanced One Signet Code of Conduct ("Code").
>
> Through ethical behavior and commitment to a high standard of integrity, we earn and keep the trust of our Customers who turn to us to help them **CELEBRATE LIFE AND EXPRESS LOVE**. Without the trust of our Customers, our Company will not achieve its mission. You have the power not to allow anything to compromise your commitment to Signet Jewelers' Core Values as well as your own values.

276.    The Code of Conduct also included multiple reassurances to employees that any complaints would be handled anonymously, and specifically included a direction to Sterling managers to "[n]ever retaliate against a[n employee] who raises an issue or concern."

277.    On June 2, 2017, Bryan Morgan, Signet's COO, resigned due to "violations of company policy unrelated to financial matters," and the Company provided no further detail.

278.    On July 17, 2017, Signet issued a press release announcing that Defendant Light was unexpectedly retiring.  The press release came as a surprise to investors who noted Light's three-plus decades with the Company, and provided very little explanation of the organizational change, with Light stating only that "[g]iven the Company's positive direction and my need to address some health issues, the Board and I agreed that it is a good time for a transition."

279.    On July 17, 2017, the *Wall Street Journal* reported that Light "decided to retire for health reasons," but that Signet "[o]fficials declined to disclose the condition prompting Mr.

Light to leave the company he has been a part of for 35 years."  Several news sources connected his departure to the sexual harassment allegations revealed in the Redacted Declarations and the Washington Post Article.  For example, in an article published on July 17, 2017 entitled "Signet Jewelers CEO Hit By Sexual Harassment Controversy Leaving Company," Fortune.com reported:

> The Signet Jewelers CEO who faced allegations of misconduct during the retailer's ongoing sexual harassment controversy is leaving the company, citing health reasons.
>
> Mark Light, who became chief executive of the largest U.S. jewelry retailer in late 2014, will be replaced by a longtime Proctor & Gamble executive and current Signet director Virginia Drosos on August 1, the company said on Monday. She'll face the daunting task of getting the company, which operates the Kay, Jared, and Zales stores in the United States, along with British chains, back on track saleswise and past a series of damaging hits to its reputation in the last year.
>
> Those have included allegations of gem swapping at its Kay Jewelers stores and a devastating Washington Post story earlier this year alleging years of systemic, mass sexual harassment, charges Signet has repeatedly and adamantly denied. The Post story said among other things that Light was alleged to have been seen in a pool with "nude and partially undressed female employees."

280.   *The Washington Post* also made the connection, discussing the sexual harassment allegations in detail along with Light's resignation, under the headline "Signet Jewelers CEO, at center of gender-discrimination case, retires for 'health reasons.'"

281.   Similarly, in another article published on the same day entitled "Signet Jewelers' New CEO Has Her Work Cut Out for Her," the *Bloomberg Gadfly* explained:

> Signet Jewelers Ltd., the corporate parent of Kay Jewelers and Zales, has lost much of its sparkle in the past couple of years.
>
> The company on Monday took an important step toward reclaiming it: naming a new CEO, Virginia C. Drosos. She will replace Mark Light, who had held the top job since 2014, but

whose career at Signet spanned more than 35 years. The company said Light is retiring "due to health reasons."

The change is a potentially pivotal shake-up for a company that badly needs one.

* * *

[S]worn statements in an arbitration case released earlier this year show Light has been accused of inappropriate sexual behavior toward female employees. This claim was unearthed in a class-action case in which hundreds of former workers said there was a pattern of sexual misconduct at the company. (Signet has denied wrongdoing.)

Replacing Light is an effective way for Signet to show employees and investors it wants to move forward and is serious about fixing a troubling workplace culture.

It's also an opportunity to bring fresh eyes to a business that clearly needs new direction.

282.    On December 6, 2017, Representative Cheri Bustos – joined by a bipartisan group of legislators, including Senator Kirsten Gillibrand, Senator Lindsey Graham, Representative Pramila Jayapal, Representative Elise Stefanik, and Representative Walter Jones – introduced legislation entitled the "Ending Forced Arbitration of Sexual Harassment Act."  The bill would ban mandatory arbitration of sexual harassment claims.  Representative Bustos explained that she was inspired to write the legislation after reading the Washington Post Article and learning how Signet's mandatory, "secret arbitration process" had kept the facts about its culture of sexual harassment from being widely known:

The idea of this legislation came to me actually in February. It was a Monday night, and I'm reading the Washington Post. Thank you to our reporters – I'm a former reporter – thank you to our reporters for uncovering what is going out there. I read that night about a story that involved Kay jewelry and Jared jewelry, and how they had a rigged system that allowed those in senior leadership to prey on women in the workforce. Here's what they reported. It detailed allegations of a chief executive who would only promote women who would sleep with him. It shed light on an alcohol-fueled managers' meeting where, of course, spouses

were banned, and where dozens of women would go there and they would be groped, they would be demeaned, they would be harassed. Oh, and by the way, these meetings were mandatory for these women. The report in the Washington Post painted a troubling picture of a corporate culture that fostered systemic sexual harassment. And once the women had had it, they were totally fed up, they were disgusted by this offensive behavior, and they finally decided that they were going to take action. So, they did what women who were sharing these stories would do, and they decided to file a class action suit. But as you can see, by those of us standing in front of you, there's not one woman from Kay jewelry or Jared jewelry. And you know why? Because, when they were hired, they filled out paperwork, just like when you start any new job, you sign your name on the paperwork, or you're handed an employee handbook, and it was slipped right under their nose and that took away their right to sue. So instead, when they brought these issues up, they were forced into a secret arbitration process, and that meant that their stories would never see the light of day, because of that employment agreement that they signed. So this is why we have to address institutionalized sexual harassment.

283.   On December 15, 2017, the *Retail Dive* – an industry publication – wrote that (as expected) Signet was losing customers over the sexual harassment issues.  Demonstrating that Signet was particularly vulnerable to the exact kind of sexual harassment issues that the Washington Post Article disclosed (and that investors would clearly care about), the article described industry research that women's perception of Signet brands was more negative in light of the sexual harassment revelations.

284.   On April 23, 2019, the *New York Times Magazine* published an extensive account of Signet's culture of sexual harassment, including new and further interviews with victims.  The article also included a fulsome description of Signet's internal "adjudication" system and how it was used to sweep incidents under the rug, with the author noting:

> Resolve was Sterling's most insidious tool; it was the lock box in which the company kept all of its good-old-boy behavior a secret; it's how the behavior was permitted to flourish, and it has proved neither efficient nor effective for the women involved.

285. The *New York Times Magazine* article also further analyzed the redacted filings now available, in light of the interviews by the author, observing:

> It is Mark Light who, based on my interviews, is the subject of many redacted and nonredacted pages of the lawsuit filings, and who left to tend to an unnamed illness in 2017. (I tried to contact the executives whose names I came across, but none of my Facebook, Twitter, LinkedIn InMail or text messages, or emails or phone calls, were returned, and a formal request to interview them through the company was denied.)

286. The *New York Times Magazine* account also summarized documentation now available regarding Signet's culture – and it was ugly:

> Whether Sterling is guilty of pay-and-promotions discrimination doesn't seem as if it's up for debate. According to documents produced in discovery, as early as 2006, the vice president Michael Lynch alerted other executives that an internal study — titled "Post-Merit Field Operations EEOC Analysis" — found that female hourly sales employees were on average paid 40 cents less an hour than men. In bold, he wrote, "This equates to over 7 million annual affected hours." The [A]rbitrator noted in her decision awarding class certification that Sterling didn't offer any alternative explanation of the data. (Sterling says this document is incomplete, but it would not provide me with any means to make it complete.)

287. The article also reviewed documentation now available regarding Signet's knowledge of its culture – and it was extensive:

> There also doesn't seem to be a question, even by the company's own account, that a large amount of harassment was reported at Sterling. Tom Parks, one of five regional human-resources specialists, said in his deposition that he received thousands of calls each year. According to one of the claimants' expert reports, in 2006 alone, there were 19,321 calls, of which 11,851 involved discrimination complaints; 1,519 were about sexual harassment. When a case is investigated at Sterling, there are a series of steps followed, which conclude in a recommended response from H.R. Parks said that Sterling kept no data on whether recommendations were implemented. The worst part of the wage gap — other than all the other worst parts of the wage gap — is that when there's a disregard for women, pay disparity is often only a first indicator of

> the other stuff. The payroll records that covered Dawn's desk that
> day in 2005 lay atop hundreds of crimes that could have been
> predicted in a company culture where women were demonstrably
> valued less than men.

288.     Further, the article provided additional evidence that Signet knew all along that

sexual harassment allegations were not a minor, ignorable, part of the *Jock* Actions, but instead,

that the gender pay and promotion discrimination described in part of the *Jock* Actions was part

and parcel of an overriding culture of sexual harassment at Signet – and that the Company

concealed both its pervasive culture, and the sexual harassment focus of the *Jock* Actions, from

investors and the public.

289.     Signet, while knowing full well about its ugly culture of sexual harassment,

concealed that culture from investors, concealed that the actions concerned pervasive sexual

harassment, and concealed the risk (later materialized) that when this issue was revealed,

Signet's business, and thus investors' interests, would be harmed.

## ADDITIONAL SCIENTER ALLEGATIONS

290.     As set forth above and further below, numerous facts demonstrate that Defendants

knew or, at minimum, recklessly disregarded that their statements were materially false and

misleading.

## Additional Scienter Allegations With Respect to the Credit Quality Fraud

291.     As noted above, Defendants repeatedly stated that they were intimately familiar

with the Company's underwriting and the credit quality of its loan portfolio.  For instance,

Defendant Barnes stated that the loan portfolio was "a big important part of our business and one

that we don't take lightly. We watch it very closely and we use it to really help drive the core of

our business."   Defendant Ristau stated that we "welcome the increasing use of our credit

programs, as we have very definitive approval criteria and fully understand the credit risk and

profitability of our decisions. We take great care in our decisions[.]"  Defendant Light stated that

he and other senior executives were personally familiar with the portfolio because "we've been

running a credit portfolio for well over 30 years."  In its SEC filings, Signet repeatedly assured

investors that "on an ongoing basis, management monitors the credit exposure," "[w]e closely monitor the credit portfolio," and Signet assessed the portfolio's quality "on a real-time basis." Given their detailed knowledge of Signet's credit operation, Defendants knew or recklessly disregarded that Signet was engaged in reckless underwriting and had generated several hundred million dollars' worth of high-risk subprime loans.

292.    According to the CAC, Former Employee 1 reported that Signet's senior management, including Defendant Light, were made aware of problems with the credit portfolio as far back as 2007 or 2008.  As set forth above, Former Employee 1 reported that the credit risk department began issuing internal warnings that the bad debt issue was a problem and the portfolio was in trouble as far back as 2007 or 2008, but nothing was really done.  As Former Employee 1 stated, "the credit department had some major issues with the bad debt process, with how it used recency methods," particularly because the Company was booking sales that weren't actually generating real cash due to the borrower's inability to pay a meaningful portion of their loan.  The problems with the loan portfolio were documented in regular internal reports that were ultimately shared with Defendant Light and Bob Trabucco.  Further, there were regular bad debt meetings with executives, including Light and Trabucco, to discuss strategies to overcome expanding bad debt, low contact rates, and similar issues.  As Former Employee 1 reported, at these meetings, the executives considered changing the Company's lending practices and adopting more stringent credit terms, but decided against it because it would harm sales.

293.    In addition, as detailed above, beginning in approximately November 2015, concerned investors repeatedly questioned Signet's underwriting and the credit quality of its loan portfolio, and criticized its recency method as opaque.  In response, Defendants staunchly denied that there was a basis for any concern or criticism.  Defendants called investor criticism of the Company's disclosures and business practices "bullying," and stated that any concern was "unwarranted, quite frankly."  They further reassured investors that the Company's underwriting remained stringent, the credit quality of the portfolio remained strong, and the Company's use of the recency method accurately reflected the health of the portfolio.  At the

same time, they undertook a series of machinations designed to prop up the Company's flagging stock price, including substantial stock buybacks, a dividend raise, and the announcement of a private equity investment.  Just weeks after issuing these denials, Signet disclosed that its Board was considering selling the loan portfolio.  Ultimately – contrary to Defendants' strident assurances of stringent underwriting and high credit quality – it was revealed that nearly half of the Company's loan portfolio consisted of risky subprime loans.  The fact that Defendants issued repeated false denials when investors questioned their statements, while pulling "levers" to prop up the stock price, is significant evidence of scienter.

294.    The significance of the loan portfolio to Signet further supports an inference of scienter.  As set forth above, Defendants routinely stated that the portfolio was a key enabler of sales, especially in the critical bridal segment, and was therefore an essential aspect of Signet's business model.  Defendants constantly emphasized that the portfolio was a "competitive advantage" for Signet that set it apart from its peers.  The loan portfolio grew to be approximately $1.8 billion in size, and was Signet's second largest asset, accounting for approximately 30% of its total assets.  Given that the loan portfolio was critical to Signet's business model and an extremely important driver of the Company's operations and financial performance, Defendants' misstatements on this subject were at least reckless.

295.    The market's intense focus on the Company's credit operation also supports an inference of scienter. As set forth herein, given the importance of the credit operation to Signet's business, the market focused closely on the purported credit quality of the portfolio and the conservatism of Signet's underwriting.  Because these issues were so important to the valuation of Signet's stock, Defendants made myriad public statements assuring investors that Signet's underwriting was, in fact, stringent and the credit quality of the portfolio was strong.  As Defendant Ristau stated during the beginning of the Relevant Period, "[w]ell, I couldn't do a presentation without talking about credit."  In turn, analysts issued dozens, if not hundreds, of reports addressing this subject.  In light of the attention that the market paid to this subject – and

the fact that Defendants spoke reassuringly about it dozens of times – any failure by Defendants to ensure the accuracy of their repeated statements was severely reckless at minimum.

296.    Finally, Defendants' use of the recency aging methodology supports an inference of scienter under the circumstances of this case.  As set forth above, recency is a disfavored method because it can be used to obscure the credit risk in a portfolio – and that is precisely how Defendants used it here.  Despite repeated calls from the market and an inquiry from the SEC to provide delinquency numbers based on the contractual method, Defendants refused. It was not until the end of the Relevant Period that the reason became clear: because, contrary to Defendants' statements, nearly half of Signet's loan portfolio consisted of toxic subprime loans that posed a material concentration of risk to Signet. Signet employed the recency method for the very reason that investors questioned it – because the Company had something to hide.

**Additional Scienter Allegations With Respect to the Sexual Harassment Fraud**

297.    As set forth above and further below, numerous facts demonstrate that Defendants knew or, at minimum, recklessly disregarded that their statements were materially false and misleading.

298.    There can be no serious dispute that Defendants were aware of the facts detailed in the Declarations. Defendants had received the Declarations well before any of the misrepresentations or omissions alleged herein.  Thus, contrary to their public statements, they knew that the *Jock* Actions did not merely concern "store-level" practices related only to pay and promotion activities, but rather detailed a pervasive culture of sexual harassment that reached the Company's highest levels.

299.    Further, the harassment was open, notorious, and widespread.  Among other things, the harassment regularly occurred at the Company's gathering of executives known as the Managers' Meetings.  And, according to the Declarants, it involved Defendant Light.  Given Defendants' knowledge of this widespread conduct, they knew that their statements mischaracterizing the nature and scope of the arbitration, as well as their statements touting Signet's supposed ethical business conduct, were materially misleading at best.

300.    In addition, the information contained in the Declarations – and specifically the facts asserted as to Defendant Light – was repeatedly discussed at the highest levels of Signet. As noted above, the Signet Board had been repeatedly briefed on the litigation since 2008 and, when considering Defendant Light for promotions, had again reviewed this information. According to Signet's Chairman:

> As a Board, we have been briefed on this litigation since 2008. . . . When evaluating whether to make Mark Chief Operating Officer in 2014, we obviously reviewed his business performance and evaluated, with advice from counsel, the allegations that were described in connection with the case, reviewed the available information, the timeframes involved, and the context in which it was offered. . . . When the previous CEO departed the Company, we conducted a further confirmatory review, and Mark was appointed CEO.

301.    In short, Defendants were well aware of the facts set forth in the Declarations when they made the misrepresentations and omissions at issue.

## SIGNET MATERIALLY UNDERSTATED THE RESERVES FOR ITS LOAN PORTFOLIO, THEREBY MATERIALLY OVERSTATING ITS INCOME

302.    At each quarter, Signet was required to record in its publicly filed financial statements an "allowance for doubtful accounts," or "allowance for credit losses," also known as a reserve.  The reserve represented the dollar amount of accounts receivable that, based on current evidence, were likely uncollectible.  This was a key metric for investors because it reflected the health of the loan portfolio, which, as noted above, was fundamental to Signet's business.  Further, reserve increases were charged dollar-for-dollar against Signet's pre-tax income, and directly impacted the Company's financial performance.

303.    Generally Accepted Accounting Principles ("GAAP") required that Signet recognize and disclose probable losses inherent in its loan portfolio prior to charging off accounts receivable when the loss is ultimately confirmed (*i.e.*, the "loss confirming event"). Specifically, ASC 450, in conjunction with ASC 310, Receivables, required that the Company

record allowances for uncollectible accounts receivable and related credit loss provisions when the following conditions existed:

    a.    Information available before Signet's financial statements were issued or were available to be issued indicated that it was probable that a loan or group of loans had been impaired or a liability had been incurred at the date of the financial statements; and

    b.    The amount of the loss was reasonably estimable (ASC 450-20 -25-2).

304. Under GAAP, those conditions may be considered in relation to individual receivables or in relation to groups of similar types of receivables. If the conditions are met, allowances for losses shall be made even though the particular receivables that are uncollectible may not be identifiable. (ASC 310-10-35-9).

305. Signet's use of the recency aging method and its related charge-off policy obscured and extended the time between when a loan was made and when the related receivable was ultimately charged off – a period of time known as the "loss discovery period." Signet required its credit customers to sign an agreement specifying minimum payment terms. Typically, a failure to comply with the minimum payment terms is an adverse fact that indicates that the prospect for an uncollectible account is greater. However, under the recency method, Signet permitted customers to make partial payments (as little as 75% of the agreed upon amounts) for the account to be considered as current.

306. Therefore, a customer could be dropping further and further from its agreed upon payment schedule, but with these partial payments the account would be considered to be current under Signet's recency method. Post-Relevant-Period (October 2016) the SEC questioned Signet on its use of the recency method, indicating that it is not comparable to other market participants. Indeed, one impact of Signet's atypical recency method is to understate and/or mask true delinquency trends, as accounts may be shown as recency current but may actually be several payments contractually past due. Thus, while Signet reported figures for delinquent and

non-performing loans in its SEC filings during the Relevant Period, these figures understated the true number of delinquencies and non-performing loans the Company was experiencing, and obscured the true credit quality of the loan portfolio.

307.    Since the uncollectibility of an account receivable – and hence, the adequacy of a reserve – is confirmed when the account is charged off, a company's policy of writing off its accounts is significant.  Signet's policy of writing off accounts receivable is to wait until the accounts become (a) more than 120 days aged on the recency method, and (b) more than 240 days aged on the contractual method.

308.    Thus, Signet's use of the recency method for aging accounts receivables defers the identification of an account as past due.  Further, Signet's policy of not charging the loan off until it is both 120 days past due on a recency basis and 240 days past due on a contractual basis, significantly defers when the Company recognizes the "loss confirming event" (*i.e.*, the charge-off of the uncollectible account receivable).  To illustrate, if a customer failed to make any payments on an account, it would take 30 days for that account to become one day past due, and then another 240 days for it to become 240 days past due – meaning that even in the case of a customer who made no payments it would take Signet nine months (270 days) before it wrote off the account.

309.    Notably, this 270-day minimum period could be extended if the customer made any partial payments under the recency method.  Therefore, in all reality, Signet's accounting policy likely extended the loss-confirming period to at least one year

310.    Notwithstanding the fact that Signet had extremely lenient delinquency and charge-off policies (which delayed the charge-off of losses), Signet's reserves were still consistently less than the confirmed losses it recognized during the preceding twelve months.  In other words, Signet's reserves for losses were consistently less than the actual charge-offs it had recorded on a smaller receivable portfolio during the preceding loss discovery period (*i.e.*, assumed twelve month period).

311.    For example, in Signet's third quarter of its 2017 fiscal year, Signet had a recorded reserve of $133 million for its accounts receivable of $1.7 billion.  Yet – even under its very lenient recency method and its policy of not charging off accounts until they become 240 days past due on the contractual basis – Signet wrote off $195 million for the preceding one-year period loan portfolio, which was slightly smaller at $1.6 billion.  This is strong evidence that Signet's reserves were understated by at least $62 million at the end of the Relevant Period. This is especially so given Signet's assertions that its underwriting and the performance of the portfolio did not change for many years – assertions which further demonstrate that at a minimum the probable uncollectible receivables (the reserve) and related loss experience should be the same as those which very recently occurred (the charge-offs).

312.    Based on an estimated loss discovery period of one year, Signet failed to increase its reserves and related bad debt expense as of the end of each quarter in the Relevant Period in violation of GAAP.  Consequently, Signet's reserves and bad debt expense were understated, and its pre-tax income was overstated, by material amounts throughout the Relevant Period

313.    The following table sets forth the understatements of Signet's reserves for each reporting period in the Relevant Period based on an estimated loss discovery period of one year. The cumulative amount by which Signet's reserve was understated ranged from $30 to $84 million.

| Fiscal Period: | Reserve reported by Signet (in millions): | Charge-offs reported by Signet for the preceding year (in millions): | Understatement of reserve and related bad debt expense (in millions) if cumulative understatement was recognized: |
|---|---|---|---|
| Q2 2014 | $89 | $120 | $31 |
| Q3 2014 | $90 | $125 | $35 |
| Q4 2014 | $98 | $128 | $30 |
| FY 2014 | $98 | $128 | $30 |

| Fiscal Period: | Reserve reported by Signet (in millions): | Charge-offs reported by Signet for the preceding year (in millions): | Understatement of reserve and related bad debt expense (in millions) if cumulative understatement was recognized: |
|---|---|---|---|
| Q1 2015 | $88 | $131 | $43 |
| Q2 2015 | $99 | $135 | $36 |
| Q3 2015 | $103 | $138 | $36 |
| Q4 2015 | $113 | $145 | $32 |
| FY 2015 | $113 | $145 | $32 |
| Q1 2016 | $103 | $150 | $47 |
| Q2 2016 | $116 | $156 | $40 |
| Q3 2016 | $122 | $165 | $43 |
| Q4 2016 | $130 | $174 | $44 |
| FY 2016 | $130 | $174 | $44 |
| Q1 2017 | $117 | $183 | $66 |
| Q2 2017 | $129 | $189 | $59 |
| Q3 2017 | $133 | $195 | $62 |
| Q4 2017 | $139 | $203 | $64 |
| FY 2017 | $139 | $203 | $64 |
| Q1 2018 | $127 | $210 | $83 |
| Q2 2018 | $114 | $198[4] | $84 |

[4] Unlike other balances presented in the table, this amount was derived by annualizing net charge-offs recorded during Signet's quarter ended July 29, 2017. This calculation change was made because Signet's Q2 2018 net charge-offs were based, in part, on the Company's significantly reduced "receivable balance evaluated for impairment." The receivable decrease resulted from Signet's May 25, 2017 reclassification of approximately $1 billion of its "receivable balance evaluated for impairment" to "Accounts Receivable held for sale," made in connection with the outsourcing of its loan portfolio.

314.    Likewise, the following chart reflects the percentage amounts by which Signet's quarterly income and earnings would have decreased at each reporting period in the Relevant Period if Signet had corrected its cumulative understatements of reserves and bad debt expenses.

| Fiscal Period: | Percentage decrease of reported quarterly operating income if cumulative understatement was recognized: | Percentage decrease of reported quarterly pre-tax income if cumulative understatement was recognized: | Percentage decrease of reported net income if cumulative understatement was recognized: | Percentage decrease of reported diluted earnings per share if cumulative understatement was recognized: |
|---|---|---|---|---|
| Q2 2014 | 29% | 29% | 30% | 30% |
| Q3 2014 | 68% | 69% | 69% | 67% |
| Q4 2014 | 11% | 11% | 11% | 11% |
| FY 2014 | 5% | 5% | 5% | 5% |
| Q1 2015 | 29% | 29% | 29% | 29% |
| Q2 2015 | 43% | 51% | 40% | 41% |
| Q3 2015 | 333% | 1874% | 1780% | 1429% |
| Q4 2015 | 10% | 10% | 9% | 9% |
| FY 2015 | 5% | 6% | 5% | 5% |
| Q1 2016 | 27% | 28% | 26% | 26% |
| Q2 2016 | 40% | 45% | 42% | 42% |
| Q3 2016 | 128% | 196% | 186% | 186% |
| Q4 2016 | 11% | 11% | 10% | 10% |
| FY 2016 | 6% | 7% | 6% | 6% |

| Fiscal Period: | Percentage decrease of reported quarterly operating income if cumulative understatement was recognized: | Percentage decrease of reported quarterly pre-tax income if cumulative understatement was recognized: | Percentage decrease of reported net income if cumulative understatement was recognized: | Percentage decrease of reported diluted earnings per share if cumulative understatement was recognized: |
|---|---|---|---|---|
| Q1 2017 | 31% | 33% | 29% | 29% |
| Q2 2017 | 49% | 55% | 47% | 47% |
| Q3 2017 | 194% | 321% | 238% | 274% |
| Q4 2017 | 16% | 17% | 14% | 17% |
| FY 2017 | 8% | 9% | 8% | 10% |
| Q1 2018 | 73% | 82% | 69% | 66% |
| Q2 2018 | 62% | 69% | 64% | 67% |

315.    Notably, an analysis of charge-offs subsequent to each reporting period confirms the understatement of Signet's reserves.  The following table compares each respective reserve to the confirmed losses realized over the relevant, average discovery period (*i.e.*, the subsequent twelve month period):

| Fiscal Period: | Reserve reported by Signet (in millions): | Charge-offs reported by Signet for the subsequent year (in millions): | Understatement of reserve if cumulative understatement was recognized (in millions): |
|---|---|---|---|
| Q2 2014 | $89 | $135 | $46 |
| Q3 2014 | $90 | $138 | $49 |
| Q4 2014 | $98 | $145 | $47 |

| Fiscal Period: | Reserve reported by Signet (in millions): | Charge-offs reported by Signet for the subsequent year (in millions): | Understatement of reserve if cumulative understatement was recognized (in millions): |
|---|---|---|---|
| FY 2014 | $98 | $145 | $47 |
| Q1 2015 | $88 | $150 | $63 |
| Q2 2015 | $99 | $156 | $57 |
| Q3 2015 | $103 | $165 | $63 |
| Q4 2015 | $113 | $174 | $61 |
| FY 2015 | $113 | $174 | $61 |
| Q1 2016 | $103 | $183 | $79 |
| Q2 2016 | $116 | $189 | $73 |
| Q3 2016 | $122 | $195 | $73 |
| Q4 2016 | $130 | $203 | $73 |
| FY 2016 | $130 | $203 | $73 |
| Q1 2017 | $117 | $211 | $94 |
| Q2 2017 | $129 | $218 | $88 |

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS WITH RESPECT TO THE CREDIT QUALITY FRAUD

316. Throughout the Relevant Period, Defendants made numerous materially false and misleading statements and omissions including those concerning: (1) the quality and risks of Signet's in-house credit portfolio and underwriting; and (2) the Company's financial performance and accounting, including its reserves and earnings.

A.      **Materially False And Misleading Statements And Omissions Concerning The Second Quarter Fiscal 2015**

317.    On August 28, 2014, Signet issued a press release entitled, "Signet Jewelers Reports Second Quarter Financial Results" (the "Second Quarter 2015 Press Release").  On that same day, the Company filed with the SEC a Form 8-K (the "Second Quarter 2015 Form 8-K"), which Defendant Santana signed, that attached the press release as an exhibit.  The Second Quarter 2015 Press Release and the Second Quarter 2015 Form 8-K reported diluted EPS of $0.72, down 14.3% due to one-time expenses from the Zale acquisition, and organic EPS of $1.00.   The Company also reported net income of $58.0 million, operating income of $83.5 million, and income before taxes of $69.8 million.

318.    The financial results set forth above were materially misstated.   Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 40%, its operating income was overstated by 43%, its income before taxes was overstated by 51% and its diluted EPS was overstated by 40%, as set forth above.

319.    Thereafter, on September 10, 2014, Signet filed with the SEC its Form 10-Q for the quarter ended August 2, 2014 (the "Second Quarter 2015 Form 10-Q"), which was signed by Defendant Barnes and Defendant Santana.   The Second Quarter 2015 Form 10-Q reported the same financials set forth above. The Second Quarter 2015 Form 10-Q also reported allowance for credit losses of $98.9 million, a 7% valuation allowance of gross receivables, and year-to-date net bad debt expense of $64.1 million.

320.    Those metrics were materially understated by the amounts and for the reasons set forth above.

321.    In the Second Quarter 2015 Press Release Defendants made additional misleading statements concerning Signet's credit portfolio.  For instance, the press release provided that

> The net bad debt as a percentage of the division's total sales increased to 3.7% in year to date Fiscal 2015 compared to 3.6% in year to date Fiscal 2014, driven primarily by growth in the

outstanding receivable balance from increased credit penetration. <u>The portfolio continues to perform strongly as evidenced by the allowance for doubtful accounts as a percentage of ending accounts receivable decreasing 20 basis points from 7.2% as of August 3, 2013 to 7.0% as of August 2, 2014.</u>

322.    These statements were materially misleading.  It was materially misleading to state that the "portfolio continues to perform strongly," and to point to the purportedly low allowance figures as "evidence," when that allowance figure was materially understated, and the portfolio contained hundreds of millions of dollars' worth of high-risk subprime loans.

323.    On August 28, 2014, Defendants held a conference call with investors to discuss second quarter fiscal 2015 results (the "Second Quarter 2015 Conference Call").  During the conference call Defendants made additional misleading statements regarding Signet's credit portfolio.   Specifically, Defendant Santana noted the year-over-year increase in the credit penetration rate from 57.1% to 60%, and attributed this increase

> primarily to the credit decision engine improvements, higher outlet participation and strong guest acceptance of our credit offerings. We have recently invested in a new decision engine, which preserves credit requirements, but more accurately scores applications, <u>which yields more qualified customers. . . . Operating improvements made to the decision engine have helped increase credit penetration without adversely affecting the net impact of bad debt.</u>

324.    This statement was materially false and misleading.  It was materially misleading to tout the new decision engine as yielding "more qualified customers" and increasing "credit penetration without adversely affecting the net impact of bad debt," when the Company's net bad debt figures were materially understated, and the Company was continuing to generate massive amounts of high-risk subprime loans.

### B.    Materially False And Misleading Statements And Omissions Concerning The Third Quarter Fiscal 2015

325.    On September 4, 2014, Signet participated in a Goldman Sachs Global Retailing Conference (the "Fiscal 2015 Retailing Conference"), during which analysts asked about the performance of the Company's credit book.  Defendant Santana stated that

> our credit portfolio continues to perform very strong. Our credit is a key enabler of our sales, and we really do view it as one of the competitive advantages we have. And the value that a credit customer brings to our Sterling Jewelers division is about 3.5 times that of a noncredit customer.

326.    This statement was materially misleading.  Contrary to the statement that the "credit portfolio continues to perform very strong," the portfolio contained several hundred million dollars' worth of high-risk subprime loans.

327.    Also during the Fiscal 2015 Retailing Conference, Defendant Santana made materially misleading statements concerning operating changes the Company made to its credit decision mechanism, meant to assure investors that despite the increase in the credit penetration rate, the quality of Signet's borrowers remained strong.  Santana specifically stated:

> One of the investments we recently had made was in our decision engine, and we've really been seeing the return on that investment. And in our last call, we talked about our credit penetration rate had increased up to 62%, and that really is driven by the investments we've made on the front end. And our investment there maintains that credit quality that we absolutely have to be robust about. But, what it does is it's a little bit more in terms of how it scores the accuracy of scoring an applicant. So, we're pulling in more of these quality customers into our portfolio.

328.    This statement was materially misleading.  Contrary to Defendants' statement that the investment made in the credit decision engine "maintains that credit quality that we absolutely have to be robust about," Signet sought to drive loan volume through the use of reckless underwriting practices, and issued huge amounts of loans to high-risk subprime borrowers.  Contrary to Defendants' statement that the Company was "pulling in more of these quality customers into our portfolio," the number of high-risk subprime loans in Signet's portfolio remained enormous throughout the Relevant Period.

329.    During the Fiscal 2015 Retailing Conference, Santana also relied on the Company's misstated allowance for doubtful accounts to convince investors that Signet's credit portfolio was healthy, stating that

> when we think about the performance of our credit portfolio, if
> you actually look at our allowance as a percentage of our accounts
> receivable, we actually had an improvement there of about 20
> basis points over last year. So, it continues to perform strong, and I
> think there's great things to come from our credit portfolio.

330.    These statements were materially misleading.  It was materially misleading to state that the "portfolio continues to perform strong," and to point to the purportedly low allowance figures as a credit quality indicator, when that allowance figure was materially understated and the portfolio contained hundreds of millions of dollars' worth of high-risk subprime loans.

331.    On November 25, 2014, Signet issued a press release entitled "Signet Jewelers Reports Third Quarter Fiscal 2015 Financial Results" (the "Third Quarter 2015 Press Release"). On that same day, the Company filed with the SEC a Form 8-K (the "Third Quarter 2015 Form 8- K"), signed by Defendant Santana, that attached the press release as an exhibit.  The Third Quarter 2015 Press Release and the Third Quarter 2015 Form 8-K reported adjusted EPS of $0.21 and pre-adjusted loss per share of $0.02 due to transaction costs in relation to the Zale acquisition.  The Company also reported a net loss of $1.3 million, operating income of $10.7 million, and a loss before taxes of $1.9 million.

332.    The results set forth above were materially misstated.  Specifically, as a result of Signet's cumulative understatements of its reserve, its net loss was understated by 1780%, its operating income was overstated by 333%, its loss before taxes was understated by 1874%, and its loss per share was understated by 1429%, as set forth above.

333.    The Third Quarter 2015 Form 8-K also reported an allowance for credit losses as a percentage of ending accounts receivable as 7.4% for year-to-date fiscal 2015.  This metric was materially understated for the reasons set forth above.

334.    On December 8, 2014, the Company filed with the SEC its Form 10-Q for the period ending November 1, 2014 (the "Third Quarter 2015 Form 10-Q"), which was signed by Defendant Santana.  The Third Quarter 2015 Form 10-Q reported the same financial results set forth above.  The Third Quarter 2015 Form 10-Q also reported an allowance for credit losses of

$102.6 million, a 7.4% valuation allowance as a percentage of gross receivables for the quarter, and year-to-date net bad debt expense of $105.8 million.

335.    These metrics were materially understated by the amounts and for the reasons set forth above.

336.    The Third Quarter 2015 Press Release and the Third Quarter 2015 Form 8-K contained additional misleading statements concerning the health of Signet's credit portfolio as related to its bad debt valuation allowance.  For instance, in the Third Quarter 2015 Press Release, Defendants stated that the "portfolio performed strongly as evidenced by the allowance for doubtful accounts as a percentage of ending accounts receivable decreasing 10 basis points to 7.4% as of November 1, 2014 from 7.5% as of November 2, 2013."

337.    These statements were materially misleading.  Like the statements Defendant Santana made earlier in the year at the Fiscal 2015 Retailing Conference, it was materially misleading to state that the "portfolio performed strongly," and to point to the purportedly low allowance figures as "evidence," when that allowance figure was materially understated, and the portfolio contained hundreds of millions of dollars' worth of high-risk subprime loans.

338.    On or about January 12, 2015, Signet participated in the ICR Xchange Conference in Orlando Florida.  For this conference, Signet provided a presentation, which included material misstatements or omissions, in particular, with respect to its credit portfolio, Signet stated that it was "focused on selling jewelry, not credit" and that its credit system was "resilient."  Signet made additional statements about its credit system, including that it was in-house, and touted the credit system as a positive to the Company.  These statements were materially misleading, as they failed to include that Signet's credit portfolio was of poor quality, was not well managed, and had poor underwriting standards.

339.    These statements were also false and misleading as Signet, in fact, was focused on selling credit as demonstrated by revelations of its low to nonexistent underwriting practices and guidelines, and by information from Former Employees that Signet was pushing credit.  It was materially misleading to state that credit was a competitive strength or that the portfolio was

managed effectively, when credit was in fact a risk to the company, and the portfolio was being managed per poor to non-existent underwriting practices and guidelines.

### C.  Materially False And Misleading Statements And Omissions Concerning The Fourth Quarter And Full Fiscal Year 2015

340.  On March 26, 2015, Signet issued a press release entitled "Signet Jewelers Reports Excellent Fourth Quarter And Strong Fiscal 2015 Financial Results" (the "Fourth Quarter 2015 Press Release").  On that same day, Signet filed with the SEC a Form 8-K (the "Fourth Quarter 2015 Form 8-K"), which Defendant Santana signed, that attached the press release as an exhibit.  In the Fourth Quarter 2015 Press Release and Fourth Quarter 2015 Form 8-K, the Company reported diluted EPS of $2.84, net income of $228.0 million, operating income of $331.7 million, and income before taxes of $323.8 million for the fourth quarter.

341.  The results set forth above were materially misstated.  Specifically, as a result of Signet's understatements of its reserve, its fourth quarter 2015 net income was overstated by 9%, its operating income was overstated by 11%, its income before taxes was overstated by 10%, and its diluted EPS was overstated by 9%.

342.  For the full fiscal year, the Company reported diluted EPS of $4.75, net income of $381.3 million, operating income of $576.6 million, and income before taxes of $540.6 million.

343.  The results set forth above were materially misstated.  Its full year net income was overstated by 5%, its operating income was overstated by 5%, its income before taxes was overstated by 6%, and its diluted EPS was overstated by 5%, as set forth above.

344.  Also on March 26, 2015, Signet filed with the SEC its Form 10-K for the year ended January 31, 2015 (the "Fiscal 2015 Form 10-K"), which was signed by Defendant Light and Defendant Santana.  The Fiscal 2015 Form 10-K reported allowance for credit losses of $113.1 million, a 6.8% valuation allowance as a percentage of receivables, and year-to-date net bad debt expense of $160.0 million.

345.  Those metrics were materially understated by the amounts and for the reasons set forth above.

346.    That same day, Defendants held a conference call with investors to discuss fourth quarter and full-year fiscal 2015 financials (the "Fourth Quarter 2015 Conference Call"). During the conference call, Defendants made additional misleading statements concerning Signet's credit portfolio.  Specifically, Defendant Santana stated that

> [o]perating improvements made to our decision engine have helped increase credit penetration and profit without adversely affecting the net impact of our bad debt for the full year. Now on a quarterly basis the net impact of bad debt and interest income was about flat and that's due primarily to the timing of recoveries which have been realized in the first quarter of fiscal 2016. The portfolio continues to perform very strongly for us and that's evidenced by the allowance as a percentage of our ending accounts receivable finishing nearly flat to last year.

347.    These statements were materially misleading.  It was materially misleading to state that the improvements made to the decision engine "helped increase credit penetration and profit without adversely affecting the net impact of our bad debt," when the Company's net bad debt figures were materially understated, and the Company  was continuing to generate massive amounts of high-risk subprime loans.

### D.    Materially False And Misleading Statements And Omissions Concerning The First Quarter Fiscal 2016

348.    On May 28, 2015, Signet issued a press release entitled "Signet Jewelers Reports Strong First Quarter Financial Results" (the "First Quarter 2016 Press Release").  On the same day, the Company filed with the SEC a Form 8-K (the "First Quarter 2016 Form 8-K"), which Defendant Santana signed, that attached the press release as an exhibit.  The First Quarter 2016 Press Release and the First Quarter 2016 Form 8-K reported diluted EPS of $1.48, net income of $118.8 million, operating income of $176.2 million, and income before taxes of $165.2 million.

349.    The results set forth above were materially misstated.  Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 26%, its operating

income was overstated by 27%, it income before taxes was overstated by 28% and its diluted EPS was overstated by 26%, as set forth above.

350.    On June 3, 2015, Signet filed with the SEC its Form 10-Q for the quarter ended May 2, 2015 (the "First Quarter 2016 Form 10-Q"), which was signed by Defendant Light and Defendant Santana.  The First Quarter 2016 Form 10-Q reported the same misstated financial results set forth, above.  The First Quarter 2016 Form 10-Q also reported allowance for credit losses of $103.3 million, a 6.5% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $28.1 million.

351.    Those metrics were materially understated by the amounts and for the reasons set forth above.

352.    Later on May 28, 2015, Defendants held a conference call with investors to discuss first quarter fiscal 2016 financials (the "First Quarter 2016 Conference Call").  During the call, Defendants repeated the financials set forth in the First Quarter 2016 Press Release, and made additional misleading statements concerning Signet's credit portfolio.

353.    Specifically, Defendant Santana again relied on the Company's valuation allowance to represent to investors that the Company's credit portfolio was performing well:

> Net bad debt expense for the quarter was $28.1 Million compared to $22.3, last year, an increase in $5.8 Million. And that was driven primarily by the growth in receivables balance from increased penetration and change in the credit program mix. Other operating income was $63.5 Million compared to $54m last year. This was an increase of $9.5 Million and is due primarily to more interest income on the higher outstanding receivables as well as the shift away from interest-free programs. So the net impact of these two items was income of $35.4 Million compared to $31.7 Million in the prior year or an increase of $3.7 Million. Our portfolio continues to perform well as evidenced by the net impact of bad debt and other operating income as well as the allowance as a percentage of accounts receivable being fairly consistent.

354.    This statement was materially false and misleading.  It was materially misleading to state that the "portfolio continues to perform well," and to point to the purportedly low net bad debt and allowance figures as "evidence," when those figures were materially understated,

and the Company's extremely risky lending to subprime borrowers had created a material risk to the Company.

355.    On or about June 24, 2015, Signet presented at the Signet Institutional Investor Conference in New York, New York.   As part of that conference, Signet issued a slide presentation for "New York Investor Day."   In that presentation, Signet stated that they "effectively managed our credit portfolio" and stated that their in-house credit system was a competitive strength.   Those statements were false or materially misleading; it was materially misleading to state that credit was a competitive strength when Signet's credit figures were materially understated, and the Company's extremely risky lending to subprime borrowers had created a material risk to the Company.

E.    **Materially False And Misleading Statements And Omissions Concerning The Second Quarter Fiscal 2016**

356.    On August 27, 2015, Signet issued a press release entitled "Signet Jewelers Reports Second Quarter Financial Results" (the "Second Quarter 2016 Press Release").   That same day, Signet filed with the SEC a Form 8-K (the "Second Quarter 2016 Form 8-K"), signed by Defendant Santana, that included the press release as an exhibit.  The Second Quarter 2016 Press Release and Second Quarter 2016 Form 8-K reported diluted EPS of $0.78, exceeding guidance for the quarter.   The Company also reported pre-tax income of $89.7 million, net income of $62.2 million, and operating income of $100.8 million.

357.    The results set forth above were materially misstated.   Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 42%, its operating income was overstated by 40%, its income before taxes was overstated by 45%, and its diluted EPS was overstated by 42%, as set forth above.

358.    On September 3, 2015, the Company filed with the SEC its Form 10-Q for the quarter ended August 1, 2015 ("Second Quarter  2016 Form 10-Q"), which was signed by Defendant Light and Defendant Santana.   The Second Quarter 2016 Form 10-Q reported the same financial results set forth above.   The Second Quarter 2016 Form 10-Q also contained

reported allowance for credit losses of $116.0 million, a 7.3% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $77.5 million.

359.    Those metrics were materially understated by the amounts and for the reasons set forth above.

360.    On August 27, 2015, the Company held a conference call with investors to discuss its fiscal 2016 second quarter results (the "Second Quarter 2016 Conference Call").  On that call, Defendant Santana made misleading statements designed to ensure investors that the credit quality of the Company's consumer loan portfolio was strong and healthy.

361.    For instance, Defendant Santana made false and misleading statements regarding the Company's allowance for doubtful accounts as a percentage of accounts receivable:  "The allowance as a percentage of AR of 7.3% increased over last year due to timing. That is, in Q2 last year accounts receivable grew due to the credit decision engine introduction; but the bad debt that would come with any AR growth lagged. So this created an unusually low percentage last year, which we are now lapping."

362.    This statement was materially false and misleading.  It was false to state that the Company's prior allowance was "unusually low" when it was, in fact, materially understated.

### F.    Materially False And Misleading Statements And Omissions Concerning The Third Quarter Fiscal 2016

363.    On November 24, 2015, Signet issued a press release entitled "Signet Jewelers Reports Third Quarter Financial Results" ("Third Quarter 2016 Press Release").  That same day, Signet filed with the SEC a Form 8-K ("Third Quarter 2016 Form 8-K"), which Defendant Santana signed, that included the press release as an exhibit.  The Third Quarter 2015 Press Release and the Third Quarter 2015 Form 8-K reported diluted EPS of $0.19.   The Company also reported net income of $15 million, operating income of $33.6 million, and income before taxes of $21.9 million.

364.    The financial results set forth above were materially misstated.  Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 186%, its

operating income was overstated by 128%, its income before taxes was overstated by 196%, and its diluted EPS was overstated by 186%, as set forth above.

365.    Thereafter, on December 4, 2015, Signet filed with the SEC its Form 10-Q for the quarter ending October 31, 2015 ("Third Quarter 2016 Form 10-Q"), which was signed by Defendant Light and Defendant Santana.  The Third Quarter 2016 Form 10-Q reported the same financial results set forth above.  The Third Quarter 2016 Form 10-Q also reported allowance for credit losses of $122.2 million, a 7.8% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $130.6 million.

366.    Those metrics were materially understated by the amounts and for the reasons set forth above.

367.    On November 24, 2015, Defendants held a conference call with investors to discuss third quarter fiscal 2016 results ("Third Quarter 2016 Conference Call").  Defendants repeated the results in the Third Quarter 2015 Press Release and the Third Quarter 2015 Form 8-K.  On the call, Defendant Santana addressed Signet's credit portfolio and made misleading statements meant to quell market concern:

> Our credit approval standards remain disciplined and unchanged. The higher participation rate was primarily driven by a greater increase of Kay customers compared to our Jared customers. The average monthly collection rate was 11.7% compared to 12.1% due to two main reasons. First, as our mix or bridal increases due to our best in bridal strategy this creates a higher average receivable. By design the repayment rate is lower as the price point of the merchandise increases. Bridal has a higher average credit sale and therefore the repayment is longer, so this leaves a higher outstanding receivable to be collected. And second, like other consumer loans more principle is paid off later in the life of the loan. So as our credit portfolio has grown more in the last year proportionally more of it will be paid later. . . . Importantly Signet has not changed its credit standards and our credit portfolio continues to perform well and profitably.

Santana again stated later during the call that

> [n]o changes have been made in our credit standards and the bottom line is that small changes had a more pronounced impact in

the third quarter as the third quarter is our smallest quarter but our credit earnings are earned more evenly throughout the year. . . . We remain highly disciplined in our approval process and as a result our credit portfolio continues to be profitable and stable.

368.    Those statements were materially false and misleading.    Contrary to Defendants' statements that the Company's "credit approval standards remain disciplined and unchanged" and that Defendants "remain highly disciplined in our approval process," the Company sought to drive loan volume through the use of reckless underwriting practices. Further, contrary to Defendants' statements that the credit portfolio "continues to perform well and profitably," and "continues to be profitable and stable," the Company's reckless lending generated several hundred million dollars' worth of high-risk subprime loans that posed a material risk to Signet.

### G.    Materially False And Misleading Statements And Omissions Concerning The Fourth Quarter And Full Fiscal Year 2016

369.    On January 7, 2016, Defendants held a conference call with investors to discuss holiday results (the "Fiscal 2016 Holiday Conference Call").  Early in the call, Defendant Santana addressed Signet's credit operation, stating that

> [i]n-house credit has long been an important element of Signet's success and we are very proud of the significant sales and earnings the program has delivered in its 30-plus year history. Our credit program offers a competitive advantage for the company."

She then again stated that the Company's credit portfolio is "profitable and the performance in Q4 is very much in line with our expectations."

370.    These statements were materially false and misleading.  It was materially false and misleading to state that the portfolio was "profitable" when the portfolio contained hundreds of millions of dollars' worth of high-risk subprime loans with substantial unrecognized losses.

371.    Also during the Fiscal 2016 Holiday Conference Call, Defendant Santana made misleading statements meant to address market skepticism surrounding the Company's

credit metrics for the third quarter of fiscal 2016.  In response to an analyst question about the possibility of outsourcing the credit business Santana stated that

> the modest mix shift that we saw in Q3 . . . was really magnified . . . given the small size of the quarter in Q3 which was only about 5% of our annual operating income. And that we had mentioned in Q4 the effect of that would be immaterial all of which was factored into our guidance at that point and continues to be factored into our guidance. <u>The credit portfolio as I mentioned is performing exactly very much so in line with our expectations . We're very pleased with the performance. Early on the initiatives that we put forth to favorably influence that mix seem to be working in the right direction and again I just go back to our credit portfolio remains extremely profitable.</u>

372.    Those statements were materially misleading.  Contrary to statements that the credit portfolio "is performing exactly very much so in line with our expectations," and that the "portfolio remains extremely profitable," the portfolio contained several hundred million dollars' worth of high-risk subprime loans with significant undisclosed losses.

373.    In addition to Defendant Santana's misleading statements regarding the health of Signet's credit portfolio, Defendant Light made statements meant to quell investor concern. Specifically, Defendant Light stated that

> I just wanted to reinforce something that Michele said and I think it's very important that everybody understands this. We've been running a credit portfolio for well over 30 years, well over 30 years and we've been through good times and bad times with the recession and we've been able to manage our accounts receivable appropriately and arguably better than most during all times within the last 30-plus years.
>
> So this credit as Michele said there's modest shifts going on but there's nothing that's unprecedented for us. So we have every confidence in the way we manage our credit portfolio. I just want to reinforce that because there seems to be some concerns about our credit portfolio, and the profitability of our credit portfolio. I just want to reinforce that because there seems to be some concerns about our credit portfolio and we  just think it's unwarranted quite frankly[.]"

374.    Those statements were materially misleading.  Contrary to the assurance that any "concerns about our credit portfolio" were "unwarranted," Signet had generated huge amounts of subprime loans that posed a material risk to the Company.

375.    Similarly, Santana added that, "so, I really hope with the comments that we mentioned today that it does help to put this credit discussion to minimize it where it should be."  It was materially false and misleading for Santana to "minimize" concern over the credit portfolio because Signet had generated huge amounts of subprime loans that posed a material risk to the Company.

376.    On February 29, 2016, Signet issued a press release entitled "Signet Jewelers Announces Strong Fourth Quarter Preliminary Results" ("Preliminary Fourth Quarter 2016 Press Release").  On the same day, Signet filed with the SEC a Form 8-K ("Preliminary Fourth Quarter 2016 Form 8-K"), which was signed by Defendant Santana and attached the Preliminary Fourth Quarter 2016 Press Release as an exhibit.  The Preliminary Fourth Quarter 2016 Press Release and Preliminary Fourth Quarter 2016 Form 8-K reported EPS of $3.42.  The Preliminary Fourth Quarter 2016 Press Release and Preliminary Fourth Quarter 2016 Form 8-K also reported allowance for credit losses as 7.0% of gross receivables and a fourth quarter bad debt expense of $60 million.

377.    Signet's fourth quarter EPS was materially misleading because it was overstated by 10% as a result of Signet's understatements of its reserves.  Further, Signet's allowance for credit losses and bad debt expense were materially understated for the reasons set forth above.

378.    Thereafter, on March 24, 2016, Signet issued a press release entitled "Signet Jewelers Reports Excellent Fourth Quarter and Fiscal 2016 Financial Results" ("Fourth Quarter 2016 Press Release").  On the same day, Signet filed with the SEC a Form 8-K ("Fourth Quarter 2016 Form 8-K"), which was signed by Defendant Santana and attached the press release as an exhibit.  The Fourth Quarter 2016 Press Release and the Fourth Quarter 2016 Form 8-K reported diluted EPS of $3.42, net income of $271.9 million, operating income of $393.1 million, and income before taxes of $381.0 million for the fourth quarter.  The Company

also reported allowance for credit losses of $130 million, a 7% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $190.5 million.

379.   Those results were materially misstated.  Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 10%, its operating incoming was overstated by 11%, its income before taxes was overstated by 11%, and its diluted EPS was overstated by 10%, as set forth above.  Further, as set forth above, the Company's allowance for credit losses and bad debt expense were materially understated.

380.   For the full fiscal 2016 year, the Fourth Quarter 2016 Press Release and the Fourth Quarter 2016 Form 8-K also reported net income of $467.9 million, operating income of $703.7 million, income before taxes of $657.8 million, and diluted EPS of $5.87.  For the full fiscal year, the Company reported net bad debt expense of $190.5 million.

381.   Those results were materially misstated.  Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 6%, its operating incoming was overstated by 6%, its income before taxes was overstated by 7%, and its diluted EPS was overstated by 6%, as set forth above.  Further, as set forth above, the Company's net bad debt expense was materially understated

382.   Also on March 24, 2016, Signet filed with the SEC its Form 10-K for the fiscal year ended January 30, 2016 ("Fiscal 2016 Form 10-K"), which was signed by Defendant Light and Defendant Santana.  The Fiscal 2016 Form 10-K repeated many of the same financial results stated above.

383.   The Fourth Quarter 2016 Press Release contained additional false and misleading statements regarding the Company's credit portfolio.  Specifically, Defendant Santana is quoted as saying:

> Our consistency in underwriting is informed by our deep history of borrower behavior data which provides insights into payment patterns where customers have an emotional connection with their jewelry purchases. This provides us with a unique ability to underwrite effectively, capture incremental profitable sales, and develop lifetime customer relationships. . . .  We continue to be

confident in our credit portfolio performance and the competitive advantages associated with our in-house program.

384.    It was materially misleading to tout the Company's "unique ability to underwrite effectively" or that the in-house credit program was a "competitive advantage" when, in truth, Signet had engaged in reckless underwriting, and thus generated hundreds of millions of dollars' worth of high-risk subprime loans.

385.    The Fourth Quarter 2016 Press Release further quotes Santana as defending the Company's use of the recency aging method, specifically that its

> use of the recency aging method optimizes collections and is aligned with our lending terms which require a qualifying payment defined as at least 75% of the scheduled monthly minimum payment and increases with delinquency level. It is important to understand that regardless of aging method, the balance sheet and income statement will yield the same result under US GAAP, as receivables must be stated at the net realizable value.

386.    These statements are materially false and misleading. It was false and misleading to represent that Signet's financial performance would not be affected by the proper application of GAAP, because Signet's financial statements were materially misstated in violation of GAAP.  The proper application of GAAP would have (and as the truth emerged, eventually did) alter the value of Signet's credit portfolio, as Signet's reserves were misstated, and the net realizable value was false and misleading under Signet's improper accounting.

387.    On March 24, 2016, Defendants held a conference call with investors to discuss these results (the "Fourth Quarter 2016 Conference Call").  Santana stated that the Company's

> underwriting standards are proven and have been consistent over a long period of time. This consistency in our underwriting also is demonstrated in our weighed average FICO score for the portfolio. For FY16, our weighted average FICO was 662 and has been in the mid-660s for numerous years. The FICO scores of the new customers in our portfolio in FY 16 at 684 was higher than the average for the total portfolio.

388.     Those statements were materially misleading.  It was materially misleading to tout the supposed proven and consistent nature of Signet's underwriting and the prime FICO scores of its customers, when the Company's underwriting was reckless, and the portfolio contained hundreds of millions of dollars' worth of high-risk subprime loans.

490.  Defendant Santana stated that

> regardless of aging method used over one's portfolio, the balance sheet and income statement will yield the same result, as under US GAAP receivables must be stated at the net realizable value. The net charge-off to the balance sheet and the net bad debt expense in the P&L would be the same under both recency and contractual aging. There is no difference between the two when it comes to our financial statements.

389.     Those statements were materially misleading.  It was false and misleading to represent that Signet's financial performance would not be affected by the proper application of GAAP, because Signet's financial statements were materially misstated in violation of GAAP. The proper application of GAAP would have (and as the truth emerged, eventually did) alter the value of Signet's credit portfolio, as Signet's reserves were misstated, and the net realizable value was false and misleading under Signet's improper accounting.

**H.     Materially False And Misleading Statements And Omissions Concerning The First Quarter Fiscal 2017**

390.     In May 26, 2016, Signet issued a press release titled, "Signet Jewelers Reports Record First Quarter Earnings" ("First Quarter 2017 Press Release").  On the same day, Signet filed with the SEC a Form 8-K ("First Quarter 2017 Form 8-K"), signed by Defendant Santana, which attached the press release as an exhibit.  The First Quarter 2017 Press Release and the First Quarter 2017 Form 8-K reported net income of $146.8 million, operating income of $212 million, income before taxes of $200.2 million, and diluted EPS of $1.87.

391.     Those financial metrics were materially misstated.  Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 29%, its operating

income was overstated by 31%, its income before taxes was overstated by 33%, and its diluted EPS was overstated by 29%, as set forth above.

392. Those metrics were materially understated by the amounts and for the reasons set forth above.

393. On May 26, 2016, Defendants held a conference call with investors to discuss first quarter fiscal 2017 earnings (the "First Quarter 2017 Conference Call"). During the First Quarter 2017 Conference Call, Defendants responded to analyst questions about outsourcing their credit portfolio. Defendant Light stated

> Our credit metrics in our credit portfolio are strong. As we said our credit metrics are improving sequentially and within our expectations and all we fought for and involved in our earnings guidance both on a quarterly basis and on an annual basis. So our credit metrics are strong. . . . [T]he reason why we're doing this credit project, your point is, yes, we have had some good experience with ADS. We've had a full quarter now under our belt where ADS has been managing our entire credit portfolio for Zales from January through now, we're having some good experiences and we're learning more. . . . [W]e're an evolving company. We're always looking for ways to better improve our business part of our business. That being said, we always feel there's ways of us getting smarter and understanding more about our business and we've also seen other major retailers out there, and I'm sure a lot of you know of them, that have carried internal receivables and have sold their receivables and have done work with receivables of recent and we've just understand [sic] there's an evolution going on and we want to make sure that we're on top of it. . . . Credit is no different. We've done major credit analysis in the past. So as we mentioned, as I mentioned in our remarks, possible outcomes could be outsourcing of all of our credit functions, possible outcomes could be some in- housing of our credit functions, some would be outsourced.

394. Those statements were materially misleading. Contrary to the statements that the "credit metrics in our credit portfolio are strong," as a result of Defendants' reckless lending practices, the portfolio contained several hundred million dollars' worth of high-risk subprime loans that posed a material risk to Signet.

395.    During the First Quarter 2017 Conference Call, another analyst asked about accounts receivable aging and the "reality of using the recency accounting methodology" in terms of what Defendants are "seeing in your portfolio."  Defendant Santana responded, stating:

> <u>Regardless of recency or contractual, whatever method you are on, the financial results are going to yield the same answer. The provision will be the same, our bad</u> debt expense will be the same. . . . The reason why we use our recency is one, we have done it since the beginning of time. And it really has worked well for us over the years with the type of lending that we do, jewelry lending that emotional connection and it does optimize our collections for us. So with the use of recency it does help us to engage with the borrower, start collecting quicker. . . . Now we will continue and when you see the 10-Q that we plan to file within the next week or so in the footnote you'll see the same type of a breakdown of our aging. So we've continued to provide the 30 day, 60, 90, etc.

396.    This statement was materially misleading.   It was false and misleading to represent that Signet's financial performance would not be affected by the proper application of GAAP, because Signet's financial statements were materially misstated in violation of GAAP. The proper application of GAAP would have (and as the truth emerged, eventually did) alter the value of Signet's credit portfolio, as Signet's reserves were misstated, and the net realizable value was false and misleading under Signet's improper accounting.

397.    On June 3, 2016, Signet filed with the SEC its Form 10-Q for the quarter ended April 30, 2016 ("First Quarter 2017 Form 10-Q"), which was signed by Defendant Light and Defendant Santana.  The First Quarter 2017 Form 10-Q repeated the financials stated above.  The First Quarter 2017 Form 10-Q also reported allowance for credit losses of $116.8 million, a 6.6% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $33.6 million.

398.     Those metrics were materially understated by the amounts and for the reasons set forth above.

399.    Marcato actually relied on these reassurances in purchasing Signet common stock starting on June 6, 2016.

**SIGNET'S MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS REGARDING THE ACTIONS AND THE CULTURE OF SEXUAL HARASSMENT AT SIGNET**

400. Throughout the Relevant Period, Defendants made numerous materially false and misleading statements and omissions including those concerning: (1) the culture of sexual harassment at Signet, including the nature and risks of the lawsuits it was facing; and (2) the conduct of its business, particularly as it related to ethical standards and sexual harassment.

**A. Materially False And Misleading Statements And Omissions in the Fiscal 2016 Form 10-K**

401. On March 24, 2016, Signet filed with the SEC its Form 10-K for the fiscal year ended January 30, 2016 ("Fiscal 2016 Form 10-K"), which was signed by Defendant Light and Defendant Santana.

402. In this filing, Signet made false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Fiscal 2016 Form 10-K, Signet made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion.
>
> * * *
>
> Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. The EEOC 's lawsuit alleges that SJI

> engaged in intentional and disparate impact gender discrimination
> with respect to pay and promotions of female retail store
> employees from January 1, 2003 to the present.
>
> \* \* \*
>
> SJI denies the allegations of the Claimants and EEOC and has
> been defending these cases vigorously. At this point, no outcome
> or possible loss or range of losses, if any, arising from the
> litigation is able to be estimated.

403. This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

404. Also in the Fiscal 2016 Form 10-K, Signet provided that it was exposed to the following risk factor (bold and italics in original):

> ***Loss of confidence by consumers in Signet's brand names**, poor
> execution of marketing programs and reduced marketing
> expenditure **could have a detrimental impact on sales.***
>
> Primary factors in determining customer buying decisions in the
> jewelry sector include customer confidence in the retailer and in
> the brands it sells, together with the level and quality of customer
> service. The ability to differentiate Signet's stores and merchandise
> from competitors by its branding, marketing and advertising
> programs is an important factor in attracting consumers. If these
> programs are poorly executed, the level of support for them is
> reduced, or the customer loses confidence in any of Signet's
> brands for whatever reason, it could unfavorably impact sales and
> earnings.

405. This statement was materially false and misleading. It was materially false and misleading for Signet to represent that the risk of customers losing confidence in the Company's brands was merely hypothetical when Signet knew that it was, in fact, already facing a highly material risk that customers would lose confidence in its brands. Indeed, as set forth above, Signet knew that there was a pervasive culture of sexual harassment at the Company, and that this information was highly likely to become public.

406. The Fiscal 2016 Form 10-K further provided that Signet was exposed to the following additional risk factor (bold and italics in original):

> ***Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders whose behavior may be affected by its management of social, ethical and environmental risks.***
>
> Social, ethical and environmental matters influence Signet's reputation, demand for merchandise by consumers, the ability to recruit staff, relations with suppliers and standing in the financial markets. Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders: customers, shareholders, employees and suppliers. In recent years, stakeholder expectations have increased and Signet's success and reputation will depend on its ability to meet these higher expectations. Signet's success also depends upon its reputation for integrity in sourcing its merchandise, which, if adversely affected could impact consumer sentiment and willingness to purchase Signet's merchandise.

407. This statement was materially false and misleading. It was false and misleading for Signet to represent that that the behavior of stakeholders, including "employees," "may be affected by its management of social, ethical, and environmental risks," when this risk had already materialized, and Signet's "employees" already <u>had</u> been affected by the Company's pervasive culture of sexual harassment.

B. **Materially False And Misleading Statements And Omissions in the First Quarter 2017 Form 10-Q**

408.    On June 3, 2016, Signet filed with the SEC its Form 10-Q for the quarter ended April 30, 2016 ("First Quarter 2017 Form 10-Q"), which was signed by Defendant Light and Defendant Santana.

409.    Marcato began purchasing stock at inflated prices after this filing.

410.    Signet made further false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company.  In the First Quarter 2017 Form 10-Q, Signet made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion.

> \* \* \*

> Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. The EEOC 's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.

> \* \* \*

> SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated.

411.   This statement was materially false and misleading.  It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company.  It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations.  It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

412.   Also in the same filing, Signet stated that "[t]here have been no material changes in our risk factors from those disclosed in Part I, Item 1A, of Signet's Fiscal 2016 Annual Report on Form 10-K, filed with the SEC on March 24, 2016."

413.   This statement incorporates by reference the statements discussed in ¶404 and ¶406.  Those statements remained false and misleading for the reasons identified in ¶405 and ¶407.

### C. <u>Materially False And Misleading Statements And Omissions in the Second Quarter 2017 Form 10-Q</u>

414.   On August 31, Signet filed with the SEC its Form 10-Q for the period ended July 30, 2016 ("Second Quarter 2017 Form 10-Q"), which was signed by Defendant Light and Defendant Santana.

415.   At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company.  In the Second Quarter 2017 Form 10-Q, Signet made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an

unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that <u>US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender.</u> In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. <u>The Claimants filed a motion for class certification and SJI opposed the motion.</u>

* * *

Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. <u>The EEOC 's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.</u>

* * *

SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated.

416.    This statement was materially false and misleading.  It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company.  It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations.  It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

417.    Also in the same filing, Signet stated, with respect to the relevant risk factors, "[t]here have been no material changes in our risk factors from those disclosed in Part I, Item

1A, of Signet's Fiscal 2016 Annual Report on Form 10-K, filed with the SEC on March 24, 2016."

418.    This statement incorporates by reference the statements discussed in ¶404 and ¶406. Those statements remained false and misleading for the reasons identified in ¶405 and ¶407.

## D. Materially False And Misleading Statements And Omissions in the Third Quarter 2017 Form 10-Q

419.    On November 29, 2016, Signet reported additional financial metrics. Specifically, Signet filed with the SEC its Form 10-Q for the quarter ended October 29, 2016 ("Third Quarter 2017 Form 10-Q"), which was signed by Defendant Light and Defendant Santana.

420.    In this filing, Signet made false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company.  In the Third Quarter 2017 Form 10-Q, Signet made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion.

> * * *

> Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. The EEOC 's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.

* * *

> SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated.

421.    This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company.  It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations.  It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

422.    Also in the same filing, Signet stated, with respect to the relevant risk factors, "[t]here have been no material changes in our risk factors from those disclosed in Part I, Item 1A, of Signet's Fiscal 2016 Annual Report on Form 10-K, filed with the SEC on March 24, 2016."

423.    This statement incorporates by reference the statements discussed in ¶404 and ¶406. Those statements remained false and misleading for the reasons identified in ¶405 and ¶407.

424.    Representatives of Marcato directly listened to Signet's conference call with respect to its Third Quarter 2017 results.  On that call, Signet failed to inform investors, including Marcato, about its culture of sexual harassment, violations of company policy, the true subject matter of the Actions, and the degree of reputational and business risk Signet faced from its culture.  Signet's omissions on this call were material to a reasonable investor and rendered Signet's other statements false or misleading.

**Additional False and Misleading Statements Regarding Signet's Code of Conduct**

425.    During the Relevant Period, Signet repeatedly made available to investors its Codes.  The Code of Conduct explained that (i) Signet was committed to a workplace free from sexual harassment, (ii) the Company based its employment and promotion decisions, among other things, "solely" on ability and potential in relation to job needs, (iii) the Company would protect persons who reported ethical concerns and had confidential and anonymous processes for reporting concerns, and (iv) sexual harassers would be disciplined.  As stated above, the Codes also provided specific duties for Signet's officers in enforcing the Codes.

426.    Statements from the Codes were substantially re-adopted each year by the Board and published on Signet's website before and during the Relevant Period.  Signet also incorporated these documents by reference into SEC filings before and during the Relevant Period.  Signet included false statements in re-adopting its Codes, at minimum, on March 3, 2016.

427.    In the Fiscal 2015 Form 10-K, during the Relevant Period, Signet incorporated its false and misleading Codes by reference.

## LOSS CAUSATION

428.    The market price of Signet's publicly traded common stock was artificially inflated by the material misstatements and omissions complained of herein.

429.    Defendants' misstatements and omissions concerning the Company's credit operation artificially inflated the price of Signet's stock.  The artificial inflation in Signet's stock price was removed when the conditions and risks misstated and omitted by Defendants were revealed to the market.

430.    The information regarding credit quality issues was disseminated through a partial disclosure on August 25, 2016, which, only partially, revealed the nature and extent of the subprime quality of Signet's loan portfolio and its inadequate reserves.  This disclosure, more particularly described below, reduced the amount of inflation in the price of Signet's publicly traded stock, causing economic injury to Plaintiffs.

431.     On August 25, 2016, Signet announced disappointing results for the second fiscal quarter 2017.   Specifically, Signet announced that its same store sales had decreased 2.3%, and its total sales had declined 2.6%.   It also reported adjusted earnings of $1.14 per share, far below consensus estimates.   Signet also lowered its fiscal 2017 same-store growth guidance from 2-3.5% growth, to negative 2.5-1.0%.   The Company also announced worsening credit metrics.   It reported that net bad debt expense rose 12% from the prior year, total loan loss reserves increased 12% from the prior quarter, and non-performing loans as a percentage of gross receivables increased more than 22%.     Simultaneously, the Company announced deteriorating credit metrics.  Specifically, Signet reported that net bad debt expense rose 12% from the prior year, driven by higher receivable balances and an increase in non-performing loans. Total allowance for doubtful accounts also increased 12% from the prior quarter, while non-performing loans as a percentage of gross receivables increased more than 22%.

432.     In response to the Company's August 25 announcements, Signet's stock price plummeted on heavy volume.  On August 25, 2016, the Company's stock price fell from the prior day's close of $95.50, to a closing price of $83.44 – a decline of nearly 13% – on volume of nearly 11 million shares.

433.     Signet's August 25, 2016 disclosure partially corrected Defendants' prior materially misleading statements and omissions concerning the credit quality of Signet's loan portfolio, the conservative nature of its underwriting, and the profitability of its credit business. Notwithstanding that partially corrective information, Defendants' prior false statements and omissions continued to operate as a fraud on the market because the August 25, 2016 disclosures failed to disclose that:   (a) Signet had engaged in reckless underwriting and had been systematically issuing loans to subprime borrowers to drive loan volume; and (b) Signet overstated its financial results by failing to properly reserve for delinquent loans in violation of GAAP.

434.    In the alternative, on August 25, 2016, there was a materialization of the otherwise hidden risk of the misrepresented credit quality of Signet's credit portfolio.  As this risk materialized, Signet's stock fell.

435.    With respect to Signet's misrepresentations and omissions regarding the Actions and its culture of sexual harassment, the artificial inflation in Signet's stock price was removed when the conditions and risks misstated and omitted by Defendants were revealed to the market. This information was disseminated via a corrective disclosure on the evening of February 27, 2017, and then the further materialization of the undisclosed risk on at least March 7th, 10th, 13th, and 14th, 2017.

436.    On February 27, 2017, after market close, the *Washington Post* published an article describing the contents of hundreds of sworn Declarations, submitted as part of class certification briefing in the *Jock* Arbitration and made public for the first time – after years of wrangling with Signet – the night before.  The Declarations and the Washington Post Article described a culture of pervasive sexual harassment and gender discrimination at Sterling, and for the first time, provided the market with a comprehensive understanding of that culture of sexual harassment at the Company, including the fact that there was significant evidence demonstrating that it reached to Signet's highest levels.

437.    These revelations shocked the market, and the market reacted immediately. Signet stock closed at $72.88 per share on February 27, 2017, just hours before the Washington Post Article was published.  It opened on the morning of February 28 at $68.90, and, by 11:22 a.m. that day, it was down 8.3% from the previous day's close, to $66.89.  At that time, the Company halted trading pending a press release.  Thirty minutes later, Signet issued a press release stating that the allegations in the article were "misleading" and "inaccurate."  Given all they had learned from the Washington Post Article and the Declarations, investors were not reassured:  Signet stock continued to plummet and, by day's end on February 28, Signet was trading at $63.59, down from the previous day's close of $72.88 by $9.29 per share, or 13%, on extraordinary volume of 11,317,100 shares.

438.    The Washington Post Article also materialized the until-then-undisclosed risk of Signet's pervasive culture of sexual harassment and that the actions against Signet concerned that culture.

439.    In addition, further reporting on Signet's culture of sexual harassment and the true nature of the *Jock* Actions continued from March 7th, and 10th to 14th, leaking additional information into the market.  During this period, Signet stock suffered the foreseeable effects of the revelation of the fraud, and the foreseeable effects of the materialization of the undisclosed risk.

440.    On March 7th, Signet stock declined over 3.5%; from March 10th to 14th, as the news about Signet continued to be dominated by sexual harassment issues, Signet stock declined a collective 3.16%.

441.    Signet's stock price declines on March 7th, and 10th to 14th were the result of information leaking into the market and the materialization of the previously undisclosed risks.

442.    The decline in Signet's stock price on the above dates was a direct and proximate result of Defendants' scheme being revealed to investors and to the market.

443.    Internally, on at least February 28, 2017 and March 2, 2017, Signet lawyers were discussing media coverage of the Jock Arbitration, and Signet's response, indicating that Signet continued to focus on the materialization of this concealed risk into March 2017.

## THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

444.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.  Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

445.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Signet who knew that the statement was materially false or misleading when made.

## **RELIANCE**

### A.  **The Presumption of Reliance/Fraud on the Market**

446.    Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omission of material facts that there was a duty to disclose.

447.    Plaintiffs are also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Relevant Period:

>   a.  Signet's common stock was actively traded in an efficient market on the New York Stock Exchange;
>
>   b.  Signet's common stock traded at high weekly volumes;
>
>   c.  As a regulated issuer, Signet filed periodic public reports with the SEC;
>
>   d.  Signet was eligible to file registration statements with the SEC on Form S-3;
>
>   e.  Signet regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;
>
>   f.  The market reacted promptly to public information disseminated by Signet;

g.  Signet securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;

h.  The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Signet securities; and

i.  Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs purchased or acquired Signet common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

448.  The Court overseeing the Class Action has found, in a July 10, 2019 Order, that Signet stock traded in an efficient market during a period encompassing the Relevant Period here.

449.  Accordingly, Plaintiffs relied, and are entitled to have relied, upon the integrity of the market prices for Signet's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Relevant Period.

**B.  Actual Reliance**

450.  Plaintiffs, through Marcato, actually, read (or heard), reviewed, and relied upon certain of Defendants' misrepresentations prior to purchasing Signet stock.

451.  Prior to purchasing Signet stock for Plaintiffs, one or more employees of Marcato actually read, reviewed and relied upon Signet's public disclosures, investor presentations and financial statements, including Signet's Form 10-K.

452.  During the Relevant Period, employees at Marcato actually relied upon Signet's credit portfolio statements, statements regarding underwriting policies and practices, and quantitative data in deciding to purchase the stock.  Employees at Marcato also actually relied upon the truth and accuracy of Signet's risk disclosures and statements regarding Signet's

litigation issues involving the Actions and Signet's statements regarding its code of conduct, in deciding to purchase the stock.

453.    As Plaintiffs continued to purchase Signet stock throughout and 2016 and 2017, Marcato kept abreast of publicly-disclosed developments concerning Signet, and prior to purchasing stock, as applicable, actually read (or heard), reviewed, and relied upon Signet's SEC filings, publicly released documents and Defendants' comments on calls and conferences, including, but not limited to, the following documents and items:

        a.    Fiscal 2016 Form 10-K
        b.    First Quarter 2017 Press Release
        c.    First Quarter 2017 Form 8-K
        d.    First Quarter 2017 Form 10-Q

454.    When purchasing Signet stock on behalf of Plaintiffs, employees at Marcato, in particular analysts reviewing Signet's stock, actually read (or heard) and justifiably relied on the statements identified immediately above.

455.    Had Marcato known the truth, it would not have purchased Signet common stock on behalf of Plaintiffs or, if it had done so, would not have paid the price it did.

## CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER (Against All Defendants)

456.    Plaintiffs repeat and reallege the paragraphs above as if set forth herein.

457.    This Cause of Action is asserted against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

458.     Defendants both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of Signet common stock; and (iii) cause Plaintiffs to purchase Signet common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct Defendants took the actions set forth above.

459.     Defendants both directly and indirectly:  (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Signet common stock in an effort to artificially inflate and maintain the market prices for Signet common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

460.     By virtue of their high-level positions at the Company, the Executive Defendants were authorized to make public statements, and made public statements on Signet's behalf. These senior executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

461.     In addition, Defendants had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading, including information with respect to Signet's credit portfolio, so that the market price of the Company's securities would be based on truthful, complete and accurate information.

462.     Defendants acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them.  Defendants' material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of

concealing the truth with respect to Signet's credit from the investing public, including misstating the accuracy of Signet's financial statements, the health of the credit portfolio, the accuracy of the loss reserves, and the risk of the credit portfolio to Signet.  By concealing these material facts from investors, Defendants supported the artificially inflated price of Signet common stock.

463.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Signet's common stock.  In ignorance of the fact that the market prices were artificially inflated, and justifiably relying directly or indirectly upon the materially false and misleading statements made by Signet, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiffs purchased Signet common stock at artificially inflated prices.  As a series of partial but inadequate disclosures were issued, the price of Signet's securities substantially declined.

464.    At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs known the truth with respect to the business, operations, performance and prospects of Signet, which was concealed by Defendants, Plaintiffs would not have purchased Signet common stock, or if they had purchased such securities, they would not have done so at the artificially inflated prices that they paid.

465.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

466.    As a direct and proximate result of Defendants, wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in the Company's securities.

467.    Taking into account, inter alia, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.), Plaintiff has brought this claim within two years of discovery

of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

**COUNT II**

**VIOLATIONS OF SECTION 18 OF THE EXCHANGE ACT**
**(With respect to the Form 10-K Filed March 24, 2016)**

468.    Plaintiffs repeat and reallege each and every allegation above as if set forth herein.

469.    As alleged herein, Defendants made or caused statements to be made in Signet's Form 10-K for the fiscal year ended January 30, 2016 concerning Signet's credit portfolio, loss reserves, and risks to Signet from the credit portfolio, which statements were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, or omitted material facts whose omission rendered those statements false and misleading when made.   As alleged herein, Signet's Form 10-K also contained false and misleading statements regarding Signet's risks, culture of sexual harassment, the Actions, and Signet's Code of Conduct (including but not limited to by incorporation).

470.    In purchasing Signet common stock, Plaintiffs' investment team actually read, and had direct eyeball reliance on, Signet's Forms 10-K for the fiscal year ended January 30, 2016.

471.    Specifically, Plaintiffs' investment advisor read and actually relied upon Signet's Form 10-K for the fiscal year ended January 30, 2016 in making each purchase or acquisition set forth in the Exhibits on behalf of Plaintiffs.  Plaintiffs'

472.    In ignorance of the falsity of Defendants statements and omissions, or of the true facts, Plaintiffs purchased Signet common stock in actual, eyeball reliance upon Defendants' representations.

473.    Defendants' materially false and misleading statements and omissions of material fact artificially inflated the price of Signet's common stock.

474.     Had they known the true facts, Plaintiffs would not have purchased Signet common stock and/or would not have purchased them at the inflated prices they paid.

475.     Upon the partial disclosure of the true facts, the prices of Signet common stock dropped, and Plaintiffs suffered damages in an amount to be proven at trial.

476.     By reason of the foregoing, Defendants are liable to Plaintiffs for violations of Section 18 of the Exchange Act, 15 U.S.C. § 78r.

477.     Taking into account, inter alia, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.), Plaintiff has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

## COUNT III

### VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
#### (Against the Executive Defendants)

478.     Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

479.     To the extent that any of Executive Defendants are not found to be liable for any of the statements in the First and Second Causes of Action above, this Count is asserted in the alternative against the Executive Defendants and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

480.     The Executive Defendants were at the time of the wrongs alleged herein each a controlling person of Signet within the meaning of Section 20(a) of the Exchange Act.

481.     As alleged herein, the Executive Defendants caused Signet to violate Sections 10(b) and 18 of the Exchange Act and Rule 10b-5 promulgated thereunder, by making material misstatements and omissions in connection with the purchase and sale of securities.

482.     The Executive Defendants had the power and influence, and did in fact exercise that power and influence, to cause Signet to issue the statements set forth above.

483.     As the CEOs or CFOs of Signet, the Executive Defendants were intimately familiar with, and exercised substantial control over, every aspect of Signet's business.  The Executive Defendants made numerous representations directly to investors about Signet, including its credit portfolio.

484.     By reason of the conduct alleged herein, Signet is liable for violations of Sections 10(b) and 18 of the Exchange Act and Rule 10b-5 promulgated thereunder, and the Executive Defendants are liable based on their control of Signet.

485.     The Executive Defendants culpably participated in Signet's violation of Sections 10(b) and 18 and Rule 10b-5, because they knew or recklessly ignored the true state of Signet's credit portfolio, lending standards, loss reserves, and the risks of the credit portfolio to Signet.

486.     The Executive Defendants are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs for the substantial damages which Plaintiffs suffered in connection with their purchases of Signet common stock.

487.     Taking into account, inter alia, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.), Plaintiff has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

### COUNT IV

### COMMON LAW FRAUD
**(Against All Defendants)**

488.     Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

489.     Defendants made, authorized or caused the representations and/or omissions set forth above.

490.     Those representations and omissions were material.

491.    The material representations set forth above were knowingly made by such Defendants with the intent to deceive, and such Defendants' representations omitted and concealed material statements of fact from Plaintiffs.

492.    Each such Defendant knew its representations were false and/or misleading, and their omissions were material and rendered their representations misleading, at the time they were made or omitted.

493.    Defendants knew that Plaintiffs would receive and rely on such representations, and intended that their false and/or misleading statements would induce Plaintiffs to purchase Signet common stock at inflated prices.

494.    Plaintiffs reasonably and justifiably relied on such misrepresentations and omissions.  Plaintiffs would not have purchased Signet common stock at all, or at the prices they paid, had they known the true facts regarding Signet's credit portfolio.

495.    As a direct and proximate result of such reliance, and these Defendants' fraudulent misconduct, Plaintiffs have suffered damages.

496.    Plaintiffs could not have discovered the true facts until at least such time as corrective information entered the market and thus, where a discovery rule is applicable, Plaintiffs' cause of action did not begin to accrue until such time as corrective information placed them on notice of Defendants' fraud.  Consequently, this action is timely.

497.    As applicable, taking into account, inter alia, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.), Plaintiff has brought this claim within the relevant statute of limitations period.  Consequently, this action is timely.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests relief and judgment, as follows:

(a)    Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b)     Awarding Plaintiffs punitive damages;

(c)     Awarding Plaintiffs their attorneys' fees and costs; and

(d)     Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.


Dated: October 25, 2019
  New York, New York

         **LOWENSTEIN SANDLER LLP**

      By: /s/ *Lawrence M. Rolnick*
        Lawrence M. Rolnick
        Marc B. Kramer
        Richard A. Bodnar
        Jennifer A. Randolph
        Nicole Castiglione
        1251 Avenue of the Americas
        New York, NY 10020
        Tel. 212-262-6700

        &

        Thomas E. Redburn, Jr.
        (*pro hac vice* forthcoming)
        One Lowenstein Dr.
        Roseland, NJ 07068